# PDF No. 1: **AMENDED COMPLAINT**

**Plaintiff: DENIEL SHUMEIKO**

**Defendant: DEUTSCHE BANK TRUST COMPANY AMERICAS**

# TABLE OF CONTENTS


SUMMARY OF CLAIMS ........ 3

I. JURISDICTION AND VENUE ........ 4

II. NATURE OF THE ACTION ........ 5

III. STATEMENT OF FACTS ........ 7

A–M. Factual Background, Historical Conduct, Recovery Framework, U.S. Enforcement Proceedings, Federal Policy, and Timeliness ........ 7–46

IV. CAUSES OF ACTION ........ 46

COUNT I: Breach of Fiduciary Duty – Duty of Loyalty and Care ........ 46

COUNT II: Fraudulent Misrepresentation and Concealment; Constructive Fraud in the Alternative ........ 50

COUNT III: Gross Negligence ........ 53

COUNT IV: Breach of the Deposit Agreement and, in the Alternative, Breach of the Implied Covenant of Good Faith and Fair Dealing ........ 56

COUNT V: Unjust Enrichment (Pled in the Alternative) ........ 61

V. PRAYER FOR RELIEF ........ 64

A–H. Injunctive, Declaratory, Monetary, Discovery, Accounting, Disgorgement, and Further Relief ........ 64–70

JURY TRIAL DEMANDED ........ 70

INDEX OF EXHIBITS ........ 72–73

A–H – Previously Filed Exhibits, Resubmitted with Updated Cover Descriptions ........ 72

I–Q – Additional Exhibits Submitted with the Amended Complaint ........ 73

## SUMMARY OF CLAIMS

**PLAINTIFF:** Deniel Shumeiko, assignee of ILVEYS INC., concerning claims arising from 50,000 Yukos Oil Company ADRs (CUSIP 98849W108).

**DEFENDANT:** Deutsche Bank Trust Company Americas ("DBTCA"), the U.S. Depositary for the Yukos ADR program.

1. **The Asset and Depositary Relationship.**

   DBTCA administered the Yukos ADR program under the March 12, 2001 Deposit Agreement and occupied the institutional position between ADR beneficial owners and the underlying Yukos shares. Plaintiff alleges that Defendant abandoned and misused that position during and after the destruction and liquidation of Yukos.

2. **The Structural Barrier and Defendant's Institutional Position.**

   The 2016 Swedish adjudication exposed a structural barrier preventing Yukos ADR holders from pursuing the Russian Federation through the Treaty arbitration mechanism on the basis of their ADR holdings. Plaintiff alleges that DBTCA's historical Depositary and shareholding position therefore remains essential to asserting the corresponding ADR–holder recovery interests.

3. **The Alleged Misconduct.**

   Plaintiff alleges that Defendant concealed material information, declared the Yukos ADRs "worthless" in 2007, misrepresented in 2016 that Deutsche Bank was not involved in any Yukos claims process, failed to protect ADR–holder interests during subsequent distributions, and again refused to act when formally requested in 2026. Plaintiff further alleges that newly discovered evidence concerning Deutsche Bank's 2005 Confidential Sale Agreement with Rosneft and the Schedule 8 bankruptcy mechanism reveals a historical conflict underlying that continuing passivity.

4. **Causes of Action.**

   Plaintiff asserts claims for: (I) Breach of Fiduciary Duty; (II) Fraudulent Misrepresentation and Concealment, with Constructive Fraud pleaded in the alternative; (III) Gross Negligence; (IV) Breach of the Deposit Agreement and, alternatively, the Implied Covenant of Good Faith and Fair Dealing; and (V) Unjust Enrichment.

5. **Principal Relief Sought.**

   Plaintiff principally seeks equitable relief compelling DBTCA to actively assert the ADR holders' corresponding interests in the existing United States Yukos recognition and enforcement proceedings, or, if necessary, to initiate and diligently pursue an appropriate independent U.S. proceeding. Plaintiff also seeks declaratory and monetary relief, discovery, equitable accounting and disgorgement, and other relief established by the evidence and applicable law.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

DENIEL SHUMEIKO,

Plaintiff,

v.

DEUTSCHE BANK TRUST COMPANY AMERICAS,

Defendant.

Case No. 1:26–cv–03516–MKV

## AMENDED COMPLAINT

Plaintiff Deniel Shumeiko, appearing pro se, alleges as follows:

## I. JURISDICTION AND VENUE

**1.** This Court has subject–matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). For purposes of diversity jurisdiction, Plaintiff is a citizen of the Russian Federation. Defendant Deutsche Bank Trust Company Americas is a New York corporation with its principal place of business in New York. The matter in controversy exceeds $75,000, exclusive of interest and costs.

**2.** Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant Deutsche Bank Trust Company Americas ("DBTCA" or "Defendant") is headquartered at 1 Columbus Circle, New York, New York 10019, and a substantial part of the conduct giving rise to Plaintiff's claims occurred through Defendant's New York–based depositary operations.

## II. NATURE OF THE ACTION

**3.** Plaintiff Deniel Shumeiko is the sole legal owner and assignee of all claims, rights, and causes of action assigned to him by ILVEYS INC. in connection with 50,000 American Depositary Receipts ("ADRs") of Yukos Oil Company, CUSIP 98849W108. The ADRs were originally acquired and held by ILVEYS INC., a family investment vehicle established for the management and protection of Plaintiff's family assets. Pursuant to a formal Deed of Assignment, duly authorized by ILVEYS INC., Plaintiff possesses the right to enforce the assigned claims in his own name. (Exhibit A.)

**4.** Defendant DBTCA served as the U.S. Depositary for the Yukos ADR program under the Deposit Agreement dated March 12, 2001. Through that depositary structure, Defendant occupied the legal position between the ADR beneficial owners and the underlying Yukos shares and held the deposited Yukos shares underlying the ADR program.

**5.** This action arises from Defendant's alleged abandonment and misuse of that depositary position during and following the destruction and liquidation of Yukos, and from Defendant's continuing refusal to use its institutional position to protect, assert, and recover the economic interests corresponding to the Yukos ADR holders while substantial Yukos–related recovery mechanisms remain active.

**6.** Plaintiff's principal objective is equitable relief compelling Defendant to actively assert the ADR holders' corresponding interest in the existing United States Yukos recognition and enforcement proceedings, including Case No. 14–cv–1996 in the United States District Court for the District of Columbia, and to pursue recovery for the benefit of Yukos ADR holders through Defendant's own institutional and historical legal position.

**7.** If participation in the existing enforcement proceeding becomes procedurally unavailable, Plaintiff seeks alternative equitable relief requiring Defendant to initiate and diligently pursue an appropriate independent United States proceeding to establish and enforce the recovery rights attributable to the underlying Yukos share position historically administered through the ADR program.

**8.** Plaintiff additionally seeks relief arising from Defendant's alleged misconduct in administering and abandoning the Yukos ADR interests, including its December 2007 representation that the ADRs were "worthless," its subsequent non–participation in Yukos distribution mechanisms, its January 2016 representation that Deutsche Bank was "not involved in any Yukos claims process," its continued failure to protect ADR–holder interests during subsequent distributions, and its refusal in 2026 to take the action demanded by Plaintiff.

**9.** Plaintiff further alleges that evidence discovered after commencement of this action materially clarifies the historical conflict underlying Defendant's conduct, including evidence concerning the December 13, 2005 Confidential Sale Agreement with Rosneft and the Schedule 8 bankruptcy mechanism subsequently described in the Hague Yukos arbitral record.

**10.** On March 26, 2026, before commencing this action and before the subsequent assignment of the Yukos ADR–related claims, Plaintiff Deniel Shumeiko, then acting on behalf of ILVEYS INC. – the Beneficial Owner of the 50,000 Yukos ADR position – as its U.S. representative and as a shareholder of that family investment vehicle, submitted and caused to be delivered to Defendant a comprehensive 35–page written demand and

supporting legal memorandum concerning the Yukos ADR claims. Defendant thereafter rejected that demand without undertaking the substantive action requested. (Exhibit D.)

**11.** Plaintiff therefore seeks mandatory injunctive relief, declaratory relief, damages, accounting, disgorgement, and such other legal and equitable relief as is supported by the causes of action pleaded below.

## III. STATEMENT OF FACTS

### A. The Yukos ADR Program and Defendant's Contractual Position

**12.** The Yukos American Depositary Receipt program was governed by a Deposit Agreement dated March 12, 2001, entered into between Yukos Oil Company and Bankers Trust Company, Defendant DBTCA's predecessor as Depositary. The Agreement established the contractual structure through which the underlying Yukos securities were held and administered for the corresponding ADR Holders and Beneficial Owners. (Exhibit Q.)

**13.** Under the Deposit Agreement, the Depositary occupied the central contractual position between the Holders and Beneficial Owners of the ADRs and the Deposited Securities. Section 2.01 appointed the Depositary and granted it specified authority, including attorney–in–fact authority, to act in connection with the performance of its duties and obligations under the Agreement.

**14.** The Agreement expressly recognized both Holders and Beneficial Owners within the contractual structure. Section 7.04 provides that Holders and Beneficial Owners are parties to and bound by the Deposit Agreement, while Section 7.06 provides that the Agreement and the Receipts are governed by the law of the State of New York.

**15.** The Deposit Agreement expressly contemplated representative action by the Depositary on behalf of Holders and Beneficial Owners. Section 5.01 recognizes circumstances in

which the Depositary acts on their behalf in pursuing claims and, in specified circumstances, makes the Depositary the sole permitted claimant. Representative enforcement by the Depositary on behalf of ADR interests was therefore an express feature of the contractual architecture itself.

**16.** Section 5.03 likewise expressly contemplates the Depositary's appearance in, prosecution of, or defense of proceedings concerning Deposited Securities or Receipts, and provides a contractual mechanism addressing expenses or liabilities associated with such proceedings. The Agreement further requires performance of the obligations specifically set forth therein without negligence or bad faith.

**17.** The Deposit Agreement additionally established a contractual framework governing the consequences of termination. Section 6.02 contemplated post–termination surrender and delivery of Deposited Securities, continued collection of dividends and other distributions pertaining to such securities, and, following any sale of remaining Deposited Securities, the holding of net proceeds for the pro rata benefit of Holders whose Receipts remained outstanding.

**18.** These provisions are material because Defendant's later termination of the Yukos ADR program occurred within, and remained governed by, an existing contractual framework. The Agreement itself defined the respective legal positions of the Depositary, Holders, Beneficial Owners, Custodian, and Deposited Securities; expressly contemplated representative claims and judicial proceedings in specified circumstances; and provided mechanisms governing distributions and proceeds after termination. (Exhibit Q.)

**B. ILVEYS INC.'s Yukos ADR Investment**

**19.** ILVEYS INC., Plaintiff's predecessor–in–interest, acquired Yukos ADRs during 2004 and 2005 and accumulated a position of 50,000 ADRs. Those acquisitions occurred years before the commencement of this litigation and before the events that form the principal basis of Plaintiff's allegations concerning Defendant's later conflict, concealment, and abandonment of ADR–holder interests. (Exhibit A.)

**20.** ILVEYS INC. acquired 10,000 Yukos ADRs on November 16, 2004; 10,000 additional ADRs on November 25, 2004; 5,000 additional ADRs on November 29, 2004; and 25,000 additional ADRs on March 30, 2005, resulting in a total position of 50,000 ADRs. The brokerage records documenting these acquisitions form part of Plaintiff's chain–of–title evidence. (Exhibit A.)

**21.** Plaintiff does not allege that he personally acquired the Yukos ADRs in 2004–2005. ILVEYS INC. was the historical investor and beneficial owner of the relevant ADR position. Plaintiff subsequently acquired the claims, rights, and causes of action associated with that position through the duly authorized assignment described above and set forth in Exhibit A.

**22.** Through the ADR structure, ILVEYS INC. held the beneficial investment interest represented by those ADRs, while the underlying Yukos shares were held through the Depositary structure administered by Defendant and its predecessor. The distinction between the ADR investors' beneficial position and the Depositary's position with respect to the underlying Yukos shares later became central to the Swedish proceedings described below.

### C. The Swedish Adjudication and the ADR Structural Barrier

**23.** The Swedish proceedings arose from an arbitration commenced by Yukos ADR investors against the Russian Federation. In 2012, the arbitral tribunal ruled in favor of those investors and awarded compensation based on an arbitral valuation of Yukos corresponding to an overall company value of approximately $62.1 billion. That victory, however, was later challenged in the Swedish courts and ultimately could not be preserved after the arbitral tribunal was held to lack jurisdiction over the Treaty claim. The subsequent Swedish proceedings exposed the structural distinction between the ADR investors' beneficial interests and the underlying Yukos shares held through the Deutsche Bank depositary structure.

**24.** On January 18, 2016, the Svea Court of Appeal issued its judgment in Case No. T 9128–14 concerning claims brought by investors in Yukos ADRs against the Russian Federation. The Court of Appeal held that the arbitral tribunal lacked jurisdiction to decide the investors' case. On December 14, 2016, the Supreme Court of Sweden denied leave to appeal in Case No. T 778–16 and expressly stated that the Court of Appeal's judgment therefore stood. (Exhibit F.)

**25.** For purposes of this action, the critical feature of the Swedish adjudication is that the Yukos ADR investors could not proceed against the Russian Federation through the Treaty arbitration mechanism on the basis of their ADR holdings.

**26.** In separate grounds reaching the same ultimate jurisdictional result, Appeals Judge PS concluded that the ADR investors' rights did not constitute a protected "investment" under the Treaty. He reasoned that the acquisition of Yukos ADRs created rights against DBTCA rather than rights or obligations between the ADR investors and Yukos, and that

the ADR acquisition therefore did not constitute an investment made within the territory of the Russian Federation.

**27.** Judge PS identified as undisputed that the investors acquired the Yukos ADRs from Deutsche Bank Trust Company Americas in New York; that DBTCA, in turn, held shares in Yukos; and that acquisition of the ADRs established a legal relationship between the investors and DBTCA rather than between the investors and Yukos.

**28.** As Judge PS explained, by acquiring ADRs rather than Yukos shares directly, the investors had "put another party – Deutsche Bank – between themselves and the Yukos company." The Swedish adjudication therefore exposed the structural consequence central to this action: the ADR beneficiaries' investment was legally mediated through DBTCA, while the individual ADR holders themselves could not invoke the Treaty arbitration mechanism against the Russian Federation on the basis of their ADR holdings.

**29.** The significance of the Swedish adjudication to this action is structural. It did not create Defendant's intermediary position. It judicially exposed the legal consequences of the ADR structure that Defendant had administered: the beneficial investor held an ADR–based relationship through DBTCA, while DBTCA occupied the intervening position connected to the underlying Yukos shares.

**30.** The same structure cannot be recreated retroactively by an individual ADR beneficiary acting alone. An assignment of personal claims or an authorization to litigate cannot transform that beneficiary into the historical Depositary or into the institution that held the underlying Yukos shares through the ADR structure at the time the investment existed.

**31.** Taken together, those conclusions exposed a remedial barrier of direct relevance here. The Majority foreclosed the arbitral forum from adjudicating the underlying expropriation

claim presented by the ADR investors, while the separate grounds of Judge PS identified the DBTCA intermediation that distinguished those investors from direct Yukos shareholders. The resulting structure left the ADR beneficiaries unable simply to proceed as though they themselves had occupied Defendant's historical position with respect to the underlying Yukos shares.

**32.** Plaintiff accordingly alleges that Defendant's continued refusal to use its own historical and institutional position cannot be cured merely by telling individual ADR beneficiaries to act in Defendant's place. On the pleaded record, DBTCA remains the sole identified surviving entity that occupied the combined position of U.S. Depositary, holder of the underlying Yukos shares within the ADR structure, and legal intermediary between the ADR investors and Yukos.

**33.** This structural barrier is central to the equitable relief sought in this action. Plaintiff does not seek permission to substitute himself for DBTCA's historical legal position; he seeks an order requiring Defendant to use that position to protect and pursue the economic interests that were administered through the Yukos ADR program.

**D. The Confidential Sale Agreement, Schedule 8, and Defendant's Historical Conflict of Interest**

**34.** The historical conflict alleged in this action arose from the convergence of two contemporaneous positions within the Deutsche Bank organization. While DBTCA remained the U.S. Depositary administering the interests of Yukos ADR beneficiaries, the broader Deutsche Bank network was simultaneously expanding substantial commercial relationships in the Russian Federation and participating in transactions directly connected to the bankruptcy and redistribution of Yukos assets. The following facts

provide the historical and economic context for Plaintiff's allegation that Defendant's later silence, passivity, and refusal to assert the ADR–related interests were conflicted rather than neutral.

**35.** Deutsche Bank's own 2006 Annual Review documents its acquisition of United Financial Group ("UFG") in Russia. UFG was a primary intermediary and leading broker in the Russian energy sector. During the same period, Deutsche Bank publicly reported the "best revenues ever" in its Advisory business and described itself as the "market leader in Russia." (Exhibit J.)

**36.** Deutsche Bank's financial disclosures further reflected substantial growth in its Russian and transaction–banking activities while the Yukos liquidation was proceeding. (Exhibits J and M.)

**37.** The historical dimensions of Deutsche Bank's involvement are further documented in the Final Award of the Hague Tribunal, PCA Case No. AA 227. The arbitral record describes Deutsche Bank as part of a syndicate of Western Banks that entered into a "Confidential Sale Agreement" with state–owned Rosneft on December 13, 2005. (Exhibit I.)

**38.** Under that Confidential Sale Agreement, Rosneft agreed to satisfy Yukos's outstanding commercial debt in exchange for assignment of the Western Banks' rights of claim.

**39.** Schedule 8 to the Confidential Sale Agreement was expressly titled "Application for Bankruptcy." Pursuant to that contractual mechanism, the Western Banks filed a bankruptcy petition against Yukos with the Moscow Arbitrazh Court on March 6, 2006. (Exhibit I.)

**40.** The Hague Tribunal described the Western Banks as having allowed themselves to be used as a "cover" in connection with the initiation of the bankruptcy, obscuring Rosneft's and the Russian Federation's role in the process. (Exhibit I.)

**41.** The Hague record further establishes that the resulting bankruptcy structure enabled the Russian State and Rosneft to control more than 93% of the creditors' votes, reject the Rehabilitation Plan, auction Yukos's remaining assets, and obtain 99.71% of the liquidation proceeds. (Exhibit I.)

**42.** Thus, at the same time that the Yukos ADR program remained administered through the Deutsche Bank depositary structure, the broader Deutsche Bank network had become directly involved in the contractual and financial machinery through which Yukos was placed into bankruptcy and its remaining assets were liquidated.

**43.** Plaintiff alleges that this historical dual position created a profound institutional conflict between the interests of the Yukos ADR beneficiaries and the broader commercial interests of the Deutsche Bank global holding network in the Russian Federation.

**44.** Plaintiff further alleges that Defendant's later passivity, its failure to assert the interests administered through the ADR structure, and its representations to ADR beneficiaries must be viewed against this pre–existing institutional conflict.

**45.** Plaintiff alleges that Defendant's failure to disclose this conflict to Yukos ADR holders deprived those beneficiaries of material information concerning the relationship between the institution administering their ADR interests and the corporate network participating in transactions directly connected to Yukos's liquidation.

**46.** This conflict did not end with the formal liquidation of Yukos. Plaintiff alleges that it continued, and continues, to shape Defendant's past and present refusals to assert and

protect ADR–holder interests in the recovery, enforcement, and distribution of Yukos–related assets arising from the same destruction of Yukos.

**E. Deutsche Bank's Russian Commercial Alignment and the Economic Motive for Defendant's Passivity**

**47.** The economic scale of Yukos provides material context for the institutional conflict and conduct alleged in this action. The Hague Tribunal observed that, by the period in which the measures against Yukos began, the company had emerged as the largest oil company in the Russian Federation. The dismantling and redistribution of Yukos affected a broader asset base, within which Yuganskneftegaz ("YNG"), Yukos's core production subsidiary, provides a concrete illustration of the economic scale at stake. In addressing the forced disposition of YNG, the Hague Tribunal concluded that the Russian Federation was not engaged in a true, good–faith tax collection exercise, but was intent on confiscating Yukos's most valuable asset and effectively transferring it to the Russian State. The magnitude of that single asset was later underscored by the Hague Tribunal's record that, by the time of Rosneft's 2006 IPO, YNG alone was valued at approximately $55.78 billion. These findings provide economic context for the scale and strategic value of the broader Yukos asset base affected by the company's dismantling and redistribution. (Exhibit I.)

**48.** Against that economic background, the institutional conflict described above was accompanied by contemporaneous commercial relationships demonstrating that Deutsche Bank's Russian strategy was increasingly tied to state–controlled enterprises and governmental access during the same period in which Yukos was being dismantled. (Exhibits O and P.)

**49.** Contemporary reporting concerning Deutsche Bank's entry into United Financial Group ("UFG") reflected the strategic importance of those relationships. The Times reported that Deutsche Bank Chief Executive Josef Ackermann personally informed the President of the Russian Federation of the Bank's plans to acquire a substantial interest in UFG during a summit attended by German Chancellor Gerhard Schröder, and that Deutsche Bank consulted the Russian Government before completing the transaction. The same reporting stated that the political turmoil surrounding Yukos was not regarded by the Bank as a major obstacle to its Russian expansion. (Exhibit P.)

**50.** That expansion continued during the precise period in which the Yukos liquidation machinery was developing. On December 6, 2005, Deutsche Bank publicly announced legally binding agreements to acquire the remaining 60% of UFG, following its earlier acquisition of a 40% interest in 2004. Deutsche Bank described the transaction as underscoring its "strategic commitment to Russia" and as positioning the combined business as a leading force in the Russian market. The announcement occurred only days before the December 13, 2005 Confidential Sale Agreement containing the Schedule 8 bankruptcy mechanism described above. (Exhibit O.)

**51.** Deutsche Bank's commercial relationships were directly connected to the disposition of Yukos assets. Contemporary Financial News reporting identified Deutsche Bank as an adviser to state–controlled Gazprom and reported that the Bank advised Gazprom on its proposed acquisition of YNG, Yukos's core production subsidiary. The same reporting stated that Deutsche Bank sought to assist in financing Gazprom's approximately $10 billion bid for YNG, but that a Texas bankruptcy court injunction barred Gazprom and its lenders from participating. (Exhibit P.)

**52.** The same contemporary reporting further described Deutsche Bank as maintaining active relationships with both Gazprom and Rosneft after Rosneft ultimately obtained control of YNG. Deutsche Bank's Russian leadership publicly acknowledged that "Rosneft and Gazprom are clients" and stated that the Bank maintained a system for managing conflicts arising from its work for both state–controlled companies. (Exhibit P.)

**53.** The economic importance of those relationships was also publicly acknowledged by Deutsche Bank's own Russian leadership. Charlie Ryan, Deutsche Bank's Chief Country Officer and Chief Executive in Russia, had worked in St. Petersburg since 1991, where his role in Russia's privatization program brought him into contact with reformers including the future President of the Russian Federation, then Deputy Mayor of St. Petersburg**.** Ryan later stated that "I think we are doing God's work there" while describing the Bank's expanding Russian operations. The same reporting stated that Ryan claimed Deutsche Bank's revenues generated from Russia exceeded those of any other investment bank, while noting that Frankfurt would not permit disclosure of the underlying figures. (Exhibit P.)

**54.** Plaintiff alleges that these contemporaneous commercial relationships supplied a powerful economic motive for the Deutsche Bank global corporate network to avoid conduct that could jeopardize its expanding relationships with Russian state–controlled enterprises or expose its own historical involvement in transactions connected to the dismantling and redistribution of Yukos. Plaintiff further alleges that this broader economic conflict materially influenced Defendant DBTCA's treatment of the Yukos ADR beneficiaries whose interests it continued to administer in the United States.

**55.** Defendant DBTCA's role made that conflict particularly consequential. As the U.S. Depositary positioned between the ADR Beneficial Owners and the underlying Yukos shares, Defendant occupied the domestic institutional position through which the conflict could have been disclosed, the beneficiaries could have been alerted, and the corresponding ADR interests could have been affirmatively protected. Plaintiff alleges that Defendant instead remained silent and administratively passive, and that the 2005–2007 information vacuum and subsequent "Worthless Notice" described below operated consistently with the broader Deutsche Bank network's self–protective commercial interests.

**F. The Functional Value of DBTCA's Silence and Coordinated Financial Complicity**

**56.** The broader commercial alignment described above made Defendant DBTCA's role materially more consequential than that of a passive administrative intermediary. Through the Yukos ADR structure, Defendant occupied the United States Depositary and historical holder position corresponding to approximately 15% of Yukos equity. Plaintiff alleges that this institutional position represented a substantial potential source of opposition to transactions affecting the underlying Yukos investment because DBTCA could disclose material conflicts to the ADR beneficiaries, assert the corresponding institutional interest, and enable or pursue protective action through the United States legal system.

**57.** The significance of Defendant's position became particularly acute during Yukos's December 2004 Chapter 11 proceeding in the United States. At that time, Deutsche Bank was part of a banking consortium intending to finance Gazprom's approximately $10–13 billion bid for Yuganskneftegaz, Yukos's principal production asset. After the United

States Bankruptcy Court issued an emergency injunction that prevented the contemplated financing from proceeding, Deutsche Bank sought dismissal of Yukos's Chapter 11 case. At the same time, DBTCA remained the United States Depositary administering the ADR structure through which an approximately 15% historical Yukos shareholding position was held for the corresponding ADR beneficiaries. Plaintiff alleges that this created a direct institutional conflict between the broader Deutsche Bank network's commercial effort to facilitate Gazprom's acquisition and DBTCA's entrusted position with respect to a substantial block of Yukos equity. (Exhibit C.)

**58.** Plaintiff alleges that DBTCA did not act as an independent institutional counterweight to that conflict. It did not disclose to the ADR beneficiaries that the broader Deutsche Bank network was taking positions adverse to the preservation of Yukos and its principal asset, did not alert those beneficiaries to the resulting conflict, and did not employ its own institutional position to support, preserve, or otherwise seek protection for the corresponding ADR–related economic interests. Plaintiff alleges that, had DBTCA acted consistently with the duties of loyalty and care alleged herein, its disclosure or protective action could have produced a materially different institutional record in the United States reflecting the interests associated with the substantial Yukos shareholding administered through the ADR program.

**59.** The conflict became still more pronounced in December 2005. As recorded by the Hague Tribunal in paragraph 1065 of the Final Award, Rosneft's payment of the purchase price to the Western Banks was expressly predicated upon those banks agreeing to undertake the steps specified in Schedule 8, including bankruptcy proceedings against Yukos. Plaintiff alleges that DBTCA's continued silence toward its ADR beneficiaries during this

period removed from the developing liquidation process a potentially significant source of institutional resistance associated with approximately 15% of Yukos equity, while the broader Deutsche Bank network participated in a banking arrangement under which the Western Banks' receipt of Rosneft's purchase price was expressly conditioned upon their undertaking the Schedule 8 steps. (Exhibit I.)

**60.** Plaintiff does not allege that protective action by DBTCA necessarily would have prevented the Russian Federation from completing the expropriation of Yukos. Plaintiff alleges instead that Defendant's conduct materially affected the position of the ADR beneficiaries: timely disclosure, institutional opposition, or protective action by the United States Depositary administering an approximately 15% Yukos position could have increased judicial scrutiny, enabled beneficiaries to seek timely relief, preserved or asserted claims associated with that substantial shareholding position, and materially altered the beneficiaries' subsequent ability to protect and recover the economic value associated with the destruction and redistribution of Yukos.

**61.** Plaintiff further alleges that this institutional asymmetry possessed substantial strategic and commercial value. Other Western banks could perform creditor-side and bankruptcy-related functions, as reflected by the participation of a syndicate of Western Banks in the Schedule 8 mechanism. What another creditor could not replicate, however, was DBTCA's distinct position as the United States Depositary and institutional intermediary through which the approximately 15% Yukos ADR position was administered. Plaintiff alleges that the absence of resistance from that unique position materially served the interests of the Russian Federation and the state-controlled actors involved in the dismantling and redistribution of Yukos, while simultaneously serving the broader

Deutsche Bank network's own commercial interest in preserving and expanding the highly profitable relationships described above with Russian state-controlled enterprises. Plaintiff therefore alleges that DBTCA's silence and later non-participation were aligned with both the interests advanced through the expropriation and redistribution of Yukos and the global Deutsche Bank network's conflicting economic interests.

### G. The 2005–2007 Fiduciary Deception: Tainted Fee Generation and the "Worthless" Notice

**62.** Immediately following the Deutsche Bank global corporate network's execution on December 13, 2005 of the Confidential Sale Agreement containing the Schedule 8 bankruptcy mechanism, Defendant subjected Plaintiff's predecessor–in–interest to an extended information vacuum concerning the material circumstances affecting the Yukos ADR investment.

**63.** During this period, Defendant continued to administer the Yukos ADR program while possessing institutional knowledge that the underlying corporate issuer had been placed on a path toward bankruptcy and liquidation through the mechanism described above.

**64.** Defendant nevertheless continued administering the ADR program and collecting fiduciary and custodial fees from beneficiaries whose underlying investment interests were simultaneously being subjected to the liquidation process described in the Hague record.

**65.** Defendant's non–disclosure during this same period also concealed the institutional conflict arising from the Deutsche Bank global holding network's involvement in the Confidential Sale Agreement, Schedule 8, and related Russian business activities.

**66.** During this same period, Deutsche Bank's Global Transaction Banking division reported a 34% increase in profit to €945 million, while commissions from fiduciary and custodial activities reached €3.965 billion. (Exhibit M.)

**67.** Plaintiff presently lacks access to the internal records necessary to determine how economic benefits associated with the relevant Russian commercial relationships were received, credited, allocated, transferred, or retained among DBTCA and other entities within the broader Deutsche Bank corporate network. Plaintiff therefore does not allege that all such benefits were received by DBTCA itself, but alleges that their internal allocation and any causal connection to DBTCA's conduct are matters uniquely within Defendant's corporate records and properly subject to discovery and accounting.

**68.** This period culminated on December 18, 2007, when Defendant DBTCA issued its "Liquidation / Worthless Notice," declaring the outstanding Yukos ADRs "worthless," cancelling them from the Depositary's records, terminating the Deposit Agreement effective immediately, and ceasing services with respect to the outstanding ADRs. (Exhibit D.)

**69.** Defendant's own termination Notice expressly acknowledged that the underlying Yukos ordinary shares had already been removed from the Russian corporate register and "no longer existed."

**70.** By declaring the ADRs "worthless" and cancelling them from the Depositary's records, Defendant presented the relationship to its beneficiaries as effectively exhausted and created the appearance that no continuing economic interest remained to be protected, recovered, distributed, or asserted.

**71.** That representation materially obscured the continuing contractual structure reflected in Section 6.02 of the Deposit Agreement, which provided a post–termination framework concerning distributions relating to Deposited Securities and the holding of net proceeds for the pro rata benefit of Holders in the circumstances contemplated by that provision.

**72.** Defendant thereby created and maintained the appearance that termination of the ADR program and disappearance of the underlying shares automatically extinguished the remaining economic interests administered through the depositary relationship.

**73.** The timing of the "Worthless Notice" is particularly significant. On October 31, 2007, only weeks before Defendant issued that Notice, the Amsterdam District Court refused recognition of the Russian bankruptcy order in the Netherlands, preserving Yukos–related assets outside Russia that subsequently became the subject of distributions during the period from 2015 through 2026.

**74.** Defendant's December 2007 Notice therefore operated as an information barrier at precisely the time when assets and claims arising from the destruction of Yukos continued to exist outside the Russian liquidation process.

**75.** Plaintiff alleges that the Notice induced and reinforced passivity among Yukos ADR holders generally by creating the false appearance that nothing remained to be protected, recovered, distributed, or demanded through the Depositary, thereby discouraging and materially delaying efforts by ADR beneficiaries to seek protective or recovery action through DBTCA and impairing their ability to timely assert their interests in the surviving Yukos–related asset mass and subsequent recovery and distribution mechanisms.

**76.** Plaintiff alleges that Defendant's continued extraction of fiduciary and custodial fees while administering the Yukos ADR program, followed by its presentation of the ADR interests

to beneficiaries as "worthless" upon termination, supports the inference that the December 2007 termination was not merely a neutral administrative closure, but also operated as a deceptive shield obscuring the circumstances under which those fees had been generated and insulating Defendant's prior conduct from beneficiary scrutiny.

**77.** Plaintiff further alleges that the information barrier created during 2005–2007 remained consequential long after termination because it suppressed beneficiary action while Yukos–related recovery mechanisms continued to develop internationally.

**78.** The consequences of that concealment later became concrete when substantial Yukos–related assets and recoveries were distributed without Defendant asserting the institutional position of the ADR holders, as further described below.

**H. The Recovery Framework and the January 2016 Misrepresentation**

**79.** By 2015, substantial Yukos–related assets had entered an active recovery and distribution framework associated with the majority–shareholder interests and their leadership. Plaintiff's predecessor–in–interest, ILVEYS INC., established direct contact with persons occupying senior positions within that structure, including David Andrew Godfrey, Director of Yukos UK Ltd. and the FPH Foundation, and Tim Osborne, Director of GML, the majority–shareholder consortium. (Exhibit L.)

**80.** On September 25, 2015, David Godfrey informed ILVEYS INC. that, following an amicable settlement between Yukos and Rosneft, the Board of the FPH Foundation had decided to resume preparations for a distribution to Yukos shareholders. (Exhibit L.)

**81.** On September 26, 2015, ILVEYS INC. responded with a direct question concerning the legal and administrative route by which ADR holders would participate in that recovery:

"Payments will be made through Deutsche Bank TCA, as Yukos shareholder, or directly to the owner of the ADRs?" (Exhibit L.)

**82.** That question went directly to the same structural issue later exposed in the Swedish proceedings: whether recovery attributable to the underlying Yukos share position would proceed through DBTCA or directly to the ADR Beneficial Owners.

**83.** On November 13, 2015, David Godfrey provided ILVEYS INC. with the Yukos claims website. (Exhibit L.)

**84.** ILVEYS INC. thereafter turned directly to Deutsche Bank concerning the Yukos ADR distribution process. On December 21–22, 2015, it contacted Deutsche Bank seeking the appropriate department concerning Yukos American Depositary Receipts issued by DBTCA and expressly explained that the distribution of funds among former Yukos shareholders had begun. (Exhibit K.)

**85.** ILVEYS INC. specifically stated that its questions concerned "the issuer (Deutsche Bank Trust Company Americas)" and requested contact information for the appropriate department. (Exhibit K.)

**86.** Deutsche Bank's Depositary Receipts representative, Zoya Soldatova, responded through the Moscow–New York operational channel and undertook to forward the inquiry to New York for consideration. On December 23, 2015, she further advised ILVEYS INC.: "We have received your question and will forward it to our lawyers for review." (Exhibit K.)

**87.** On January 14, 2016, ILVEYS INC. followed up and expressly asked whether its letter had been sent to New York and when a response could be expected. (Exhibit K.)

**88.** On January 21, 2016, Defendant's representative Zoya Soldatova responded in writing:

"Deutsche Bank is not involved in any Yukos claims process and therefore we are unable to provide any further information. We were not aware of any such process until you sent us the link to the Yukos claims website (www.yukosclaims.com)." (Exhibit K.)

**89.** That categorical representation was made after ILVEYS INC. had specifically identified DBTCA as the issuer of the Yukos ADRs and had expressly sought information concerning DBTCA's role in the then–active Yukos distribution process.

**90.** Plaintiff alleges that the January 21, 2016 representation materially and fraudulently obscured DBTCA's own legal and institutional position from the Beneficial Owner whose Yukos investment had been administered through that position.

**91.** The representation was not a mere failure to volunteer information. After ILVEYS INC. expressly asked whether the Yukos recovery would proceed through DBTCA and thereafter directly sought DBTCA's assistance, Deutsche Bank affirmatively represented that it was "not involved in any Yukos claims process" and directed the Beneficial Owner back to the claims administrator.

**92.** Plaintiff alleges that this affirmative denial perpetuated the information barrier created by the 2007 "Worthless Notice," induced continued reliance on the appearance that DBTCA had no role to perform in connection with surviving Yukos recoveries, and prevented Plaintiff's predecessor–in–interest from timely seeking judicial relief directed at DBTCA's own institutional position.

**93.** Plaintiff alleges that Defendant's January 2016 denial of involvement cannot be viewed in isolation from the identity and control of the recovery structure then confronting it. The Yukos distribution process was being administered through leadership associated with GML and the former majority–shareholder interests, while Deutsche Bank's own

global corporate network had previously participated in transactions adverse to Yukos, including the Confidential Sale Agreement and Schedule 8 bankruptcy mechanism described above.

**94.** Plaintiff further alleges that this created a powerful self–protective motive for Defendant to remain passive. Any institutional assertion by DBTCA against the GML–controlled recovery structure risked placing Defendant in direct conflict with parties positioned to expose or invoke Deutsche Bank's own historical involvement in the 2005 bankruptcy machinery.

**95.** Plaintiff therefore alleges that Defendant's refusal to approach the recovery managers, assert the ADR–related institutional interest, or lodge a protective objection was not neutral administrative inaction, but conflicted passivity intended to avoid such confrontation and the resulting scrutiny of Deutsche Bank's historical conduct.

**96.** Plaintiff further alleges that Defendant's later and continuing passivity served, and continues to serve, an additional self–protective function by avoiding adversarial proceedings and discovery in which the historical commercial relationships, internal allocation of associated economic benefits, and any causal connection between those benefits and Defendant's conduct could become subjects of judicial scrutiny and accounting.

### I. The 2017–2018 Distribution and Defendant's Continued Absence

**97.** The practical consequences of Defendant's January 2016 representation became concrete during the 2017–2018 Yukos Claims Administration distribution. Having been told by Deutsche Bank that it was "not involved in any Yukos claims process" and was

unable to provide further assistance, ILVEYS INC. proceeded without DBTCA and attempted to obtain recovery directly through the claims–administration process.

**98.** The initial distribution involved a Distribution Fund of at least $337 million and formed the first stage of a continuing series of Yukos–related asset distributions. Rather than distributing recovered value according to the holders' proportional share of Yukos equity, the Plan of Allocation calculated each claimant's "Recognized Loss" through a methodology incorporating purchase dates, holding periods, event–based price reactions, and progressively increasing discounts applied to later acquisitions. (Exhibit H.)

**99.** ILVEYS INC.'s claim based on its 50,000 Yukos ADR position was accepted as eligible for participation. GCG, then acting as Distribution Agent for the Yukos Claims Administration, ultimately determined that ILVEYS INC. was eligible to receive only $2,499.16. Under a simple pro–rata allocation based upon Yukos share capital, the same 50,000–ADR position corresponded to approximately $35,000 from a $337 million distribution pool. (Exhibit H.)

**100.** ILVEYS INC. disputed the calculation and repeatedly requested a written explanation of how the payment amount had been determined. During that dispute, the Distribution Agent advised that payment would not be processed while ILVEYS INC.'s objections were treated as inconsistent with the Release provisions, and ultimately stated that the claim had been rejected unless the Release was reconfirmed. (Exhibit H.)

**101.** Faced with that position, ILVEYS INC. confirmed that it accepted the applicable rules and discount and did not withdraw its signature, while continuing to request the promised written calculation. The Distribution Agent thereafter restored the claim to payable status, and ILVEYS INC. ultimately received $2,499.16. Plaintiff alleges that this

sequence demonstrates the concrete consequence of Defendant's earlier refusal to participate: the ADR Beneficial Owner, having been directed away from its own Depositary, was left to confront the allocation and release process alone, without DBTCA asserting the institutional interest corresponding to the underlying Yukos share position. (Exhibit H.)

**102.** Defendant DBTCA did not participate in the formulation or presentation of ILVEYS INC.'s claim before GCG, did not assert the institutional share position corresponding to the Yukos ADR program, and did not object on behalf of the ADR beneficiaries to the allocation framework.

**103.** Plaintiff alleges that Defendant's absence left individual ADR beneficiaries to negotiate directly with a recovery structure controlled by interests associated with Yukos's majority shareholders despite Defendant's historical position between those beneficiaries and the underlying Yukos shares.

**104.** The 2017–2018 distribution therefore demonstrated in practice the consequences of the information barrier and institutional passivity described above: substantial Yukos–related value had survived and was actually being distributed, notwithstanding Defendant's earlier representation that the ADR interests were "worthless," yet Defendant still did not appear to assert the interests administered through the Yukos ADR structure.

**105.** The resulting payment is documented by a distribution check dated January 9, 2018, issued to ILVEYS INC. in the amount of $2,499.16. (Exhibit H.)

**106.** The 2017–2018 distribution thus confirmed that termination of the Yukos ADR program in 2007 had not extinguished the underlying economic interests associated with

the ADR position and that Yukos–related value remained capable of recovery and distribution to former investors.

### J. The March–April 2026 Renewed Distribution and Defendant's Refusal to Act

**107.** On March 16, 2026, Epiq, acting as the new Distribution Agent for the Yukos Claims Administration following GCG's administration of the 2017–2018 distribution, sent ILVEYS INC. a new formal notice advising that another tranche of recovered funds was to be distributed. The notice expressly stated that ILVEYS INC. was being contacted because it had previously submitted an approved claim in the Yukos Claims Administration. (Exhibit H.) ILVEYS INC. responded the same day and requested clarification of both the total amount being distributed and the specific amount attributable to its 50,000 Yukos ADR position.

**108.** The March 2026 notice therefore confirmed that, notwithstanding the change in Distribution Agent from GCG to Epiq, the same Yukos recovery and claims–administration infrastructure that had produced the 2017–2018 distribution remained active and continued to possess recovered funds available for distribution.

**109.** In response to this renewed distribution and Defendant's continuing absence, a comprehensive legal demand package was delivered to DBTCA on March 26, 2026. The demand described the surviving Yukos recovery interests and requested that Defendant take action to protect and recover the proportional interests associated with the Yukos ADR program. (Exhibit D.) On April 2, 2026, while that demand remained pending, Epiq advised ILVEYS INC. that the exact amount of its distribution payment had not yet been determined and that the calculation was still being finalized. ILVEYS INC. did not thereafter take further affirmative steps to pursue the 2026 distribution

independently, but instead awaited Defendant's response to its demand for institutional participation.

**110.** On April 6, 2026, DBTCA, through Vice President and Senior Counsel Sarah Schoenbach, rejected the demand and relied upon Defendant's December 18, 2007 "Worthless Notice" and termination of the Yukos ADR program as the basis for declining to undertake the requested action. (Exhibit D.)

**111.** Defendant therefore continued in 2026 to rely upon the same 2007 termination position even though substantial Yukos–related assets had subsequently survived, been recovered, and been distributed to former investors through claims–administration structures operating from at least 2015 through 2026.

**112.** On April 7, 2026, Plaintiff's predecessor formally responded to Defendant's rejection, challenged Defendant's continued reliance upon the 2007 "Worthless Notice," and again demanded Defendant's participation in the existing recovery and enforcement mechanisms. (Exhibit D.)

**113.** Defendant did not reverse its position.

**114.** On April 14, 2026, all shareholders of ILVEYS INC. unanimously authorized the transfer of the Yukos ADR–related claims and rights to Plaintiff Deniel Shumeiko, who was already a shareholder of ILVEYS INC. The corporate resolution expressly identified ILVEYS INC. as a Family Investment Vehicle established to manage and protect the financial assets and long–term investments of its shareholders and their family members, and characterized the transfer to Plaintiff as a Distribution in Kind in the ordinary course of managing that family investment vehicle. (Exhibit A.)

**115.** On April 23, 2026, pursuant to that unanimous corporate authorization, ILVEYS INC. executed the formal Deed of Assignment transferring to Plaintiff 100% of its rights, titles, interests, claims, causes of action, demands, and enforcement authority associated with the 50,000 Yukos ADR position. The assignment therefore transferred existing family–investment claims to an existing shareholder of the family investment vehicle rather than conveying a newly acquired third–party claim to an unrelated purchaser. (Exhibit A.)

**116.** Plaintiff commenced this action on April 27, 2026.

**117.** Plaintiff alleges that the March–April 2026 events did not merely concern the historical consequences of a closed dispute, but constituted a renewed and present refusal by Defendant to act while an active Yukos recovery process was again distributing recovered value to approved claimants.

**118.** The sequence from the 2007 "Worthless Notice," through the January 2016 denial of involvement, the 2017–2018 distribution, and Defendant's April 2026 refusal demonstrates the continuing institutional position alleged in this action: Yukos–related economic value survived and repeatedly entered recovery and distribution mechanisms, while DBTCA consistently declined to assert the interests administered through the ADR structure.

**119.** The economic consequences of that continuing refusal were particularly significant because protecting the corresponding ADR interests did not initially require Defendant to undertake costly litigation. Plaintiff alleges that Defendant could have taken the cost–free administrative step of approaching the recovery managers and asserting the approximately 15% institutional Yukos shareholding position corresponding to its ADR

beneficiaries. Because that historical shareholding position predated the July 2, 2003 beginning of the Recovery Period, the terms of the Plan of Allocation suggest that the progressively increasing purchase–date discounts imposed upon later–acquired positions would not have applied to Defendant's position. Defendant therefore could have sought an undiscounted institutional allocation corresponding to that approximately 15% interest for pro rata distribution among the ADR beneficiaries. Across the four successive distribution tranches administered between 2015 and 2026, involving an aggregate recovery pool of approximately $1 billion, that proportional benchmark approaches $150 million.

**120.** Against that approximately $150 million proportional benchmark, the materially reduced recoveries produced through the individual claims–allocation process described above support Plaintiff's estimate that Defendant's non–participation materially contributed to aggregate losses to the Yukos ADR beneficiaries that may exceed $100 million. Plaintiff relies upon those accrued losses not only as evidence of the economic consequences of Defendant's past refusal to act, but also as a material equitable consideration for the Court in determining both whether it is necessary and appropriate to compel Defendant now to employ its historical Depositary and shareholding position in the existing United States Yukos enforcement proceedings and whether the resulting remedial expenses should be shifted back to the very beneficiaries whose losses allegedly made that judicial intervention necessary.

**K. The Existing U.S. Enforcement Proceedings and the Present Need for DBTCA's Active Participation**

**121.** Substantial judicial recovery and enforcement mechanisms presently exist in the United States in connection with the destruction and expropriation of Yukos. Most significantly, recognition and enforcement of the 2014 Hague Arbitral Awards is being pursued in the United States District Court for the District of Columbia in Case No. 14–cv–1996. On October 17, 2025, the Supreme Court of the Netherlands rejected the Russian Federation's remaining cassation challenge in the Dutch set-aside proceedings, leaving the Hague Awards in force after years of litigation concerning their validity. That final Dutch decision removed the remaining challenge to the Awards in the courts at the seat of arbitration and materially clarified the legal basis for their continued recognition and enforcement abroad. Those U.S. proceedings place substantial Yukos–related recovery efforts before a United States federal court while the corresponding ADR interests were historically administered through DBTCA, a New York–based U.S. Depositary. Plaintiff alleges that this creates a distinct domestic institutional interest in ensuring that the ADR–related economic position is not left unrepresented in United States recovery and enforcement proceedings.

**122.** Plaintiff seeks Defendant's active participation in that existing enforcement infrastructure for the purpose of recovering the proportional economic interest attributable to the Yukos ADR holders. Plaintiff's objective is the aggregate recovery of approximately $19 billion for the benefit of the Yukos ADR beneficiaries represented through Defendant's historical shareholding and Depositary position, through such legally

available claims and remedies as may be established against the parties responsible for the corresponding loss, as described below.

**123.** The relief sought does not require Defendant to initiate the Yukos controversy from the beginning or independently recreate the underlying case concerning the destruction of Yukos. The Hague proceedings have already produced an adjudicated framework concerning the expropriation and destruction of Yukos and the resulting compensation. In particular, the Tribunal found that, as a result of material and significant misconduct by the Claimants and by Yukos, which they controlled, the Claimants contributed to the extent of 25% to the prejudice they suffered as a result of the Russian Federation's destruction of Yukos. The Tribunal accordingly determined that the resulting apportionment of responsibility between the Claimants and the Russian Federation was 25% and 75%, respectively.

**124.** Plaintiff alleges that the destruction of Yukos caused a loss of the underlying equity value that affected economic interests in Yukos proportionally, including the economic interests represented by Yukos ADRs. Plaintiff therefore applies the Tribunal's adjudicated 25% / 75% allocation of responsibility between the Hague Claimants and the Russian Federation as a causal–responsibility benchmark to the corresponding ADR–related losses, attributing 75% to the Russian Federation and 25% to the GML–controlled claimant and shareholder side. Plaintiff does not contend that the Hague Tribunal separately adjudicated the claims of Yukos ADR holders against either the Russian Federation or the GML Claimants, or imposed direct monetary obligations upon either of them in favor of the ADR holders. Rather, Plaintiff relies upon the Tribunal's adjudicated findings concerning the destruction of Yukos and its allocation of

responsibility between the parties before it as the factual and analytical basis for applying the same causal allocation to the corresponding loss of ADR–related investment interests.

**125.** The present remedial problem arises because substantial recovery mechanisms now exist, while the ADR structure through which the beneficiaries held their economic interests historically placed Defendant DBTCA between those Beneficial Owners and the underlying Yukos shares and created the structural intermediation whose consequences continue to constrain the beneficiaries' ability independently to pursue the corresponding recovery interests.

**126.** As described above, the Swedish proceedings exposed the practical consequence of that intermediation: an individual ADR beneficiary cannot simply substitute himself for the historical holder of the underlying shares and recreate the proprietary and territorial position associated with Defendant's historical institutional status.

**127.** The resulting barrier is therefore structural, not merely procedural. A passive authorization or transfer of individual litigation rights cannot transform an ADR beneficiary into the historical Depositary, recreate Defendant's institutional position with respect to the underlying Yukos shares, or otherwise eliminate the structural barrier produced by the ADR arrangement.

**128.** Defendant's refusal to participate is not hypothetical. Plaintiff and his predecessor–in–interest repeatedly sought Defendant's participation in Yukos recovery mechanisms, including the 2015–2016 communications and the formal March 2026 demand described above. Defendant expressly refused to act.

**129.** Plaintiff therefore seeks an Order compelling Defendant DBTCA to employ its own historical shareholding and Depositary position affirmatively to maintain, pursue, and enforce such Yukos recovery rights as are legally available through that position for the protection of the corresponding ADR beneficiaries.

**130.** Plaintiff principally seeks an Order compelling Defendant promptly to seek intervention in Case No. 14–cv–1996 (D.D.C.) and, if intervention is permitted, diligently to participate in that proceeding for the purpose of protecting and pursuing the proportional recovery interests attributable to the Yukos ADR position arising from the Russian Federation's adjudicated expropriation and destruction of Yukos, while preserving and asserting all legally available claims and remedies consistent with the Hague Tribunal's adjudicated 25% / 75% allocation of responsibility between the Hague Claimants and the Russian Federation and Plaintiff's application of that allocation to the corresponding ADR–related losses. Plaintiff further alleges that equity and good conscience weigh strongly against permitting the expense–and–indemnity provisions of the Deposit Agreement to operate as a shield against the protective judicial action sought herein where Defendant's systematic refusal to undertake earlier cost–free administrative measures has already materially contributed to substantial devaluation of the ADR–related economic interests, including estimated aggregate beneficiary losses that may exceed $100 million. Those accrued losses provide an additional equitable basis for the Court to evaluate the necessity and appropriateness of compelling Defendant to pursue an effective judicial remedy through its historical institutional position, whether by seeking intervention and, if permitted, participating in the Hague Awards enforcement proceedings before the United States District Court for the District of Columbia, or, if that

procedural avenue is denied or becomes unavailable, by pursuing the alternative independent proceedings described below.

**131.** If Defendant's intervention in Case No. 14–cv–1996 is denied, becomes procedurally unavailable or otherwise foreclosed by the progression of that proceeding, or ceases to provide a meaningful avenue for asserting the corresponding ADR–related recovery interests, Plaintiff seeks alternative equitable relief compelling Defendant immediately to initiate and diligently pursue appropriate independent judicial and judgment–enforcement proceedings within the United States through Defendant's own historical Depositary and shareholding position against the Russian Federation and any other party, including the GML Claimants, against whom legally cognizable recovery rights may be established. Such proceedings should preserve and pursue the aggregate ADR–related recovery consistent with Plaintiff's application of the Hague Tribunal's adjudicated 25% / 75% allocation as the causal–responsibility benchmark alleged above, without suggesting that either component was separately adjudicated by the Hague Tribunal as a direct monetary obligation to the ADR holders.

**132.** Under that alternative relief, Defendant would be required to pursue all legally available attachment, collection, and enforcement remedies necessary to secure and preserve any recovery legally attributable to its approximately 15% historical ADR–related position for the benefit of the corresponding ADR interests.

**133.** Plaintiff additionally seeks to require Defendant to protect, assert, and pursue the proportional ADR–related institutional interest with respect to recoveries arising from related United States enforcement proceedings, including any amounts ultimately recovered from the Russian Federation pursuant to the approximately $5 billion Yukos

Capital Limited arbitral award presently being pursued for recognition and enforcement in Case No. 1:22–cv–00798–CJN in the United States District Court for the District of Columbia. If and when proceeds recovered through that proceeding become available for distribution to former Yukos shareholder interests, Plaintiff seeks to require Defendant to assert and recover the proportional share corresponding to its approximately 15% historical ADR–related position for the benefit of the corresponding ADR beneficiaries, rather than leaving those beneficiaries to participate solely through an individual claims–allocation process of the kind that previously produced a materially reduced recovery.

**134.** Defendant's participation in any resulting recovery and distribution mechanism is particularly necessary in light of the prior 2017–2018 distribution experience. Plaintiff alleges that, if and when proceeds from the approximately $5 billion Yukos Capital award are recovered from the Russian Federation and become available for distribution, continued non–participation by DBTCA would create a substantial risk that those proceeds could again be allocated without assertion of the institutional interest corresponding to the ADR beneficiaries. Applying Defendant's approximately 15% historical ADR–related position as a proportional benchmark to a recovery approaching $5 billion corresponds to an economic interest approaching $750 million.

**135.** Plaintiff further seeks to require Defendant to assert the approximately 15% historical ADR–related position in any United States recovery or distribution mechanism through which proceeds obtained from Yukos–related enforcement proceedings become available for allocation, including any proceeds ultimately recovered through the Yukos Capital enforcement described above, and to lodge appropriate institutional objections

against discriminatory or non–pro–rata distribution mechanisms affecting the corresponding ADR interests.

**136.** Plaintiff further alleges, solely as an alternative monetary valuation benchmark, that the Hague Tribunal's damages analysis employed a total Yukos equity valuation of approximately $94.6 billion as of the relevant 2014 valuation date. Applying the historical ADR ratio of four Yukos ordinary shares per ADR and the post–award interest methodology identified in the Final Award, Plaintiff calculates an asserted alternative benchmark of approximately $259 per ADR, corresponding to approximately $12,950,000 for the 50,000–ADR position. Plaintiff relies upon that calculation as an alternative damages benchmark in the event the principal equitable relief sought herein is unavailable.

**137.** This requested prospective relief addresses the precise remedial vacuum alleged in this action. Defendant cannot retain the institutional position that historically stood between the ADR beneficiaries and the underlying Yukos shares, refuse to employ that position in the surviving recovery mechanisms, and then rely upon the beneficiaries' inability independently to recreate that same position as the reason no effective recovery can be pursued.

**138.** Plaintiff accordingly seeks prospective equitable relief requiring Defendant to use the legal and institutional position it historically occupied to protect and pursue the corresponding Yukos ADR recovery interests, rather than leaving the ADR beneficiaries permanently disabled by the very intermediary structure through which their investments were administered.

**L. Federal Policy and United States Government Position Concerning Yukos Investor Claims and Enforcement**

**139.** Public Law 112–208 expressly identifies the promotion of claims of United States investors in Yukos Oil Company as a matter of federal policy. Section 202(a)(1)(B) requires reporting on measures taken and results achieved in advocating for United States investors in the Russian Federation, expressly including the promotion of claims of United States investors in Yukos Oil Company. The same Public Law also contains congressional findings concerning systemic corruption involving abuse of governmental authority for political or financial gain in collusion with private entities and records congressional concern regarding due process and procedural violations in the Yukos case. (Exhibit G.)

**140.** Separately, on May 8, 2026, the United States, through the Department of Justice, filed a Government's Statement of Interest in Hulley Enterprises Ltd. v. Russian Federation, Case No. 1:14–cv–01996–BAH – the same United States Yukos enforcement proceeding in which Plaintiff seeks Defendant's participation. The United States took the position that, although foreign–court determinations are not binding on jurisdictional questions under the FSIA, there is no categorical bar to United States courts extending issue preclusion, where appropriate, to foreign–court determinations, subject to the required comity analysis. (Exhibit N.)

**141.** Plaintiff does not rely upon Public Law 112–208 or the Government's Statement of Interest as an independent cause of action or as imposing a private statutory duty upon Defendant, nor does Plaintiff contend that the Department of Justice endorsed Plaintiff's claims or the claims of Yukos ADR holders. Plaintiff relies upon them as complementary

federal context: Congress expressly recognized the promotion of United States investor claims arising from Yukos as a federal interest, while the Executive Branch has formally addressed the treatment of foreign–court determinations in the existing United States Yukos enforcement proceeding. Plaintiff alleges that the prospective equitable relief sought herein is consistent with that federal context.

**M. Timeliness, Fraudulent Concealment, Continuing Conduct, and Accrual**

**142.** Defendant cannot obtain the benefit of a statute–of–limitations defense to the extent its own affirmative acts of institutional deception materially prevented Plaintiff and his predecessor–in–interest from timely discovering and pursuing the claims asserted herein.

**143.** The concealment alleged herein occurred through a sequence of conduct extending from the period in which Yukos was being dismantled, through Defendant's termination of the ADR program, and into the subsequent Yukos recovery and distribution processes.

**144.** From 2005 through 2007, while continuing to administer the Yukos ADR program, Defendant maintained the information vacuum described above while fees, charges, and other economic benefits continued to be obtained through the Depositary relationship and the destruction and liquidation of the underlying issuer were unfolding.

**145.** The December 18, 2007 "Worthless Notice" converted that existing information vacuum into a durable post–termination information barrier by creating the appearance that no continuing economic interest, recoverable asset, distribution, or claim remained for the ADR beneficiaries to pursue.

**146.** When Yukos–related recovery activity later became visible, ILVEYS INC. did not remain passive. In September 2015, it expressly asked whether payments would be made through DBTCA as Yukos shareholder or directly to the ADR owner, and thereafter directly approached Deutsche Bank concerning DBTCA's role in the active Yukos recovery and distribution process. (Exhibits K and L.)

**147.** On January 21, 2016, Defendant's representative stated in writing that Deutsche Bank was "not involved in any Yukos claims process" and had not been aware of such a process until ILVEYS INC. supplied the Yukos claims website. (Exhibit K.)

**148.** Plaintiff alleges that ILVEYS INC. understood and relied upon that categorical representation as meaning that DBTCA had no institutional role to perform in the Yukos claims process and that the available route for recovery was to proceed directly through the Claims Administration rather than through the Depositary.

**149.** During the ensuing 2017–2018 distribution process, ILVEYS INC. accordingly pursued recovery directly through GCG without DBTCA's participation. Its claim was accepted, ILVEYS INC. actively disputed the allocation calculation, and a payment was ultimately made. Rather than revealing that Defendant's January 2016 representation was false or misleading, the direct processing of the claim without DBTCA's participation was outwardly consistent with Defendant's prior representation that Deutsche Bank had no role in the claims process. (Exhibit H.)

**150.** Those events demonstrated that Yukos–related economic value had survived notwithstanding the 2007 "Worthless Notice," but they did not disclose Defendant's concealed historical conflicts, the extent of its institutional knowledge, or that its January 2016 denial of any role in the Yukos claims process was false or materially misleading.

Plaintiff alleges that ILVEYS INC. therefore continued to rely upon Defendant's representation while pursuing recovery through the direct claims–administration channel that appeared to confirm it.

**151.** The legal and enforcement landscape materially clarified on October 17, 2025, when the Supreme Court of the Netherlands rejected the Russian Federation's remaining cassation challenge in the Dutch set–aside proceedings, leaving the 2014 Hague Awards in force after the conclusion of that challenge. Plaintiff alleges that this final Dutch disposition materially strengthened and clarified the practical basis for seeking DBTCA's active participation in the existing United States recognition and enforcement proceedings. Within approximately five months, on March 16, 2026, ILVEYS INC. received formal notice, now from Epiq rather than GCG, that another tranche of Yukos–related recovered funds was to be distributed, and Defendant was thereafter formally placed on notice through the March 26, 2026 demand described above. Plaintiff therefore alleges that both the demand for DBTCA's participation in the Hague–related United States enforcement framework and the demand that DBTCA protect the ADR–related institutional interest in the renewed 2026 distribution were asserted timely – following the final Dutch disposition and promptly upon renewed distribution activity, respectively. (Exhibits D and H.)

**152.** On April 6, 2026, Defendant's Senior Counsel issued a formal management–level refusal and again relied upon Defendant's own December 18, 2007 "Worthless Notice" and termination position to disclaim any continuing role with respect to the Yukos ADR interests. (Exhibit D.)

**153.** Plaintiff alleges that Defendant thereby renewed the same post–termination information barrier and committed a fresh and independent wrongful act in 2026 by refusing, after direct notice and demand, to employ its institutional position in then–active recovery and distribution mechanisms.

**154.** Defendant's April 6, 2026 refusal was therefore not merely a historical consequence of the 2007 termination. It was a new refusal made in response to a current demand concerning an active 2026 distribution and existing United States enforcement proceedings.

**155.** Plaintiff accordingly alleges that claims arising from Defendant's April 6, 2026 refusal constitute present and separately accruing conduct. Plaintiff separately relies upon Defendant's earlier affirmative concealment, misrepresentations, and information barriers in support of fraudulent–concealment and equitable–estoppel principles concerning the earlier phases of the same course of conduct.

**156.** Plaintiff further alleges that he and his predecessor–in–interest exercised diligence in pursuing available avenues for information and recovery. ILVEYS INC. directly pursued the Yukos recovery process and approached Deutsche Bank in 2015–2016, actively challenged the calculation and administration of the 2017–2018 distribution, renewed its efforts immediately upon notice of the 2026 distribution, caused a comprehensive formal demand to be delivered to DBTCA on March 26, 2026, responded to Defendant's April 6 refusal on April 7, and this action was commenced on April 27, 2026 following the April 23 assignment.

**157.** Plaintiff alleges that any delay in seeking judicial relief directed specifically at DBTCA's institutional position was materially induced by Defendant's representations that

the ADR interests were "worthless," that Deutsche Bank was not involved in any Yukos claims process, and that Defendant had no continuing role after termination. The affirmative concealment alleged herein therefore did not end with the 2007 "Worthless Notice"; it was reinforced by Defendant's January 2016 categorical denial and renewed in April 2026 when Defendant again relied upon the same termination position after direct notice and demand.

**158.** Plaintiff relies upon these facts both to establish the timeliness of the present claims arising from Defendant's current conduct and to prevent Defendant from obtaining the benefit of limitations periods to the extent Defendant's own affirmative concealment, misrepresentations on which Plaintiff and his predecessor–in–interest reasonably relied, and information barriers materially obstructed timely discovery and pursuit of the earlier claims.

## IV. CAUSES OF ACTION

### COUNT I: Breach of Fiduciary Duty – Duty of Loyalty and Care

**159.** Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**160.** Defendant DBTCA, as the U.S. Depositary administering the Yukos ADR program, occupied the central intermediary position between the ADR Holders and Beneficial Owners and the underlying Yukos shares, through which the Deposited Securities were held and administered, exercised the specified representative and attorney–in–fact powers described above, and possessed superior institutional knowledge concerning the disposition and recovery of those interests. Plaintiff alleges that the ADR beneficiaries entrusted Defendant with control over an institutional position that they could not

independently exercise or recreate, particularly where protection or recovery of the underlying economic interests required action through Defendant's historical holder and Depositary position. That combination of entrusted institutional control, superior knowledge, specified representative authority, and beneficiary dependence created the special relationship of trust and confidence alleged herein and gave rise to duties of loyalty and care independent of any obligation merely to perform a particular mechanical promise expressly stated in the Deposit Agreement.

**161.** Defendant breached those duties not merely by failing to perform particular contractual functions, but by allegedly using its entrusted institutional position adversely to the beneficiaries: subordinating their property and recovery interests to conflicting commercial interests, withholding material conflict information, and declining to employ its discretionary institutional position in order to avoid scrutiny of the broader Deutsche Bank global holding network's Russian interests.

**162.** That conflict arose while the broader Deutsche Bank network was simultaneously expanding its Russian state–sector business and participating in the Confidential Sale Agreement and Schedule 8 bankruptcy mechanism described above, while Defendant continued administering the Yukos ADR program without disclosing those material conflicts to the ADR beneficiaries.

**163.** Defendant further breached its duties by maintaining the 2005–2007 information vacuum, continuing to administer the Yukos ADR program and obtain fees during that period, and thereafter issuing the December 18, 2007 "Worthless Notice," which presented the ADR interests to beneficiaries as economically exhausted while Yukos–related assets and recovery interests continued to survive.

**164.** Defendant committed a further breach in January 2016 after Plaintiff's predecessor–in–interest directly sought Defendant's assistance concerning the active Yukos recovery and distribution process. Rather than asserting the institutional interests administered through the ADR structure, Defendant represented that Deutsche Bank was "not involved in any Yukos claims process" and remained passive while substantial Yukos–related recoveries were subsequently distributed.

**165.** Defendant's continued absence during the 2017–2018 distribution left the ADR beneficiaries to pursue recovery individually through a distribution framework controlled by interests associated with the Yukos majority shareholders, notwithstanding Defendant's historical position between those beneficiaries and the underlying Yukos shares.

**166.** Defendant committed a further breach in 2026. After receiving direct notice of the March 16, 2026 renewed distribution and the March 2026 formal demand, Defendant expressly refused on April 6, 2026 to employ its institutional position to protect or pursue the corresponding ADR interests and again relied upon its own 2007 "Worthless Notice" and termination position.

**167.** Defendant's repeated refusal is especially consequential because, as alleged above, the ADR structure itself created a structural barrier preventing an individual ADR beneficiary from simply recreating Defendant's historical position with respect to the underlying Yukos shares.

**168.** Plaintiff alleges that Defendant's continuing passivity was not neutral administration but a conflicted and self–protective course of conduct designed to avoid confrontation with the parties and recovery structures connected to the destruction and

redistribution of Yukos while protecting the broader commercial interests of the Deutsche Bank global holding network.

**169.** By refusing to use its institutional position in the surviving Yukos recovery and enforcement mechanisms, Defendant abandoned the economic interests administered through the ADR structure at the very time those interests became capable of producing substantial recoveries.

**170.** Plaintiff further alleges that the consequences of Defendant's breaches were materially amplified by the non–substitutable character of its institutional position. While another commercial bank could potentially have supplied financing or creditor services to the broader transactions described above, another lender could not substitute for DBTCA as the United States Depositary and institutional intermediary through which the approximately 15% historical Yukos ADR position was administered. By withholding that position from the protection of the ADR beneficiaries while the broader Deutsche Bank network pursued commercial interests adverse to the preservation of Yukos and subsequently participated in the Schedule 8 bankruptcy mechanism, Defendant removed a substantial potential source of institutional resistance and judicial scrutiny and materially impaired the beneficiaries' ability to protect and later recover the economic value associated with that substantial Yukos position.

**171.** Defendant's breaches materially impaired Plaintiff's predecessor–in–interest's recovery opportunities associated with the 50,000 Yukos ADR position and left that position to proceed through the discounted individual claims–administration framework without DBTCA asserting the corresponding institutional shareholding interest or lodging

a protective objection. Plaintiff alleges that Defendant's absence thereby materially contributed to the economic losses described above.

**172.** Defendant's conduct further continues to threaten Plaintiff and the affected ADR beneficiaries with additional loss because substantial Yukos–related enforcement and recovery proceedings remain active while Defendant continues to refuse to assert the corresponding ADR–related institutional interest.

**173.** Plaintiff has therefore suffered and continues to suffer injury as a direct and proximate result of Defendant's breaches of its duties of loyalty and care.

**174.** Plaintiff seeks damages and equitable relief arising from those breaches, including prospective relief compelling Defendant to employ its historical Depositary and shareholding position to protect, pursue, and recover the corresponding interests of the Yukos ADR beneficiaries through the existing United States enforcement mechanisms or, if necessary, through appropriate independent enforcement proceedings. Plaintiff pleads this fiduciary–duty claim independently and, to the extent necessary, in the alternative to the contractual theories asserted in Count IV.

**COUNT II: Fraudulent Misrepresentation and Concealment; Constructive Fraud in the Alternative**

**175.** Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**176.** Defendant DBTCA intentionally, actively, and in bad faith misled Plaintiff and his predecessor–in–interest through a multi–year, multi–phased course of affirmative misrepresentations, deceptive omissions, and bad–faith denials designed to conceal Defendant's interlocking institutional conflicts of interest, its superior knowledge

concerning the Yukos ADR structure and surviving recovery interests, and the broader Deutsche Bank network's historical commercial involvement in transactions connected to the destruction and liquidation of Yukos.

**177.** From 2005 through the termination of the Yukos ADR program in December 2007, Defendant knowingly maintained the engineered information vacuum described above while continuing to administer the Yukos ADR program and obtain fiduciary and custodial fees from the beneficiaries whose underlying investment interests were simultaneously being subjected to liquidation. Plaintiff alleges that Defendant thereby concealed material information concerning the conflict affecting the institution administering the ADR interests while continuing to derive economic benefits from that same relationship.

**178.** Defendant thereafter used its December 18, 2007 "Worthless Notice" and its January 21, 2016 categorical denial that Deutsche Bank was "involved in any Yukos claims process" to create and perpetuate the false appearance that no continuing institutional role remained for DBTCA in connection with surviving Yukos recovery interests. Plaintiff alleges that the January 2016 representation was material and false or materially misleading, that Defendant possessed superior institutional knowledge concerning its own historical Depositary and shareholding position, and that the representation was made with the intent and effect of causing ILVEYS INC. to proceed without DBTCA rather than seek protective action directed at Defendant's institutional position.

**179.** ILVEYS INC. believed and relied upon Defendant's January 2016 representation and thereafter pursued recovery directly through the Claims Administration without DBTCA's participation. The subsequent acceptance and processing of ILVEYS INC.'s

claim through GCG outwardly reinforced Defendant's representation that DBTCA had no role to perform. Meanwhile, Defendant failed to take even the cost–free administrative step of approaching the recovery managers, asserting its approximately 15% historical ADR–related institutional position, or lodging a protective objection to the allocation framework. Plaintiff alleges that this combination of affirmative misrepresentation, reliance, and institutional passivity materially impaired the recovery opportunity associated with the 50,000–ADR position and contributed to the specific economic losses alleged herein, while the extrapolated aggregate losses suffered by the corresponding ADR beneficiaries may exceed $100 million.

**180.** Defendant renewed this course of concealment and bad–faith denial on April 6, 2026, when, in response to the formal demand concerning the renewed March 2026 distribution infrastructure, its Senior Counsel again relied upon Defendant's own 2007 "Worthless Notice" and termination position to disclaim any continuing role or responsibility. Plaintiff further alleges that Defendant has continued to refuse participation in the existing Hague Awards enforcement infrastructure despite the present need for its historical institutional position, thereby perpetuating the same remedial barrier affecting the ADR beneficiaries. Defendant's continuing non–participation also creates a substantial risk that, if and when proceeds arising from other Yukos–related recoveries – including proceeds from the approximately $5 billion Yukos Capital award – become available for distribution, the corresponding ADR–related institutional interest will again remain unasserted. Plaintiff alleges that the foregoing course of conduct constitutes fraudulent misrepresentation and fraudulent concealment and, independently or in the

alternative, constructive fraud arising from Defendant's alleged fiduciary and confidential position.

**COUNT III: Gross Negligence**

**181.** Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**182.** Defendant DBTCA exercised and controlled the institutional position through which the Yukos ADR interests were administered and possessed superior institutional knowledge concerning the destruction, liquidation, recovery, and subsequent distribution of Yukos–related assets. Plaintiff alleges that the same entrusted institutional relationship described in Count I – including Defendant's control over a position that the ADR beneficiaries could not independently exercise or recreate, its superior knowledge, and their resulting dependence upon Defendant in matters requiring institutional action – gave rise to a duty of reasonable care independent of any obligation merely to perform a particular mechanical promise expressly stated in the Deposit Agreement.

**183.** Despite that position, knowledge, and duty, Defendant repeatedly failed to exercise even basic protective care while substantial Yukos–related economic interests remained capable of recovery and while readily available measures existed by which those interests could at least have been asserted or preserved.

**184.** During the 2015–2018 recovery and distribution process, Defendant remained passive even after Plaintiff's predecessor–in–interest directly notified Deutsche Bank of the active Yukos claims process, specifically sought DBTCA's involvement, and thereby placed Defendant on actual notice that surviving ADR–related economic interests were being subjected to an active recovery mechanism.

**185.** Defendant thereafter remained absent while the 2017–2018 distribution proceeded and the 50,000–ADR position was subjected to the individual allocation methodology described above. Plaintiff alleges that Defendant failed to take even the cost–free or materially less burdensome protective measures available at that stage, including approaching the recovery managers, asserting the corresponding institutional interest, or lodging a protective objection.

**186.** Defendant likewise took no protective action after substantial United States enforcement proceedings concerning the Hague Awards became available, including Case No. 14–cv–1996 in the District of Columbia, notwithstanding the continuing existence of other Yukos–related recovery mechanisms and Defendant's knowledge that the ADR beneficiaries could not independently recreate its historical institutional position.

**187.** Defendant repeated the same refusal under circumstances of direct and renewed notice in 2026. After receiving notice of the March 16, 2026 distribution and a comprehensive formal demand specifically identifying the surviving ADR interests and requesting protective action, Defendant expressly refused on April 6, 2026 to take the requested action and instead relied upon its own 2007 "Worthless Notice" and termination position.

**188.** Plaintiff alleges that this was not an isolated error, inadvertent omission, or ordinary failure of care. Defendant repeatedly declined to take even basic protective measures after actual notice of substantial and actively recoverable Yukos–related economic interests, after prior distributions had demonstrated that such interests continued to possess realizable value, and after Defendant had been specifically informed of the need for its institutional participation. Plaintiff alleges that, even independently of the intentional

misconduct alleged elsewhere in this Complaint, this prolonged and repeated course of conduct evinced reckless disregard for the rights and interests administered through the Yukos ADR structure and constituted gross negligence.

**189.** By repeatedly declining to exercise even slight protective care while substantial recovery mechanisms existed and while Defendant's own institutional position remained necessary to protect the corresponding ADR interests, Defendant effectively abandoned those interests and exposed Plaintiff and the affected ADR beneficiaries to substantial and avoidable economic harm.

**190.** Defendant's gross negligence materially impaired Plaintiff's predecessor–in–interest's recovery opportunities associated with the 50,000 Yukos ADR position and materially contributed to the economic losses alleged above. Plaintiff alleges that, across the successive Yukos–related distribution tranches described herein, the resulting cumulative loss attributable to the 50,000–ADR position approaches $93,000, exclusive of any legally recoverable interest. The same course of conduct, when considered across Defendant's approximately 15% historical ADR–related position, is consistent with the estimated aggregate beneficiary losses alleged above that may exceed $100 million. Defendant's continuing refusal to employ its institutional position further exposes Plaintiff and the affected ADR beneficiaries to additional loss while substantial Yukos–related recovery and enforcement mechanisms remain active and the corresponding ADR–related institutional interest remains unasserted.

**191.** Plaintiff has suffered and continues to suffer damages and other injury as a direct and proximate result of Defendant's gross negligence and seeks compensatory and equitable relief accordingly. Plaintiff pleads this claim independently and, to the extent

permitted, in the alternative to Counts I and IV. To the extent the Court determines that any duty implicated by this conduct is contractual rather than independently tort–based, Plaintiff separately relies upon the same alleged grossly negligent and bad–faith conduct in connection with the contractual standards, limitations, and remedies pleaded in Count IV.

**COUNT IV: Breach of the Deposit Agreement and, in the Alternative, Breach of the Implied Covenant of Good Faith and Fair Dealing**

**192.** Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**193.** The Yukos ADR program was governed by the Deposit Agreement dated March 12, 2001. ILVEYS INC., as a Beneficial Owner of Yukos ADRs, was within the contractual structure expressly recognized by the Agreement, and Plaintiff subsequently acquired the corresponding contractual claims and rights through the assignment described above. Plaintiff alleges that ILVEYS INC. performed the obligations required of it that are material to the claims asserted herein and that no failure of performance by ILVEYS INC. excuses the conduct challenged in this Count.

**194.** Section 7.04 expressly recognizes Holders and Beneficial Owners as parties to and bound by the Deposit Agreement, and Section 7.06 provides that the Agreement and the Receipts are governed by New York law. (Exhibit Q.)

**195.** The Deposit Agreement vested Defendant, as Depositary, with the central contractual position through which the Deposited Securities and corresponding ADR interests were administered. Section 2.01 granted the Depositary specified authority,

including attorney–in–fact authority, in connection with performance of its duties and obligations under the Agreement. (Exhibit Q.)

**196.** The Agreement also expressly contemplated representative claims activity by the Depositary. In the specific context addressed by Section 5.01, only the Depositary, acting on behalf of Holders and Beneficial Owners, is permitted to pursue claims against the Custodian for losses caused by the Custodian. Plaintiff does not rely upon Section 5.01 as a universal claims provision, but alleges that it demonstrates that representative enforcement by the Depositary on behalf of Holders and Beneficial Owners was an express feature of the contractual architecture itself. (Exhibit Q.)

**197.** Section 5.03 expressly addresses the Depositary's appearance in, prosecution of, or defense of proceedings concerning Deposited Securities or Receipts. Where, in the Depositary's opinion, such proceedings may involve expense or liability, the Section provides that the Depositary is not obligated to undertake such litigation unless satisfactory indemnity is furnished, while the same Section requires performance of obligations specifically set forth in the Deposit Agreement without negligence or bad faith. Plaintiff does not rely upon Section 5.03 as creating an unconditional contractual duty to litigate. Plaintiff alleges, however, that its expense–and–indemnity mechanism cannot operate as a categorical shield against the judicial participation in Case No. 14–cv–1996 sought here where the need for such participation was materially increased by Defendant's own prior refusal to undertake cost–free or materially less burdensome protective measures. (Exhibit Q.)

**198.** Section 6.02 further establishes a contractual framework governing the consequences of termination, including continued collection of distributions pertaining to

Deposited Securities and the holding of net proceeds for the pro rata benefit of Holders in the circumstances contemplated by that provision. The Agreement therefore did not treat termination itself as automatically eliminating every continuing economic consequence of the Depositary relationship. (Exhibit Q.)

**199.** Plaintiff alleges that Defendant breached the Deposit Agreement to the extent Defendant performed obligations specifically undertaken under the Agreement negligently or in bad faith. Independently and in the alternative, to the extent the challenged conduct concerned the exercise or withholding of contractual authority not governed by an express mandatory provision, Plaintiff alleges that Defendant breached the implied covenant of good faith and fair dealing by exercising that authority, discretion, and termination position in a manner that deprived the ADR beneficiaries of the contractual benefits reasonably expected to flow through the Depositary structure.

**200.** During the 2005–2007 period, while Defendant continued administering the Yukos ADR program, Plaintiff alleges that Defendant performed and administered that contractual relationship in bad faith by withholding material information concerning the conflict and liquidation circumstances described above while continuing to obtain fees, and thereafter by issuing the December 18, 2007 "Worthless Notice" in a manner that created the appearance that the ADR relationship and corresponding economic interests had been completely exhausted.

**201.** In January 2016, after ILVEYS INC. specifically sought Defendant's involvement concerning an active Yukos recovery process, Defendant represented that Deutsche Bank was "not involved in any Yukos claims process" and declined to employ or meaningfully consider the representative and institutional authority available through the

Depositary structure. Plaintiff alleges that this conduct constituted a bad–faith use and withholding of Defendant's contractual position that frustrated the beneficiaries' ability to receive the benefits associated with that structure.

**202.** Defendant thereafter remained absent during the 2017–2018 recovery and distribution process while substantial Yukos–related value was being distributed. Plaintiff alleges that Defendant failed even to undertake cost–free or materially less burdensome protective measures, including approaching the recovery managers, asserting the corresponding institutional interest, or lodging a protective objection, notwithstanding its prior direct notice of the active recovery process.

**203.** Defendant again exercised and withheld its contractual and institutional authority in bad faith on April 6, 2026 when, after receiving direct notice of the renewed March 16, 2026 distribution and a formal demand for action, it relied upon the 2007 termination and "Worthless Notice" to disclaim any continuing role and refused to employ its institutional position in the then–active recovery and enforcement mechanisms.

**204.** Plaintiff's implied–covenant theory does not seek to rewrite Section 5.03 into an unconditional obligation to litigate or to impose a term inconsistent with the Deposit Agreement. Rather, Plaintiff alleges that Defendant used contractual discretion, institutional authority, and the termination provisions themselves in bad faith and for a self–protective purpose so as to frustrate the benefits reasonably expected from the Depositary relationship and to leave the ADR–related economic interests without effective institutional protection.

**205.** To the extent Defendant's challenged conduct involved performance of obligations specifically undertaken under the Deposit Agreement, Plaintiff further alleges that such

performance violated the Agreement's express contractual standard requiring those obligations to be performed without negligence or bad faith.

**206.** Plaintiff further alleges that Defendant cannot treat termination as categorically eliminating the surviving economic consequences of the Depositary relationship where Section 6.02 itself contemplated continuing post–termination administration of distributions, property, and proceeds in the circumstances specified therein, and where Yukos–related economic value subsequently survived and entered recovery and distribution mechanisms.

**207.** As a direct and proximate result of Defendant's alleged breaches of the Deposit Agreement and, alternatively, the implied covenant of good faith and fair dealing, Plaintiff and his predecessor–in–interest were deprived of contractual benefits, subjected to materially impaired recovery opportunities, and exposed to continuing economic loss.

**208.** Plaintiff therefore seeks damages and equitable relief, including, to the extent supported by the Court's determination of the scope of the Agreement and Defendant's contractual obligations, relief requiring Defendant to perform the remedial action necessary to protect and pursue the Yukos ADR interests through the institutional position established and historically administered under the Deposit Agreement. Plaintiff pleads the express–contract and implied–covenant theories in the alternative to the extent a bona fide dispute exists as to whether particular aspects of Defendant's challenged conduct are governed directly by an express contractual provision or instead by the covenant governing the exercise of contractual authority and discretion.

**COUNT V: Unjust Enrichment (Pled in the Alternative)**

**209.** Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**210.** Plaintiff pleads this Count in the alternative to Counts I through IV and solely to the extent the Court determines that particular economic benefits or enrichment alleged herein are not governed by an enforceable contractual provision and are not duplicative of a conventional tort remedy concerning the same subject matter, or otherwise present a bona fide dispute as to the scope of the Deposit Agreement and the availability of restitutionary relief.

**211.** During its administration of the Yukos ADR program, Defendant DBTCA obtained fees, charges, commissions, and other economic benefits through the Depositary relationship. Plaintiff alleges that such benefits continued to be obtained during periods in which Defendant concealed the institutional conflicts described above, withheld material information from the ADR beneficiaries, continued administering the ADR program while the underlying Yukos investment was being subjected to liquidation, and failed to employ its entrusted institutional position for the protection of the corresponding beneficiary interests.

**212.** Plaintiff alleges that, to the extent such fees, charges, commissions, or other benefits were paid, charged, deducted, generated, or retained through the Yukos ADR relationship while Defendant engaged in the conflicted administration, concealment, bad–faith conduct, and abandonment alleged herein, Defendant was enriched at the expense of Plaintiff's predecessor–in–interest and the affected ADR beneficiaries.

Plaintiff further alleges that permitting Defendant to retain such benefits under those circumstances would be against equity and good conscience.

**213.** Plaintiff further alleges that the broader Deutsche Bank network's expanding relationships with Russian state–controlled enterprises supplied both an economic motive and a commercial context for Defendant's conduct. As alleged above, DBTCA's silence and non–enforcement removed a potentially significant institutional obstacle associated with the approximately 15% historical Yukos ADR position while the broader Deutsche Bank network pursued and preserved commercially valuable relationships with Gazprom, Rosneft, and other state–controlled enterprises.

**214.** Plaintiff does not allege that every economic benefit earned elsewhere within the Deutsche Bank corporate network automatically constituted enrichment of DBTCA. Rather, Plaintiff alleges that discovery and equitable accounting are necessary to determine whether economic benefits obtained, preserved, or retained elsewhere within that network were obtained or preserved through, or are otherwise causally attributable to, Defendant DBTCA's own alleged misconduct, and to identify the specific corporate entities by which any such causally attributable benefits were received, credited, allocated, transferred, or retained.

**215.** Plaintiff further alleges that the internal allocation of economic benefits among affiliated Deutsche Bank entities should not, standing alone, defeat equitable scrutiny of gains shown to be causally attributable to Defendant DBTCA's own conduct. To the extent DBTCA itself received, was credited with, was allocated, preserved, or retained an economic benefit and thereafter transferred or allocated that benefit elsewhere within the

corporate network, Plaintiff alleges that such subsequent internal movement should not by itself eliminate restitutionary liability otherwise established against DBTCA.

**216.** Plaintiff alleges that Defendant's passivity served related but distinct self–protective functions over time. During the destruction and liquidation of Yukos, DBTCA's silence and non–disclosure allegedly protected the broader Deutsche Bank network's existing financial exposure and commercially valuable Russian relationships. After those historical transactions had occurred, Defendant's continuing refusal to employ its Depositary position allegedly served to avoid adversarial proceedings, discovery, and accounting in which the underlying commercial relationships, the historical banking infrastructure surrounding Schedule 8, the internal allocation of associated economic benefits, and any causal connection between those benefits and Defendant's conduct could become subjects of judicial scrutiny.

**217.** Because the nature, amount, allocation, transfer, and retention of the relevant economic benefits are matters principally within Defendant's and the broader Deutsche Bank network's internal records, Plaintiff seeks a comprehensive equitable accounting identifying the fees, commissions, charges, and other benefits directly obtained through the Yukos Depositary relationship and tracing any additional economic benefits alleged to have been obtained, preserved, or retained through, or otherwise causally attributable to, Defendant DBTCA's own misconduct.

**218.** To the extent such accounting establishes that Defendant DBTCA obtained, preserved, retained, or is otherwise legally responsible for net gains causally attributable to its breaches of fiduciary duty, fraudulent misrepresentation and concealment, gross negligence, contractual breaches, bad–faith conduct, or other wrongful conduct alleged

herein, Plaintiff seeks restitution and equitable disgorgement of those net unjust gains to the extent permitted by law. The ultimate scope and quantum of any such gain–based relief should follow the evidence developed through discovery and accounting.

**219.** Plaintiff does not seek duplicative recovery under this Count. Plaintiff pleads unjust enrichment as an alternative equitable theory and seeks restitution, equitable accounting, disgorgement of net unjust gains properly attributable to Defendant DBTCA, and such other equitable relief as the Court determines appropriate to prevent Defendant from retaining enrichment obtained at Plaintiff's expense under circumstances in which its retention would be inequitable.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant Deutsche Bank Trust Company Americas and grant the following relief:

### A. Mandatory Injunction and Alternative Standalone Enforcement Proceedings

**1.** An Order compelling Defendant DBTCA promptly to seek intervention in Case No. 14–cv–1996 (D.D.C.) for the purpose of asserting and pursuing the proportional economic interest attributable to the historical Yukos ADR position through Defendant's own Depositary and historical shareholding position and, if intervention is permitted, diligently to participate in that proceeding to protect and pursue the corresponding ADR–related recovery interests arising from the Russian Federation's adjudicated expropriation and destruction of Yukos, while preserving and asserting all legally available claims and

remedies consistent with the Hague Tribunal's adjudicated 25% / 75% allocation of responsibility between the Hague Claimants and the Russian Federation and Plaintiff's application of that allocation to the corresponding ADR–related losses, attributing 75% to the Russian Federation and 25% to the GML–controlled claimant and shareholder side.

**2.** In the alternative, if intervention in Case No. 14–cv–1996 is denied, becomes procedurally unavailable or foreclosed, or ceases to provide a meaningful avenue for asserting the corresponding ADR–related interests, an Order compelling Defendant DBTCA promptly to initiate and diligently pursue such independent judicial and judgment–enforcement proceedings within an appropriate United States jurisdiction as are legally available through Defendant's historical Depositary and shareholding position against the Russian Federation and any other party, including the GML Claimants, against whom legally cognizable recovery rights may be established, while preserving and asserting all legally available claims and remedies consistent with the Hague Tribunal's adjudicated 25% / 75% allocation of responsibility between the Hague Claimants and the Russian Federation and Plaintiff's application of that allocation to the corresponding ADR–related losses, attributing 75% to the Russian Federation and 25% to the GML–controlled claimant and shareholder side, and thereafter to employ all legally available attachment, collection, and enforcement remedies necessary to secure and preserve the recovery attributable to Defendant's approximately 15% historical ADR–related position for the benefit of the corresponding ADR interests.

**3.** An Order further compelling Defendant DBTCA to assert the approximately 15% historical ADR–related position in any United States recovery or distribution mechanism through which Yukos–related proceeds become available for allocation, including the renewed

2026 Yukos Claims Administration distribution described herein, to the extent the corresponding ADR–related interests remain capable of protection or recovery, and including any proceeds ultimately recovered through the approximately $5 billion Yukos Capital Limited enforcement described herein; and to lodge appropriate institutional objections against discriminatory or non–pro–rata distribution mechanisms affecting the corresponding ADR interests, including mechanisms of the kind implemented in connection with the 2017–2018 Yukos Claims Administration distribution.

**B. Declaratory Relief Concerning the Deposit Agreement and Defendant's Continuing Institutional Position**

1. Declare that Defendant may not rely upon the December 18, 2007 termination of the Yukos ADR program or the "Worthless Notice" as a categorical basis for extinguishing surviving economic interests, recovery rights, or liabilities arising from Defendant's own alleged negligence, bad faith, concealment, or other misconduct.
2. Declare that the Deposit Agreement must be applied consistently with its recognition of Holders and Beneficial Owners, its representative–claims architecture, its standards governing negligence and bad faith, its contemplation of judicial proceedings involving Deposited Securities or Receipts, and its post–termination framework.
3. Declare that Defendant cannot satisfy or discharge the remedial obligations alleged herein merely by offering to transfer or assign individual litigation rights to Plaintiff where such a transfer would not recreate Defendant's historical Depositary and shareholding position or eliminate the structural barrier described in this Complaint.
4. Declare that Defendant may not invoke its own refusal to employ its historical institutional position as the reason the corresponding ADR beneficiaries must remain without an

effective means of pursuing the surviving recovery interests administered through that position.

**C. Compensatory Damages and Alternative Monetary Relief**

1. Award Plaintiff compensatory damages in an amount to be established through discovery, proof, and trial for economic injury proximately caused by Defendant's breaches of fiduciary duty, fraudulent misrepresentation and concealment and, in the alternative, constructive fraud, gross negligence, breach of contract and, alternatively, breach of the implied covenant of good faith and fair dealing, and other actionable conduct alleged herein.
2. Such damages should include, to the extent established by the evidence and applicable law, the economic losses suffered in connection with the 50,000 Yukos ADR position, lost or impaired recovery opportunities, and legally recoverable pre–judgment and post–judgment interest.
3. In the alternative to the mandatory performance requested in Section A, and upon a finding that Defendant is liable for the wrongful refusal and breaches alleged herein, award Plaintiff compensatory monetary relief in lieu of such performance in an amount to be established through proof and trial, including Plaintiff's asserted alternative valuation benchmark of approximately $12,950,000 for the 50,000 Yukos ADR position, based upon approximately $259 per ADR as alleged above, together with all legally recoverable pre–judgment and post–judgment interest.

**D. Punitive Damages**

Award punitive damages to the extent permitted by law upon proof that Defendant's conduct was willful, wanton, malicious, fraudulent, or demonstrated such reckless disregard of the rights of Plaintiff and the ADR beneficiaries as to warrant punitive relief.

**E. Discovery and Disclosure**

Permit appropriate discovery and order such disclosure as is necessary to determine:

1. The fees, commissions, custodial income, depositary income, and other economic benefits obtained through the Yukos ADR relationship;
2. The relevant communications, records, internal analyses, and institutional knowledge concerning the destruction and liquidation of Yukos, the Confidential Sale Agreement, Schedule 8, the 2007 "Worthless Notice," the 2015–2016 Yukos claims communications, the subsequent distribution processes, and Defendant's 2026 refusal to act;
3. The nature and extent of Defendant's communications and relationships with relevant entities involved in the Yukos recovery and distribution infrastructure; and
4. The existence, location, transfer, allocation, and retention of economic benefits potentially subject to the equitable accounting requested below.

**F. Allocation of Recovery Expenses**

Order that any reasonable and necessary costs incurred by Defendant DBTCA in pursuing the judicial recovery sought herein be allocated in a manner consistent with the governing Deposit Agreement and the equitable relief ultimately awarded by the Court; provided, however, that no expense, liability, fee, charge, reimbursement, or offset attributable to Defendant DBTCA's own negligence, bad faith, concealed conflicts of

interest, or other misconduct established in this action shall be imposed upon Plaintiff or the affected Yukos ADR holders, or deducted from their recovery, merely by reason of DBTCA's performance of remedial action necessitated by such misconduct.

**G. Equitable Accounting and Disgorgement**

1. Declare that Defendant DBTCA's continuing concealment of material information from the Yukos ADR beneficiaries, together with its alleged bad–faith refusal to employ its Depositary and historical shareholding position to protect and enforce their interests, constitutes conduct properly subject to equitable accounting for the purpose of determining whether economic benefits were acquired, preserved, or retained through, or are otherwise causally attributable to, Defendant DBTCA's own misconduct.
2. Order Defendant DBTCA to submit to a comprehensive, judicially supervised equitable accounting identifying all depositary fees, custodial commissions, charges, transactional income, and other economic benefits directly obtained, credited, allocated, preserved, or retained by Defendant through the Yukos Depositary relationship.
3. Require that the Accounting, together with discovery permitted under the Federal Rules of Civil Procedure, further determine whether additional economic benefits obtained, preserved, transferred, allocated, or retained elsewhere within Deutsche Bank's broader corporate network – including relevant underwriting, advisory, syndication, capital–market, and other commercial benefits associated with Gazprom, Rosneft, VTB, UFG, or other state–controlled entities – were obtained, preserved, or retained through, or are otherwise causally attributable to, Defendant DBTCA's own alleged misconduct; identify the specific corporate entities by which any such causally attributable benefits

were received or retained; and require production of responsive information within Defendant's possession, custody, or control.

**4.** Award equitable disgorgement of the net gains, if any, shown through the Accounting to have been obtained, preserved, or retained through, or otherwise causally attributable to, Defendant DBTCA's breaches of fiduciary duty, fraudulent misrepresentation and concealment, constructive fraud, gross negligence, contractual breaches, unjust enrichment, or other wrongful conduct established in this action, with the disposition and allocation of any disgorged amounts to be determined by the Court in accordance with the rights established and the equitable circumstances proven in this action.

**5.** Adjudge and declare that corporate separateness, standing alone, does not categorically preclude discovery, accounting, or equitable scrutiny concerning economic benefits generated, preserved, transferred, allocated, or retained within Defendant's affiliated corporate network where Plaintiff establishes that such inquiry concerns benefits allegedly causally attributable to Defendant DBTCA's own affirmative misconduct, bad–faith omissions, or concealed conflicts of interest.

**H. Further Relief**

Award Plaintiff such additional legal, equitable, declaratory, restitutionary, injunctive, monetary, and other relief as the Court deems just and proper, together with allowable costs and such pre–judgment and post–judgment interest as may be permitted by law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Deniel Shumeiko*

**DENIEL SHUMEIKO, Pro Se Plaintiff**

3600 Chestnut St, Apt 703

Philadelphia, PA, 19104

Telephone: 2676933824

E–mail: deniel24@sas.upenn.edu

Dated: October 12, 2026.

# INDEX OF EXHIBITS

| Exhibit | Document Description | Core Legal Purpose |
|---|---|---|
| **A** Pp. 3–43 | DEED OF ASSIGNMENT AND SUPPORTING CORPORATE RECORDS | Documents the assignment of the Yukos ADR-related claims and the supporting corporate records. |
| **B** Pp. 44–52 | UNANIMOUS SHAREHOLDERS' RESOLUTION OF ILVEYS INC. | Documents unanimous shareholder authorization for the transfer of the Yukos ADR-related claims. |
| **C** Pp. 53–61 | TIMELINE OF INSTITUTIONAL CONFLICT AND CONTINUING CONDUCT (2004–2026) | Summarizes the institutional conflict and continuing conduct underlying Plaintiff's claims. |
| **D** Pp. 62–73 | PRE-LITIGATION CORRESPONDENCE AND FORMAL DEMANDS | Documents the pre-litigation demands, Defendant's refusal, and subsequent correspondence. |
| **E** Pp. 74–81 | VALUATION AND CALCULATION METHODOLOGY | Provides the valuation methodology and benchmarks supporting Plaintiff's ADR-related calculations. |
| **F** Pp. 82–86 | SWEDISH JUDICIAL ADJUDICATION AND ADR STRUCTURAL BARRIER | Documents the Swedish adjudication and the structural barrier arising from the ADR intermediary structure. |
| **G** Pp. 87–91 | EXTRACTS FROM PUBLIC LAW 112–208 (MAGNITSKY ACT) | Provides federal policy context expressly addressing the promotion of U.S. investor claims in Yukos. |
| **H** Pp. 92–111 | YUKOS CLAIMS ADMINISTRATION – DISTRIBUTION FRAMEWORK, CLAIM PROCESSING, AND CONTINUING RECOVERY (2015–2026) | Documents the Yukos distribution framework, ILVEYS INC.'s claim and payment history, and renewed distribution activity in 2026. |

**PLAINTIFF'S INDEX OF EXHIBITS**
**(SUBMITTED IN SUPPORT OF PLAINTIFF'S AMENDED COMPLAINT)**

| Exhibit Letter | Document Description and Legal Significance | Relevant Page / Section | Source / Authority |
|---|---|---|---|
| **EXHIBIT I** Pp.3–55 | **Excerpts from the Yukos v. Russian Federation Final Award (PCA Case No. AA 227).** Documents Deutsche Bank AG's role as part of the Western Banks syndicate, the December 13, 2005 Confidential Sale Agreement with Rosneft, and the Schedule 8 bankruptcy mechanism. Provides institutional background concerning the bankruptcy and redistribution of Yukos assets and the related recovery structures. | Pages 4-12, 14, 18-19, 22-24, 27-28, 43-47 | Permanent Court of Arbitration (The Hague, 2014) |
| **EXHIBIT J** Pp.56–61 | **Excerpts from Deutsche Bank Annual Review 2006.** Contains official corporate admissions where the Deutsche Bank's Chairman reported "best revenues ever" driven by the bank's status as the "market leader in Russia." Identifies Dr. Tessen von Heydebreck as the Board member responsible for Legal and Compliance. | | Deutsche Bank AG (Official SEC Filing Record) |
| **EXHIBIT K** Pp.62–76 | **The 2015–2016 Yukos ADR Correspondence (Email Communications with Deutsche Bank Depositary Receipts).** Email communications between ILVEYS INC. and Deutsche Bank Depositary Receipts documenting inquiries concerning the active Yukos claims process and the January 21, 2016 representation that Deutsche Bank was "not involved in any Yukos claims process." Supports Plaintiff's allegations of fraudulent misrepresentation and concealment. | Full Email Thread (Jan 21, 2016) | Internal Corporate Correspondence (@db.com) |
| **EXHIBIT L** Pp.77–90 | **Yukos Recovery Framework Correspondence.** Communications with GML- and Yukos-related management concerning preparation of shareholder distributions and ILVEYS INC.'s inquiry whether ADR-related payments would proceed through Deutsche Bank TCA or directly to ADR owners. | Multi-Year Log (Jan 2010 – Sept 2015) | Direct Investor-Management Correspondence |
| **EXHIBIT M** Pp.91–95 | **Deutsche Bank Annual Report 2007.** Documents Global Transaction Banking financial results, including a 34% increase in profit to €945 million and €3.965 billion in fiduciary and custodial commissions, relevant to Plaintiff's allegations concerning fee generation, institutional conflict, and economic motive. | | Deutsche Bank AG (Official SEC Filing Record) |
| **EXHIBIT N** Pp.96–100 | **U.S. Statement of Interest (May 8, 2026) in Hulley Enterprises Ltd. v. Russian Federation.** Addresses issue preclusion, international comity, foreign-court determinations, and the FSIA in the existing U.S. Yukos enforcement proceedings. | U.S. Government Statement of Interest (May 8, 2026) | U.S. Department of Justice (DOJ) |
| **EXHIBIT O** Pp.101–102 | **Deutsche Bank Media Release — Acquisition of United Financial Group (Dec. 6, 2005).** Documents Deutsche Bank's agreement to acquire the remaining 60% of UFG and its stated "strategic commitment to Russia" shortly before the December 13, 2005 Confidential Sale Agreement. | UFG Acquisition / Dec. 6, 2005 | Deutsche Bank Corporate Media Release |
| **EXHIBIT P** Pp.103–113 | **Compendium of Financial Media Records and Independent Market Data.** Compendium of Financial Media Records and Independent Market Data. Includes The Times reporting that Josef Ackermann personally informed the President of Russia of Deutsche Bank's planned UFG investment during a summit attended by Gerhard Schröder and that Deutsche Bank consulted the Russian Government before completing the transaction. Includes Financial News London reporting and Dealogic market data concerning Deutsche Bank's Russian market position and relationships with state-controlled enterprises. | Articles dated Nov 2003, Dec 2006, Aug 2010 | *The Times*, *Financial News London*, *Dealogic* Market Data |
| **EXHIBIT Q** Pp.114–140 | **The Governing Yukos American Depositary Receipt Deposit Agreement** This Exhibit comprises relevant contractual excerpts from the governing Deposit Agreement executed between Yukos Oil Company and Bankers Trust Company (predecessor to Defendant DBTCA). It establishes the contractual framework governing the respective rights and roles of the Depositary, Holders, and Beneficial Owners, including the Depositary's representative authority, claims mechanisms, judicial proceedings, and applicable standards of performance. | Contract dated March 12, 2001 | *Securities and Exchange Commission (Form F-6EF, Registration No. 333-104052)* |