# PDF No. 2: EXHIBITS I–Q TO PLAINTIFF'S AMENDED COMPLAINT

**Plaintiff: DENIEL SHUMEIKO**

**Defendant: DEUTSCHE BANK TRUST COMPANY AMERICAS**

**PLAINTIFF'S INDEX OF EXHIBITS**
**(SUBMITTED IN SUPPORT OF PLAINTIFF'S AMENDED COMPLAINT)**

| Exhibit Letter | Document Description and Legal Significance | Relevant Page / Section | Source / Authority |
|---|---|---|---|
| **EXHIBIT I** Pp.3–55 | **Excerpts from the Yukos v. Russian Federation Final Award (PCA Case No. AA 227).** Documents Deutsche Bank AG's role as part of the Western Banks syndicate, the December 13, 2005 Confidential Sale Agreement with Rosneft, and the Schedule 8 bankruptcy mechanism. Provides institutional background concerning the bankruptcy and redistribution of Yukos assets and the related recovery structures. | Pages 4-12, 14, 18-19, 22-24, 27-28, 43-47 | Permanent Court of Arbitration (The Hague, 2014) |
| **EXHIBIT J** Pp.56–61 | **Excerpts from Deutsche Bank Annual Review 2006.** Contains official corporate admissions where the Deutsche Bank's Chairman reported "best revenues ever" driven by the bank's status as the "market leader in Russia." Identifies Dr. Tessen von Heydebreck as the Board member responsible for Legal and Compliance. | | Deutsche Bank AG (Official SEC Filing Record) |
| **EXHIBIT K** Pp.62–76 | **The 2015–2016 Yukos ADR Correspondence (Email Communications with Deutsche Bank Depositary Receipts).** Email communications between ILVEYS INC. and Deutsche Bank Depositary Receipts documenting inquiries concerning the active Yukos claims process and the January 21, 2016 representation that Deutsche Bank was "not involved in any Yukos claims process." Supports Plaintiff's allegations of fraudulent misrepresentation and concealment. | Full Email Thread (Jan 21, 2016) | Internal Corporate Correspondence (@db.com) |
| **EXHIBIT L** Pp.77–90 | **Yukos Recovery Framework Correspondence.** Communications with GML- and Yukos-related management concerning preparation of shareholder distributions and ILVEYS INC.'s inquiry whether ADR-related payments would proceed through Deutsche Bank TCA or directly to ADR owners. | Multi-Year Log (Jan 2010 – Sept 2015) | Direct Investor-Management Correspondence |
| **EXHIBIT M** Pp.91–95 | **Deutsche Bank Annual Report 2007.** Documents Global Transaction Banking financial results, including a 34% increase in profit to €945 million and €3.965 billion in fiduciary and custodial commissions, relevant to Plaintiff's allegations concerning fee generation, institutional conflict, and economic motive. | | Deutsche Bank AG (Official SEC Filing Record) |
| **EXHIBIT N** Pp.96–100 | **U.S. Statement of Interest (May 8, 2026) in Hulley Enterprises Ltd. v. Russian Federation.** Addresses issue preclusion, international comity, foreign-court determinations, and the FSIA in the existing U.S. Yukos enforcement proceedings. | U.S. Government Statement of Interest (May 8, 2026) | U.S. Department of Justice (DOJ) |
| **EXHIBIT O** Pp.101–102 | **Deutsche Bank Media Release — Acquisition of United Financial Group (Dec. 6, 2005).** Documents Deutsche Bank's agreement to acquire the remaining 60% of UFG and its stated "strategic commitment to Russia" shortly before the December 13, 2005 Confidential Sale Agreement. | UFG Acquisition / Dec. 6, 2005 | Deutsche Bank Corporate Media Release |
| **EXHIBIT P** Pp.103–113 | **Compendium of Financial Media Records and Independent Market Data.** Compendium of Financial Media Records and Independent Market Data. Includes The Times reporting that Josef Ackermann personally informed the President of Russia of Deutsche Bank's planned UFG investment during a summit attended by Gerhard Schröder and that Deutsche Bank consulted the Russian Government before completing the transaction. Includes Financial News London reporting and Dealogic market data concerning Deutsche Bank's Russian market position and relationships with state-controlled enterprises. | Articles dated Nov 2003, Dec 2006, Aug 2010 | *The Times*, *Financial News London*, *Dealogic* Market Data |
| **EXHIBIT Q** Pp.114–140 | **The Governing Yukos American Depositary Receipt Deposit Agreement** This Exhibit comprises relevant contractual excerpts from the governing Deposit Agreement executed between Yukos Oil Company and Bankers Trust Company (predecessor to Defendant DBTCA). It establishes the contractual framework governing the respective rights and roles of the Depositary, Holders, and Beneficial Owners, including the Depositary's representative authority, claims mechanisms, judicial proceedings, and applicable standards of performance. | Contract dated March 12, 2001 | *Securities and Exchange Commission (Form F-6EF, Registration No. 333-104052)* |

# Exhibit I: Excerpts from the Yukos v. Russian Federation Final Award (PCA Case No. AA 227)

This Exhibit contains relevant excerpts from the 2014 Hague Final Award documenting Deutsche Bank AG's participation as a member of the Western Banks syndicate, the December 13, 2005 Confidential Sale Agreement with Rosneft, and the Schedule 8 bankruptcy mechanism. The excerpts provide relevant historical context for Plaintiff's allegations concerning Deutsche Bank's institutional conflict and Defendant DBTCA's subsequent treatment of the Yukos ADR beneficiaries.

**PCA Case No. AA 227**

**IN THE MATTER OF AN ARBITRATION BEFORE A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH ARTICLE 26 OF THE ENERGY CHARTER TREATY AND THE 1976 UNCITRAL ARBITRATION RULES**

**- between -**

**YUKOS UNIVERSAL LIMITED (ISLE OF MAN)**

**- and -**

**THE RUSSIAN FEDERATION**

---

# FINAL AWARD

---

**18 July 2014**

*Tribunal*
The Hon. L. Yves Fortier PC CC OQ QC, Chairman
Dr. Charles Poncet
Judge Stephen M. Schwebel

Mr. Martin J. Valasek, Assistant to the Tribunal
Mr. Brooks W. Daly, Secretary to the Tribunal
Ms. Judith Levine, Assistant Secretary to the Tribunal

*Registry*
Permanent Court of Arbitration

*Representing Claimant*:

Professor Emmanuel Gaillard
Dr. Yas Banifatemi
Ms. Jennifer Younan
SHEARMAN & STERLING LLP

*Representing Respondent*:

Dr. Claudia Annacker
Mr. Lawrence B. Friedman
Mr. David G. Sabel
Mr. Matthew D. Slater
Mr. William B. McGurn
Mr. J. Cameron Murphy
CLEARY GOTTLIEB STEEN & HAMILTON LLP

Mr. Michael S. Goldberg
Mr. Jay L. Alexander
Dr. Johannes Koepp
Mr. Alejandro A. Escobar
BAKER BOTTS LLP

(c) Russian Courts Invalidate the Share Exchange Agreement ..... 285

(d) Russian Federation Ultimately Acquires Sibneft via Gazprom..... 287

3. Parties' Arguments and Tribunal's Observations ..... 287

(a) Was Yukos' NYSE Listing Put on Hold Because of the Yukos–Sibneft Merger or Fears of Exposing Yukos' Tax Optimization Scheme? ..... 287

(b) Was the 2003 Interim Dividend a Component of the Yukos–Sibneft Merger or a Means to Siphon Funds out of Russia? ..... 289

(c) Was the Unwinding of the Merger Caused by the Russian Federation? ..... 292

E. ATTEMPTS TO SETTLE..... 298

1. Introduction..... 298

2. Yukos' Settlement Offers (and the Russian Federation's Replies)..... 300

(a) Proposals Made to the Bailiffs ..... 302

(b) Proposals for a Global Settlement Conveyed by Mr. Chrétien ..... 304

(c) Requests for a Deferral or Payment in Instalments ..... 306

(d) Other Proposals ..... 307

3. Parties' Arguments and Tribunal's Observations ..... 308

(a) Did Yukos Contribute to its Own Demise by Failing to Discharge Tax Debt in the Amount of USD 9 Billion in the First Quarter of 2004? ..... 308

(b) Did Yukos' Settlement Offers Constitute Real Alternatives to Enforcement? ..... 312

F. THE AUCTION OF YNG ..... 322

1. Introduction..... 322

2. Chronology ..... 324

(a) Yukos' Shares in YNG are Seized and the Government Announces they will be Sold; Yukos Brings Unsuccessful Court Challenges ..... 325

(b) YNG is Valued for Auction while its Tax Liabilities Rapidly Escalate..... 325

(c) Yukos Tries to Prevent the Auction; Preparations Proceed; an Entity Named Baikal is Created to Purchase YNG..... 327

(d) After a 10-Minute Auction, the Successful Bidder Baikal is Sold to State-Owned Rosneft; a "Monumental Bargain"; the "State, Looking After its Own Interests" ..... 329

(e) Once it is State-Owned, YNG's Fate Improves, with Reductions in Tax Liabilities and a Dramatic Increase in Value ..... 330

3. Parties' Arguments and Tribunal's Observations ..... 331

(a) Did the Auction Price Reflect the True Value of YNG; If not, was Either Party Responsible for the Price Reduction? ... 332

(b) Who was Behind Baikal and were They a Front for the Russian State? ... 336

(c) What were Yukos' Prospects for Survival Once it Lost its Core Asset? ... 340

G. THE BANKRUPTCY OF YUKOS ... 342

1. Introduction ... 342

2. Chronology ... 343

(a) The Initiation of the Bankruptcy ... 343

(b) The Treatment of Bankruptcy Claims; the Creditors' Meeting; the Declaration of Yukos' Bankruptcy ... 349

(c) The Liquidation of Yukos' Remaining Assets ... 352

3. Parties' Arguments and Tribunal's Observations ... 355

(a) Why was the Bankruptcy Initiated and Who was Truly Behind It? ... 356

(b) Were the Bankruptcy Proceedings Conducted Properly and Fairly? ... 368

H. THE WITHDRAWAL OF PWC'S AUDIT OPINIONS ... 377

1. Introduction ... 377

2. Chronology ... 379

(a) PwC Serves as Both Auditor and Consultant to Yukos ... 379

(b) PwC Responds to the Massive Tax Reassessments against Yukos ... 380

(c) PwC Faces Mounting Pressure from the Russian Federation around the Same Time as Mr. Khodorkovsky's Second Trial Starts ... 382

(d) PwC's "Volte-Face" in Withdrawing the Yukos Audits; Improved Treatment and Continued Pressures in the Russian Federation ... 385

3. Parties' Arguments and Tribunal's Observations ... 389

(a) Did PwC Withdraw its Audits because it was under Pressure from the Russian Government? ... 389

(b) Were the Grounds Provided by PwC in its Withdrawal Letter Contrived or Credible? ... 391

(c) Concluding Observations ... 399

IX. PRELIMINARY OBJECTIONS ... 401

A. ARE ALL OR SOME OF THE CLAIMS BARRED BY THE "FORK-IN-THE-ROAD" PROVISION OF THE ECT? ... 402

1. Introduction ... 402

# LIST OF DEFINED TERMS

| **Term** | **Definition** |
|---|---|
| **2000 Audit Report** | Field Tax Audit Report No. 08-1/1, dated 29 December 2003, finding that Yukos operated a tax evasion scheme |
| **2000 Decision** | Decision No. 14-3-05/1609-1, dated 14 April 2004, holding Yukos liable for a tax offense and reassessing approximately USD 3.48 billion in taxes against Yukos for the year 2000 |
| **2001 Decision** | Decision No. 30-3-15/3, dated 2 September 2004, holding Yukos liable for a tax offense and reassessing approximately USD 4.1 billion in taxes against Yukos for the year 2001 |
| **2002 Decision** | Decision No. 52/896, dated 16 November 2004, holding Yukos liable for a tax offense and reassessing approximately USD 6.7 billion in taxes against Yukos for the year 2002 |
| **2003 Decision** | Decision No. 52/985, dated 6 December 2004, holding Yukos liable for a tax offense and reassessing approximately USD 6 billion in taxes against Yukos for the year 2003 |
| **2003 Interim Dividend** | Yukos' declaration of a USD 2 billion interim dividend in November 2003 |
| **2004 Decision** | Decision No. 52/292, dated 17 March 2006, holding Yukos liable for a tax offense and reassessing approximately USD 3.9 billion in taxes against Yukos for the year 2004 |
| **ADR** | American Depositary Receipt |
| **A Loan** | USD 1 billion loan entered into on 24 September 2003 by Yukos from the Western Banks and secured by certain of Yukos' oil export contracts and by YNG |
| **April 2004 Injunction** | Ruling by the Moscow Arbitrazh Court dated 15 April 2004 prohibiting Yukos from alienating and encumbering its assets |
| **Baikal** | Baikal Finance Group, the entity which purchased YNG at auction and which was bought by Rosneft |
| **BBS Companies** | Behles Petroleum S.A., Baltic Petroleum Trading Limited and South Petroleum Limited |
| **B Loan** | USD 1.6 billion loan entered into on 30 September 2003 by Yukos from Société Générale S.A. and fully collateralized in cash by GML |

| **Term** | **Definition** |
|---|---|
| **Chrétien letters** | Letters from Jean Chrétien to Prime Minister Fradkov, dated 6 and 15 July 2004, and to President Putin, dated 30 July 2004, 10 September 2004 and 17 November 2004 |
| **Claimants** | Hulley, VPL, and YUL |
| **Claimants' Post-Hearing Brief** | Claimants' Post-Hearing Brief, dated 21 December 2012 |
| **Claimants' Skeleton** | Claimants' Skeleton Argument, dated 1 October 2012 |
| **Confidential Sale Agreement** | Confidential sale agreement between the Western Banks and Rosneft dated 13 December 2005 |
| **Counter-Memorial** | Respondent's Counter-Memorial on the Merits, dated 4 April 2011, as corrected 29 July 2011 |
| **Cyprus-Russia DTA** | Agreement Between the Government of the Republic of Cyprus and the Government of the Russian Federation for the Avoidance of Double Taxation with Respect to Taxes on Income and on Capital, signed on 5 December 1998 |
| **DCF** | Discounted Cash Flow |
| **Dresdner** | ZAO Dresdner Bank |
| **Dresdner Summary Letter** | Dresdner Summary Valuation Opinion Letter dated 6 October 2004 |
| **Dresdner Valuation Report** | Dresdner Valuation Report of YNG dated 6 October 2004 |
| **EBITDA** | Earnings before Interest, Taxes, Depreciation and Amortization |
| **ECHR** | European Convention on Human Rights |
| **ECT (or Treaty)** | Energy Charter Treaty, 2080 UNTS 95, signed on 17 December 1994 |
| **ECtHR** | European Court of Human Rights |
| **ECtHR Yukos Judgment** | OAO Neftyanaya Kompaniya Yukos v. Russia, ECtHR, Appl. No. 14902/04, Judgment, 20 September 2011 |
| **EGM** | Extraordinary General Meeting |
| **English Judgment** | BNP Paribas S.A. v. Yukos Oil Company, High Court of England and Wales, Case No. HC 05 C0 12 19, [2005] EWHC 1321 (Ch), Judgment, 24 June 2005 |
| **GML** | GML Limited (formerly named Group Menatep Limited), a company incorporated in Gibraltar and parent company of YUL |

| **Term** | **Definition** |
|---|---|
| **Stichting 2** | Stichting Administratiekantoor Small World Telecommunication Holdings B.V. |
| **Stichtings** | Stichting 1 and Stichting 2 |
| **TRO** | Temporary Restraining Order |
| **UNCITRAL Rules** | Arbitration Rules of the United Nations Commission on International Trade Law, 1976 |
| **U.S. GAAP** | United States' Generally Accepted Accounting Principles |
| **VAT Law** | Law of the Russian Federation governing Value Added Tax |
| **VCLT** | Vienna Convention on the Law of Treaties, 1155 UNTS 331, signed on 23 May 1969 |
| **VPL** | Veteran Petroleum Limited, a company organized under the laws of Cyprus and Claimant in PCA Case No. AA 228 |
| **Western Banks** | Syndicate of Western banks led by Société Générale S.A. and including BNP Paribas S.A., Citibank N.A., Commerzbank Akziengesellschaft, Calyon S.A., Deutsche Bank A.G., Hillside Apex Fund Limited, ING Bank N.V., KBC Bank N.V., Stark Trading, Shepherd Investments International Limited, Thames River Traditional Funds PLC (High Income Fund), UFJ (Holland) N.V. and V.R. Global Partners L.P. |
| **YNG** | Yuganskneftegaz, Yukos' core production subsidiary |
| **Yukos (or OAO Yukos Oil Company)** | OAO Yukos Oil Company, a joint stock company incorporated in Russia in 1993 |
| **Yukos CIS** | Yukos CIS Investment Limited |
| **Yukos Finance** | Yukos Finance B.V. |
| **Yukos International** | Yukos International U.K. B.V. |
| **YUL** | Yukos Universal Limited, a company organized under the laws of the Isle of Man and Claimant in PCA No. AA 227, shareholder of Yukos |
| **ZATO** | Zakrytoe Administrativno-Territorial'noe Obrazovaniye, or Closed Administrative Territorial Unit. |

59. The Parties filed their costs claims on 17 April 2014, and submitted comments on the opposing side's costs claims on 6 May 2014.

60. On 7 May 2014, the Tribunal formally declared the record in these arbitrations closed.

61. On 9 June 2014, Respondent informed the Tribunal that it was prepared to agree that the Final Awards may be publicly disclosed under certain conditions. Respondent also requested that the Tribunal modify its Procedural Order No. 13 to lift confidentiality restrictions with respect to documents disclosed in the course of these proceedings, to allow them to be used in "related proceedings" recently commenced against the Russian Federation. Claimants submitted comments in response on 16 June 2014, and Respondent further commented on 20 June 2014.

62. On 27 June 2014, the Tribunal issued **Procedural Order No. 18** in which it: (a) ordered that these Final Awards remain confidential for a period of ten calendar days following electronic dispatch to the Parties, after which period the PCA would post the Final Awards to its website and so notify the Parties and the Tribunal, whereupon all confidentiality obligations in respect of the Final Awards shall terminate; and (b) modified Procedural Order No. 13 to provide for limited disclosure of documents in related proceedings.

## II. FACTUAL BACKGROUND

63. The disputes between the Parties to the present proceedings involve various measures taken by Respondent against Yukos and associated companies primarily in the period between July 2003 and November 2007, when Yukos had emerged after the dissolution of the Soviet Union to become the largest oil company in the Russian Federation. The measures complained of include criminal prosecutions, harassment of Yukos, its employees and related persons and entities; massive tax reassessments, VAT charges, fines, asset freezes and other measures against Yukos to enforce the tax reassessments; the forced sale of Yukos' core oil production asset; and other measures culminating in the bankruptcy of Yukos in August 2006, the subsequent sale of its remaining assets, and Yukos being struck off the register of companies in November 2007. Claimants contend, and Respondent denies, that Respondent failed to treat Claimants' investments in Yukos in a fair and equitable manner and on a non-discriminatory basis, in breach of Article 10(1) of the ECT, and that Respondent expropriated Claimants' investments in breach of Article 13(1) of the ECT. Claimants seek full reparation in excess of USD 114 billion.

100. Further particulars on this aspect of the case are presented in Chapter VIII.F of this Award.

### 4. Bankruptcy Proceedings

101. Claimants allege that the Russian Federation first reported in March 2005 that it intended to "push Yukos into bankruptcy in order to redistribute its remaining assets." On 6 March 2006, a syndicate of foreign bank creditors of Yukos filed a bankruptcy petition before the Moscow Arbitrazh Court, pursuant to a Confidential Sale Agreement with Rosneft (the "**Confidential Sale Agreement**"). YNG—then owned by Rosneft—filed a separate bankruptcy petition against Yukos, which was subsequently joined to that of the bank syndicate. On 28 March 2006, bankruptcy proceedings were commenced against Yukos, placing it under external supervision, and on 4 August 2006, Yukos was declared bankrupt.

102. Yukos' remaining assets were nearly all acquired by State-owned Gazprom and Rosneft, with the bankruptcy auctions raising a total of USD 31.5 billion. In November 2007, Yukos was liquidated and struck off the register of legal entities.

103. The specifics relating to Yukos' bankruptcy are set out in Chapter VIII.G of this Award.

### 5. Withdrawal of PwC's Audits

104. In June 2007, PwC (which had served as both auditor and consultant to Yukos starting in 1997) withdrew all of its audits of Yukos from 1995 to 2004.

105. This final aspect of the factual matrix is treated in detail in Chapter VIII.H of this Award.

## III. PARTIES' WRITTEN SUBMISSIONS

106. As indicated in the Procedural History above, the Parties submitted two rounds of memorials on the merits. Each side took full advantage of the written phase of these proceedings, filing detailed and extensive written submissions. Claimants' Memorial runs to 424 pages and was accompanied by 1045 exhibits and 12 witness statements. Respondent's Counter-Memorial is 787 pages long, and was accompanied by 2868 exhibits and 8 witness statements. Claimants' Reply runs to 474 pages, and was accompanied by over 600 further exhibits. Finally, Respondent's Rejoinder runs to 819 pages, and was submitted with over 1700 further exhibits and seven witness statements. The Parties filed Post-Hearing Briefs of over 100 pages.

## F. THE AUCTION OF YNG

### 1. Introduction

981. After having reviewed these futile attempts by Yukos to settle its tax debts to the State, the Tribunal comes to one of the most striking episodes in the saga of Yukos' demise, the

[1182] Letter from Mr. Sazanov, Deputy Head of the Bailiffs Department to Mr. Gololobov, 9 September 2004, Exh. C-146.

[1183] Transcript, Day 6 at 40.

December 2004 auction of its core asset, the oil production company Yuganskneftegaz ("**YNG**") and the subsequent acquisition of YNG by State-owned Rosneft.

982. Claimants argue that the auction was a sham, "carefully orchestrated to achieve the transfer of Yukos' crown jewel to the State at the lowest price that could be achieved while maintaining a façade of legality."[1184] Claimants accuse Respondent of having depressed the value of YNG by fabricating USD 4.6 billion in tax claims against the company. They argue that Respondent set a low starting price which ignored both a valuation by Dresdner and Dresdner's advice on how to conduct the auction in order to maximize the sale price. Claimants deny that their own actions contributed to the low price achieved at the auction. They maintain that the sole bidder at the auction, a previously unknown entity called Baikal Finance Group ("**Baikal**"), was a dummy that was used to mask the Russian State's interest and involvement in the process.[1185]

983. Respondent answers that the decision to sell YNG to satisfy Yukos' massive debt was a direct consequence of Yukos' misconduct and the only realistic way to collect Yukos' unpaid taxes in circumstances where Yukos had fiercely obstructed audits, resisted payment and attempted to make itself judgment proof.[1186] Although YNG was sold during a 10-minute auction attended by two bidders on a Sunday afternoon in the outskirts of Moscow, Respondent observes that it was done in compliance with Russian law. Respondent avers that the price realized—USD 9.35 billion—was consistent with the formal appraisal conducted by Dresdner and other market estimates, and notes that this price reflected YNG's own tax liabilities.[1187] If the price was lower than it might otherwise have been, says Respondent, the fault lies solely with Claimants and Yukos, who sabotaged the auction through a sham bankruptcy proceeding in Texas and published threats of "a lifetime of litigation" which kept potential bidders away. Respondent rejects Claimants' theory that Baikal was a veneer for the Russian Government. Rather, Respondent submits that it was a special purpose vehicle associated with Surgutneftegaz. When Baikal suddenly found itself unable to finance its purchase (due to the Temporary Restraining Order ("**TRO**") obtained by Yukos in Texas), Rosneft simply seized a

---

[1184] Claimants' Post-Hearing Brief ¶ 97; *see* Press Conference with Russian and Foreign Media, 23 December 2004, Russian President Official Website, Exh. C-422; *see also* Memorial ¶¶ 334, 409; Reply ¶ 293; Claimants' Skeleton ¶ 45.

[1185] Claimants' Post-Hearing Brief ¶¶ 110–14; Memorial ¶¶ 386–95; Reply ¶¶ 370–76; Claimants' Skeleton ¶¶ 40–43.

[1186] Respondent's Post-Hearing Brief ¶¶ 87–121; Counter-Memorial ¶¶ 450–527; Rejoinder ¶¶ 951–1008; Respondent's Skeleton ¶¶ 36–54.

[1187] *See, e.g.*, Deutsche Bank, Project Chekov, December 2004, Slide 6, Exh. C-284.

commercial opportunity that presented itself as a result of Claimants' misconduct.[1188]

984. At the outset of its analysis, the Tribunal will recall that during the February 2003 meeting with the Union of Industrialists and Entrepreneurs Industrialists attended by Michael Khordokovsky and referred to earlier in this Award, President Putin made this seemingly prescient observation:

> [C]ertain things are obviously clear. [Rosneft] is a State-owned company. It has insufficient reserves and should increase them. Some other oil companies, such as Yukos, have a surplus of reserves.[1189]

985. As will be seen, after having reviewed the totality of the circumstances leading to the YNG auction and the auction itself, the Tribunal concludes that this episode provides yet more compelling evidence that the Russian Federation was not engaged in a true, good faith tax collection exercise but rather was intent on confiscating the most valuable asset of Yukos and effectively transferring it to the Russian State.

986. The Tribunal notes that its findings are consistent with those of the *RosInvestCo* and *Quasar* tribunals, which found "many aspects of the YNG auction more than suspect"[1190] and concluded that "the auction of YNG was rigged."[1191]

### 2. Chronology

987. As is evident from the chronology of events recounted in Chapter VIII.B, and as observed by the ECtHR, the Russian authorities "were unyieldingly inflexible as to the pace of the enforcement proceedings, acting very swiftly."[1192] This chronology reviews the key events as of the date when the sale of YNG was announced to the auction itself on 19 December 2004, and the transfer of the YNG shares to the Russian State-owned Rosneft three days later on 22 December.

---

1188 *See* Respondent's Skeleton ¶¶ 46–52; Respondent's Closing Slides, pp. 327–70.

1189 Video recording and transcript of meeting of the members of the Union of Industrialists and Entrepreneurs with President V. Putin held in the Ekaterininsky Hall, Kremlin, 19 February 2003, Exh. C-1396.

1190 *Quasar* ¶ 116, Exh. R-3383.

1191 *RosInvestCo* ¶ 620(d), Exh. C-1049.

1192 ECtHR Yukos Judgment ¶ 656, Exh. R-3328; Chapter VIII.B.

### (a) Yukos' Shares in YNG are Seized and the Government Announces they will be Sold; Yukos Brings Unsuccessful Court Challenges

988. On 20 July 2004, the Ministry of Justice announced its plan to sell YNG in order to satisfy Yukos' tax debt for the year 2000.[1193] Mr. Misamore testified that at the time of this announcement the only tax levied against Yukos and confirmed by the courts was for the year 2000, in the amount of approximately USD 3.42 billion, which Yukos had already started to pay.[1194] In the circumstances, he viewed the seizure of YNG as disproportionate and unjustified.

989. Industry analysts interpreted the bailiff's plans to sell "Yukos's most valuable asset" as "a clear sign the authorities are going in for the kill," observing that the move "leaves little doubt the authorities' final goal is for Yukos to cease to exist in its current form, materially erasing most, if not all, shareholder value in the process."[1195]

990. On 23 July 2004, GML director Tim Osborne declared that any purchaser of YNG would be "buying a whole heap of trouble."[1196]

991. Yukos applied to the Russian courts to prevent the sale from proceeding, but to no avail.[1197] In a letter to the Chief Bailiff of the Russian Federation dated 6 August 2004, Yukos requested that any sale of YNG be conducted by public auction. This request was granted.[1198]

### (b) YNG is Valued for Auction while its Tax Liabilities Rapidly Escalate

992. On 12 August 2004, the bailiffs appointed Dresdner to carry out the valuation of YNG.[1199]

---

1193 *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698.

1194 Misamore WS ¶ 52.

1195 *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698 (quoting Mr. Steven Dashevsky).

1196 *Yukos Says Asset Sale Could Prove Fatal Blow*, NY Times, 23 July 2004, Exh. R-648.

1197 Ruling of Moscow Arbitrazh Court, 29 November 2004, Exh. C-283.

1198 Letter from Yukos' counsel D.V. Gololobov to the Chief Bailiff of the Russian Federation A.T. Melnikov, 6 August 2004, Exh. C-140; *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698. Respondent points out that the sale of the YNG shares could, instead, have been negotiated with a designated purchaser. Rejoinder ¶¶ 978, 984; Transcript, Day 3 at 115 (Respondent's opening).

1199 Resolution of Moscow Court Bailiff D.A. Borisov, 12 August 2004, Exh. C-270.

993. Dresdner issued its valuation report on 6 October 2004; it valued YNG as a stand-alone enterprise at USD 18.6 to 21.1 billion.[1200] Dresdner noted in the summary of its Report that this amount could be reduced by tax and other liabilities, which would lower the value to USD 14.7 to 17.3 billion.[1201] In its report, Dresdner observed that "[t]he sales process usually has a significant impact on the revenue from the sale" and that "[a] quick auction will most likely prevent the achievement of a full price."[1202] Dresdner added that "[i]f access to full information is not provided to potential purchasers, this will lead to a significant reduction in the number of parties interested in YNG and also in their ability to offer the full price."[1203]

994. A few days after Dresdner delivered its report, on 11 October 2004, the bailiffs recommended a minimum sale price for the YNG shares that reflected a 60 percent discount of the value determined by Dresdner.[1204] The bailiffs' declaration caused Yukos shares to fall "so far so fast . . . that trading had to be halted twice on MICEX."[1205]

995. On 13 October 2004, GML's Tim Osborne reiterated his earlier threat, and said that "[w]hoever buys [YNG] is going to be buying themselves a lifetime of litigation."[1206]

996. On 29 October 2004, following an audit that began on 23 September 2004, YNG received a tax reassessment for transfer pricing violations, in the amount of USD 2.35 billion for the year 2001.[1207] On the same day, following an audit that began on 1 October 2004, the tax authorities issued a decision finding YNG liable for a tax offense for the year 2002 in the amount of

---

1200 Dresdner Valuation Report, Exh. C-274, ZAO Dresdner Bank Summary Valuation Opinion Letter, 6 October 2004, Exh. C-273 (hereinafter "Dresdner Summary Letter").

1201 Dresdner Summary Letter, 6 October 2004, p. 6, Exh. C-273.

1202 Dresdner Valuation Report ¶ 11.2.

1203 *Ibid.* ¶ 12.8.

1204 Resolution of Moscow Court Bailiff D.A. Borisov, 11 October 2004, Exh. C-1160; *see Basic Yukos asset valued merely at $10.4 billion*, RIA Novosti, 12 October 2004, Exh. C-710; *Russia to press on with Yukos sell-off*, The Financial Times, 13 October 2004, Exh. C-711; *Low valuation for Yukos unit sale*, NY Times, 14 October 2004, Exh. C-712.

1205 *Yukos Unit Up for Sale at Discount Price*, Moscow Times, 13 October 2004, Exh. R-625. Dresdner, on 14 October 2004, released, "in the interests of transparency" and "with the permission of the Ministry of Justice," a summary of the valuation report on its own website, including the USD 14.7 to 17.3 billion range Dresdner had estimated for YNG post-liabilities. Summary valuation opinion letter on Yuganskneftegaz, Dresdner Bank Corporate Website, 14 October 2004, Exh. C-275, with link to Dresdner Summary Letter. Claimants characterize Dresdner's decision to do so as an extraordinary reaction taken to correct the public record. Memorial ¶ 370; Counter-Memorial ¶ 458 & n.686.)

1206 *Yukos Unit Up for Sale at Discount Price*, Moscow Times, 13 October 2004, Exh. R-625.

1207 Repeat Field Tax Audit Report No. 30–03–14/2, 29 October 2004, Exh. C-251; Memorial ¶ 271; Counter-Memorial ¶ 482; Reply ¶¶ 360–61; Rejoinder ¶¶ 959–60. As explained in the First Konnov Report, "under the transfer pricing rules, the tax authorities were permitted to substitute the contract price with the market price," but they "could do this . . . only if the market price deviated from the contract price by more than 20%." First Konnov Report ¶ 87.

USD 1.03 billion.[1208] A further tax audit on YNG was commenced on 12 October 2004, resulting in a tax assessment on 3 December 2004 of USD 1.22 billion for the year 2003.[1209] According to Claimants, these three successive tax assessments over a period of less than five weeks on the eve of the YNG auction amounted to double-taxation and were part of the Russian Federation's strategy to depress the auction price of YNG and destroy Yukos.[1210]

997. By mid-November, Yukos' settlement proposals were continuing to fall on deaf ears.[1211] On 18 November 2004, the bailiffs announced that YNG would be auctioned and the Ministry of Justice appointed the Russian Federal Property Fund to handle the auction.[1212] The Russian Federal Property Fund issued the formal auction notice the next day and fixed the auction date for 19 December 2004.[1213] This was a Sunday, and the earliest possible date to hold the auction under the relevant regulations.[1214] The opening price for 100 percent of the ordinary shares (or 76.79 percent of YNG's total share capital) was set at USD 8.65 billion.

998. Yukos applied to the Moscow Arbitrazh Court for a declaration that this decision was unlawful and sought interim measures. Both applications were swiftly denied.[1215]

### (c) Yukos Tries to Prevent the Auction; Preparations Proceed; an Entity Named Baikal is Created to Purchase YNG

999. On 6 December 2004, Baikal was incorporated in the town of Tver by a sole founder, Ms. Valentina Davletgareeva, with capital of USD 359.[1216] A few days later, Ms. Davletgareeva sold her stake in Baikal to a company called Makoil.[1217]

---

[1208] Memorial ¶ 271; Decision of Moscow Arbitrazh Court, 25 April 2006, p. 2, Exh. C-255.

[1209] Field Tax Audit Report No. 52/975, 3 December 2004, Exh. C-252; *but see* Decision of the Moscow Arbitrazh Court, 21 April 2006, Exh. C-256.

[1210] Claimants' Post-Hearing Brief ¶¶ 84, 98–100.

[1211] *See* Chapter VIII.E.

[1212] Resolution of Bailiff I.V. Kochergin to appoint a seller, 18 November 2004, Exh. C-279; Agreement No. 4-UYu/2–1/1772–1 between Ministry of Justice and Russian Federal Property Fund, 18 November 2004, Exh. R-623.

[1213] Notice of auction published by the Russian Federal Property Fund, 19 November 2004, Exh. C-280.

[1214] *See* YNG Auction Regulation (RP11197–221), 18 November 2004, Exh. R-3764.

[1215] Memorial ¶ 382; Ruling of the Moscow Arbitrazh Court, 29 November 2004, Exh. C-283; Resolution of the Federal Arbitrazh Court for the Moscow District, 3 May 2005, Exh. C-292; Resolution of Bailiff D.A. Borisov, 31 December 2004, Exh. C-291.

[1216] Baikalfinancegroup Limited Liability Company, Charter, 2 December 2004, Exh. R-672; Certificate of registration of OOO Baikalfinancegroup as a legal entity, 6 December 2004, Exh. C-286.

[1217] Baikalfinancegroup Limited Liability Company, Charter (amended version), 9 December 2004, Exh. R-674.

1000. On 10 December 2004, the Federal Antimonopoly Service reported that three entities—Gazpromneft, ZAO Intercom and OOO First Venture Company—had filed for clearance to participate in the auction. While Gazpromneft did eventually register for the auction, the other two companies did not.[1218]

1001. Having failed to convince the Russian courts to prevent the auction from proceeding, Yukos, in its own words, sought "to obtain justice"[1219] elsewhere. On 13 December 2004, GML posted a full-page advertisement entitled "Buyer Beware" in the Financial Times.[1220] The next day, Yukos filed for Chapter 11 bankruptcy protection in Texas.[1221] On 16 December 2004, the U.S. court granted Yukos' request for a TRO enjoining registered and prospective bidders from participating in the YNG auction.[1222]

1002. Meanwhile, on 14 December 2004, Baikal applied for antimonopoly clearance in order to participate in the auction.[1223] Two days later it registered for the auction and made a deposit of USD 1.77 billion.[1224] The only other company to register for the auction was State-owned Gazpromneft on 16 December 2004.[1225] Gazpromneft challenged the TRO on an emergency basis on 18 December 2004, but its appeal was denied that night, about ten hours before the auction was scheduled to commence in Moscow.[1226]

---

1218 *FAS of Russia Received Three Applications to Participate in the Auction for the Sale of Yuganskneftegaz*, Press Release, 10 December 2004, Exh. R-684.

1219 Memorial ¶ 383.

1220 *Buyer Beware*, Advertisement, Financial Times, 13 December 2004, Exh. R-649.

1221 *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Yukos' Original Complaint for Injunctive Relief, 14 December 2004, Exh. R-656 (hereinafter "U.S. Bankruptcy Complaint"); *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Yukos' Verified Emergency Motion for Temporary Restraining Order and Preliminary Injunction, 14 December 2004, Exh. R-629; *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Yukos' Voluntary Petition, 14 December 2004, Exh. R-658; Yukos-Moscow Limited, Resolution No. 1 of Management Board, 10 December 2004, Exh. R-657.

1222 *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Temporary Restraining Order, 16 December 2004, Exh. C-287.

1223 Application to Federal Antimonopoly Service regarding approval of acquisition by Baikal Finance (hererinafter "Baikal") of 76.79 percent interest in YNG, 14 December 2004, Exh. R-3793.

1224 Application to Participate in the Auction for the Sale of Seized Shares in OAO Yuganskneftegaz filed by Baikal Finance, 16 December 2004, Exh. R-3805.

1225 Protocol of the Results of an Auction to Sell Shares in OAO Yuganzkneftegaz, 19 December 2004, Exh. C-290.

1226 *Yukos Oil Co. v. OOO Gazpromneft*, U.S. District Court for the Southern District of Texas, Case No. 04cv4756, Hearing Minutes and Orders, 18 December 2004, Exh. R-697.

### (d) After a 10-Minute Auction, the Successful Bidder Baikal is Sold to State-Owned Rosneft; a "Monumental Bargain"; the "State, Looking After its Own Interests"

1003. The auction of YNG took place on 19 December 2004 at 4:00 p.m. Baikal opened the bidding at USD 9.35 billion. Gazpromneft's representative then asked for a recess and left the room to make a call. Upon his return, Baikal was declared the winner with its opening bid. The bidding process was over within ten minutes.[1227]

1004. One press article reported that the Baikal bidders worked for Surgutneftegaz and had "hastily departed for vacations abroad as soon as the auction ended."[1228] At a press conference on 21 December 2004, President Putin was invited to comment on the perception that "a state company is in fact behind the organisation Baikal Finance Group" and responded as follows:

> As is well known, the shareholders of this company are all private individuals, but they are individuals who have been involved in business in the energy sphere for many years. They intend, as far as I am informed, to establish relations with other energy companies in Russia which have an interest in their company. And within the framework of current legislation, the participants of this process have the right to work with this company after the auction is held. For us, it is only important that all these actions, as I already said, are within strict accordance with the current legislation of Russia. I hope that this is the way it will be. As for the ability of state company to buy these assets, they of course have this right, just like other market participants.[1229]

1005. What was not public knowledge at the time President Putin gave his press conference was the fact that, the previous day, the State-owned company Rosneft had sought and obtained antimonopoly clearance to acquire Baikal.[1230]

1006. On 22 December 2004, Rosneft purchased Baikal, before it had paid the balance of the purchase price for the YNG shares.[1231] Rosneft's purchase was announced publicly the

[1227] *See* Protocol of the Results of an Auction to Sell Shares in OAO Yuganzkneftegaz, 19 December 2004, Exh. C-290.

[1228] *Yugansk Was Purchased by Surgutneftegaz Employees*, OilCapital.ru, 21 December 2004, Exh. R-3789.

[1229] Press Statement and Answers to Questions Following Russian–German Bilateral Consultations, Russian President Official Website, 21 December 2004, p. 2, Exh. C-421.

[1230] Rosneft's request to Federal Antimonopoly Service to approve acquisition of a 100 percent interest in Baikal, 20 December 2004, Exh. C-1162; Federal Antimonopoly Service's approval of Rosneft's acquisition, 20 December 2004, Exh. C-1163.

[1231] *See* Rosneft IPO Prospectus, 14 July 2006, pp. 75–76, Exh. C-380.

following day.[1232] During another press conference, on 23 December 2004, President Putin said:

> Now regarding the acquisition by Rosneft of the well-known asset of the company—I do not remember its exact name—is it Baikal Investment Company? Essentially, Rosneft, a 100% state owned company, has bought the well-known asset Yuganskneftegaz. That is the story. In my view, everything was done according to the best market rules. As I have said, I think it was at a press conference in Germany, a state-owned company or, rather companies with 100% state capital, just as any other market players, have the right to do so and, as it emerged, exercised it.
>
> Now what would I like to say in this context? You all know only too well how the privatisation drive was carried out in this country in the early 90s and, how, using all sorts of stratagems, some of them in breach even of the then current legislation, many market players received state property worth many billions. Today, the state, resorting to absolutely legal market mechanisms, is looking after its own interests. I consider this to be quite logical.[1233]
>
> [emphasis added]

**(e) Once it is State-Owned, YNG's Fate Improves, with Reductions in Tax Liabilities and a Dramatic Increase in Value**

1007. The Tribunal notes that, as at 31 December 2004, ten days after Baikal purchased YNG for USD 9.35 billion, Rosneft stated in its consolidated financial statements that "negative goodwill" in the amount of USD 7.052 billion arose in the context of its acquisition of YNG "as a result of excess of the net assets measured at fair value, over the purchase price."[1234] Rosneft's total revenues increased from USD 5.28 billion in 2004 to USD 23.95 billion in 2005, while its net income increased from USD 0.84 billion to USD 4.16 billion over the same period.[1235] At the time of its IPO in mid-2006, Rosneft's share capital was USD 79.8 billion;[1236] YNG alone was then valued at USD 55.78 billion.[1237] Rosneft itself described the YNG acquisition as "the most monumental bargain in Russia's modern history."[1238]

1008. Subsequent to the YNG auction, Yukos continued its efforts to have the sale invalidated in the

[1232] *OJSC 'OC 'Rosneft' Buys 100% Share of 'Baykalfinancegroup' LLC And Becomes the Owner of Its Assets—76.6% Yuganskneftegas Shares*, Rosneft Press Release, 23 December 2004, Exh. C-741.

[1233] Press Conference with Russian and Foreign Media, Russian President Official Website, 23 December 2004, p. 4, Exh. C-422.

[1234] Rosneft's Consolidated Financial Statements as of 31 December 2003 and 2004, p. 24, NAV-213.

[1235] Rosneft IPO Prospectus, 14 July 2006, p. 16, Exh. C-380.

[1236] Rosneft Website, p. 16, Exh. C-381.

[1237] Rosneft IPO Prospectus, 14 July 2006, Table 40, Exh. C-380.

[1238] Place in economy of Russia, Rosneft: About company, Rosneft Website, p. 14, Exh. C-381.

Russian courts, but all its claims were dismissed.[1239]

1009. The Tribunal notes with interest that very soon after it was acquired by Rosneft, a significant portion of the tax assessments levied against YNG were set aside or vastly reduced by Russian courts.[1240] According to Mr. Konnov, after YNG contested the assessments, "the court-appointed experts who calculated the market prices" found in a number of cases "that the price deviation was within the 20% 'safe harbour' [for transfer pricing]."[1241] As a consequence, "large parts of the assessments against YNG were overturned by the courts."[1242] Claimants, while not explicitly disputing the "supposed technicality" of the provisions on transfer pricing,[1243] insist that, given the "scale of the reduction . . . the purported tax reassessments against Yuganskneftegaz lacked any credibility in the first place."[1244]

1010. As for YNG's remaining debts, Rosneft, according to Mr. Konnov, as a "strategic company" owned by the State and supplying the State with petroleum, was able to "restructure[e]" them through a series of negotiations.[1245]

## G. THE BANKRUPTCY OF YUKOS

### 1. Introduction

1045. Claimants' case is that Yukos' bankruptcy, announced by the Moscow Arbitrazh Court on 4 August 2006 and followed by the removal of Yukos from the companies' register on 21 November 2007, was the "final act of the destruction of the Company by the Russian Federation and the expropriation of its assets for the sole benefit of the Russian State and State-owned companies Rosneft and Gazprom."[1304] Claimants allege that Respondent "instigated" a syndicate of western banks led by Société Générale (the "**Western Banks**")[1305] to commence bankruptcy proceedings against Yukos based on Yukos' default under a loan agreement concluded between Yukos and the Western Banks for the purposes of funding the Sibneft merger.[1306] Claimants contend that Respondent ensured, through the initiation of bankruptcy proceedings and discriminatory treatment of bankruptcy claims, that the Russian State and Rosneft would hold over 97 percent of the alleged claims against Yukos in the bankruptcy.[1307] Having made certain that Yukos' proposed Rehabilitation Plan would be rejected at the general creditors' meeting, the Russian Federation completed its expropriation scheme by auctioning Yukos' remaining assets. Through the bankruptcy and liquidation of Yukos, the Russian State directly received more than 60.5 percent of the bankruptcy proceeds and, indirectly, through Rosneft, received more than 39.21 percent of the bankruptcy proceeds and all of Yukos' main production assets.

1046. Respondent denies all allegations of impropriety or bias in relation to the bankruptcy proceedings. Moreover, Respondent argues that the bankruptcy proceedings are irrelevant to the Tribunal's determination because the conduct that directly caused Yukos' liquidation—the initiation of Yukos' bankruptcy and the vote to liquidate Yukos—is either not attributable to Respondent or not an exercise of its sovereign power. Respondent's case is that "the insolvency of the Yukos holding company was the consequence of the Oligarchs' and Yukos' management's disastrous strategy of tax evasion, resistance to and obstruction of the collection

---

1304 Memorial ¶¶ 411–13.

1305 The Western Banks included BNP Paribas S.A., Citibank N.A., Commerzbank Akziengesellschaft, Calyon S.A., Deutsche Bank A.G., Hillside Apex Fund Limited, ING Bank N.V., KBC Bank N.V., Société Générale S.A., Stark Trading, Shepherd Investments International Limited, Thames River Traditional Funds PLC (High Income Fund), UFJ (Holland) N.V., and V.R. Global Partners L.P.

1306 Presumably for the $3 billion Share Purchase of 20 percent of Sibneft shares. *See* Yukos, *YukosSibneft, Greater Opportunities to Build Value*, Presentation of 8 October 2003, Exh. C-42.

1307 Claimant's Post-Hearing Brief ¶ 126; Memorial ¶ 439; Reply ¶ 412.

of overdue taxes, self imposition of massive non-tax and intercompany liabilities on the company, and failure to draw on Yukos' ample offshore assets."[1308]

### 2. Chronology

#### (a) The Initiation of the Bankruptcy

1047. The initiation of bankruptcy proceedings against Yukos is inextricably tied up in the history of two loans connected with the Sibneft merger, one from the Western Banks ("**A Loan**") and the other from Société Générale ("**B Loan**"). It is therefore important to review the key facts relating to each of those loans.

1048. For purposes of funding the Sibneft merger, Yukos entered into two loan agreements. The A Loan consisted of USD 1 billion borrowed by Yukos from the Western Banks, which was secured by certain of Yukos' oil export contracts and by YNG. This loan was entered into on 24 September 2003.[1309]

1049. The B Loan consisted of USD 1.6 billion borrowed by Yukos from Société Générale, which was fully collateralized in cash by GML, Yukos' ultimate parent company. This loan was entered into on 30 September 2003.[1310]

1050. On 3 October 2003, Société Générale drew on the collateral under the B Loan, making GML the lender. GML's rights were then assigned to Moravel, which was GML's wholly-owned indirect subsidiary in Cyprus.[1311]

1051. On 30 June 2004, an appeal panel of the Moscow Arbitrazh Court issued an enforcement writ against Yukos for payment of the taxes assessed for the year 2000. Following this development, the Western Banks notified Yukos that they would not demand immediate

[1308] Counter-Memorial ¶ 445.

[1309] Memorial ¶ 374, Guarantee between YNG and Société Générale, 24 May 2004, Exh. R-581.

[1310] B Loan Agreement, 30 September 2003, Exh. R-468.

[1311] *Yukos Oil Company Arranges 1.6 Billion Loan*, Yukos Press Release, 6 October 2003, Exh. C-653; Respondent's Closing Slides, p. 381; Memorial ¶¶ 441–44; Counter-Memorial ¶¶ 548, 578, 1531–33; Rejoinder ¶¶ 1054–56, 1136–37.

payment, but would instead rely on the security supporting the A Loan, namely payments through the proceeds of export sales of crude oil.[1312]

1052. Soon after, however, as described in the previous chapter, the tax authorities seized and auctioned YNG, depriving Yukos of its primary oil producing asset. Claimants contend that when YNG was taken from Yukos in December 2004, YNG stopped shipping oil under the export contracts and "[i]t was thus the actions of the Russian Federation, not Yukos, which obstructed the payment of [the A Loan]."[1313]

1053. Since Yukos ceased making payments under the A Loan, the Western Banks brought a claim against Yukos for approximately USD 472.8 million, plus interest under the A Loan. The claim was recognized by the High Court of England and Wales on 24 June 2005 ("**English Judgment**").[1314] Respondent contends that, by this time, Yukos had already paid Moravel over USD 1 billion under the B Loan, and thus had more than enough cash to have repaid the Western Banks in full under the A Loan.

1054. During this same time period, Yukos management implemented two restructurings that transferred Yukos' non-Russian assets, previously held through Yukos' wholly-owned Dutch and Armenian subsidiaries Yukos Finance and Yukos CIS into two "stichting administratiekantoor".

1055. A stichting is a Dutch "foundation."[1315] It does not have members or shareholders. All management powers are vested in a board of directors, subject only to the stichting's articles of association and Dutch law.[1316] In the case of a stichting administratiekantoor or "foundation trust," the stichting issues depository receipts for shares in exchange for shares transferred to it.[1317] This trust-like structure separates legal ownership and beneficial ownership: the

---

1312 Appeal Resolution of the Moscow Arbitrazh Court, 29 June 2004, Exh. C-121; Enforcement Writ No. 383729 of 30 June 2004, Exh. C-122; Claimant's Post-Hearing Brief ¶ 118.

1313 Claimant's Post-Hearing Brief ¶ 118.

1314 *BNP Paribas v. Yukos Oil Company*, High Court of England and Wales, Judgment, 24 June 2005, Exh. R-455 (hereinafter "English Judgment").

1315 Dutch Civil Code (Burgerlijk Wetboek) art. 285(2), Exh. R-709; Counter-Memorial ¶ 528.

1316 C. Asser, *Handleiding tot de beoefening van het Nederlands Burgerlijk Recht* (W.E.J. Tjeenk Willink, 1997) ¶ 475, Exh. R-723; ¶¶ 480, 484, Exh. R-724.

1317 C. Asser, *Handleiding tot de beoefening van het Nederlands Burgerlijk Recht* (Kluwer, 2009) ¶ 658, Exh. R-725.

stichting is the legal owner of the shares and the holder of the depositary receipts for shares is the beneficial owner of the shares.[1318]

1056. The first restructuring took place in April 2005 and consisted in the transfer of all of the assets of Yukos Finance to Yukos International U.K. B.V. ("**Yukos International**"), a wholly-owned Dutch subsidiary of Yukos Finance, and the subsequent transfer of Yukos Finance's shares in Yukos International to Stichting 1in exchange for depositary receipts for those shares.[1319]

1057. The second restructuring took place in September 2005 and consisted in the transfer of all the shares owned by Yukos CIS in Yukos Hydrocarbons Investments Limited ("**YHIL**") to Wincanton, a Dutch company; and the subsequent transfer of all of Wincanton's shares in YHIL to Small World Telecommunication Holding B.V. ("**Small World**"),[1320] another Dutch company wholly-owned by Wincanton. Finally, Wincanton's shares in Small World were transferred to Stichting 2[1321] in exchange for depositary receipts for those shares.[1322]

1058. The members of the Stichtings' boards are former managers of Yukos and individuals close to Yukos.[1323] The Stichtings hold "substantial value"[1324] and remain in place today.

1059. Articles 2.2 and 2.3 of the original Articles of Association of the Stichtings provide:

> 2. The Foundation will exercise the rights attached to the shares in such a way as to guarantee to the best of its ability, whether or not by conducting court proceedings, the interests of the Company and the other, direct or indirect, subsidiaries of Yukos Oil Company (the "Parent Company"), which jointly constitute the group of which the Company forms a part (the "Group"), the management, executive staff and employees of the Group, the Group's legitimate creditors (including creditors with undisputed claims) and all other acknowledged stakeholders of the Group.

---

1318 *Ibid.*

1319 Counter-Memorial ¶ 529; Articles of Association of Stichting Administratiekantoor Yukos International (hereinafter "Stichting 1"), 14 April 2005, Exh. C-1181.

1320 Small World Telecommunication Holding B.V. later changed its name to Financial Performance Holdings B.V. Counter-Memorial ¶ 530; *see also* Article 2.1 of the Articles of Association, Stichting Administratiekantoor Small World Telecommunications Holdings B.V. (hereinafter "Stichting 2"), 20 June 2006, Exh. R-712.

1321 Stichting 2 later changed its name to Stichting Administratiekantoor Financial Performance Holdings. *See* Counter-Memorial ¶ 530.

1322 Counter-Memorial ¶ 530; Articles of Association of Stichting 2, 26 September 2005, Exh. C-1182.

1323 Counter-Memorial ¶ 532; Minutes of the Yukos Board of Directors Executive Committee, 26 October 2005, Exh. R-716; Transcript, Day 9 at 232 (cross-examination of Mr. Misamore).

1324 Respondent's Post-Hearing Brief ¶ 120; Transcript, Day 9 at 233–34 (cross-examination of Mr. Misamore) (asserting that the maximum value held by Stichting 1 was USD 1.8 billion in 2006, and the maximum value held by Stichting 2 was around USD 500 million as of the date of the Hearing); Counter-Memorial ¶ 536.

> 3. Excluded from the Foundation's objects are the exercising of rights attached to the shares as a result of or in the implementation of an unlawful claim, judgment or transaction, including but not limited to those resulting from or related to the tax assessments imposed on Yukos Oil Company and members of the Group in the Russian Federation on or after the fourteenth of April two thousand and four, specifically including, but without prejudice to the above, any claim against, transfer of, sale of, revendication of, attachment judgment in respect of, allocation of or other applicability to, or expropriation of the shares, assets or other property of, or other imposition of charges on Yukos Oil Company and any part of the Group.[1325]

1060. Respondent asserts that the Stichtings were used to insulate assets from the reach of the Western Banks. Respondent puts particular emphasis on proceedings in Dutch courts, where the Western Banks attempted to enforce the English Judgment.[1326] On 15 July 2005, the Western Banks petitioned the District Court of Amsterdam to enforce the English Judgment, and to issue a judgment permitting the sale and transfer of Yukos' share interest in Yukos Finance.[1327] The Western Banks informed the court that the creation of the Stichtings had rendered Yukos' shares in Yukos Finance, over which the Western Banks had obtained a prejudgment attachment, "worthless" and "more or less unsellable."[1328] Respondent asserts that the Western Banks' failure to enforce the English Judgment in the Netherlands was "the death knell of Yukos' pretense of cooperation in its negotiations with the syndicate."[1329]

1061. Back in Russia, on 22 September 2005, the bailiff adopted a resolution to seize all of Yukos' assets.[1330]

1062. The Western Banks proceeded to seek to enforce the English Judgment against Yukos in Russia. The Western Banks succeeded in the first instance, before the Moscow Arbitrazh Court, but the Court's favourable ruling (issued on 28 September 2005) was reversed on "procedural" grounds by the Federal Arbitrazh Court for the Moscow District on 5 December 2005.

---

1325 Articles of Association of Stichting 1, 14 April 2005, Exh. C-1181; Articles of Association of Stichting 2, 26 September 2005, Exh. C-1182.

1326 Rejoinder ¶¶ 1073–75; English Judgment, Exh. R-455.

1327 Rejoinder ¶ 1076; *BNP Paribas S.A. et al. v. OAO Yukos Oil Company et al.*, Decision of the District Court of Amsterdam, 29 September 2005 ¶ 2.1, Exh R-756.

1328 *BNP Paribas S.A. et al. v. OAO Yukos Oil Company et al.*, Decision of the District Court. of Amsterdam, 29 September 2005 ¶ 2.3, Exh R-756.

1329 Rejoinder ¶ 1083.

1330 Resolution of Bailiff A.V. Reydik, 22 September 2005, Exh. C-301.

1063. Following the unfavourable decision by the Federal Arbitrazh Court for the Moscow District, the Western Banks entered into a confidential sale agreement with Rosneft ("**Confidential Sale Agreement**").[1331]

1064. Pursuant to this Confidential Sale Agreement, Rosneft agreed to satisfy the outstanding debt owed by Yukos to the Western Banks (the outstanding principal being at the time USD 455,124,215.03), in exchange for the assignment of the banks' rights of claim against Yukos under the A Loan to Rosneft.[1332]

1065. Significantly, the payment of the purchase price by Rosneft was predicated upon the Western Banks agreeing to take the steps described in Schedule 8 of the Confidential Sale Agreement, entitled "Application For Bankruptcy." Schedule 8 sets out the Western Banks' obligations under three steps: "1. Proceedings on recognition and enforcement of the English Judgment in Russia (the 'Enforcement Case')"; "2. Execution proceedings against the Borrower [*i.e.*, Yukos] (based on the Enforcement Case) (the 'Execution Proceedings')"; and "3. Bankruptcy proceedings against the Borrower."[1333]

1066. Following the conclusion of the Confidential Sale Agreement between the Western Banks and Rosneft, the enforcement of the A Loan was back before the Russian courts. On 21 December 2005, the Moscow Arbitrazh Court formally recognized the English Judgment against Yukos in favour of the Western Banks and issued a writ of enforcement with respect to the judgment.

1067. On 29 December 2005, the Western Banks submitted the enforcement writ to the bailiffs, who then initiated enforcement proceedings to recover from Yukos the amounts ordered under the English Judgment, namely USD 455,124,214.99 in principal and USD 9,459,143.18 in interest. These enforcement proceedings failed. Claimants assert that they were bound to fail due to the seizure of Yukos' assets, which had been imposed since July 2004.

1068. The order of the Moscow Arbitrazh Court that recognized the English Judgment was challenged by Yukos, and upheld by the Federal Arbitrazh Court of the Moscow District. In its decision of 2 March 2006, the Federal Arbitrazh Court reasoned as follows:

---

[1331] Sale Agreement Relating To Certain Rights And Benefits Arising Under A Credit Agreement dated 24 September 2003 Between, Amongst Others, "Yukos Oil Company" and Société Générale SA, 13 December 2005, Exh. C-300 (hereinafter "Confidential Sale Agreement").

[1332] *Ibid*, p. 4.

[1333] *Ibid*., pp. 37–38.

> When re-examining the case, the Court did comply with the directions given by the cassation Resolution of December 5, 2005. The Court fully and comprehensively reviewed the circumstances of the case. Its conclusions on the application of legal rules are consistent with the established circumstances and evidence in the case.[1334]

1069. On 6 March 2006, the Western Banks petitioned the Moscow Arbitrazh Court to declare Yukos bankrupt.[1335]

1070. In an undated letter, Mr. Theede wrote in mid-March to the bailiffs requesting that the authorities "immediately release Company property from the freezing order in an amount sufficient to satisfy" the debt owed to the A Loan lenders, and thus avert the commencement of the bankruptcy proceedings.[1336]

1071. On 14 March 2006, consistent with the terms of the Confidential Sale Agreement, Rosneft paid the Western Banks the full outstanding amount of the A Loan; in exchange, the Western Banks assigned their rights of claim to Rosneft.[1337]

1072. On 24 March 2006, YNG—by then a subsidiary of Rosneft—filed a separate and parallel petition against Yukos before the Moscow Arbitrazh Court to declare Yukos bankrupt.[1338]

1073. According to Respondent, the YNG petition was based on a judgment in respect of transportation services provided while Yukos owned YNG in January through March 2004, under a January 2003 contract.[1339]

1074. The YNG petition was formally granted on 27 March 2006.[1340] Since Russian law does not allow separate bankruptcy proceedings against one company, YNG's claim was joined to the bankruptcy proceedings initiated by the Western Banks.[1341]

---

[1334] Resolution of the Federal Arbitrazh Court for the Moscow District, 2 March 2006, p. 4, Exh. C-302.

[1335] Banks' Petition to Declare Yukos Bankrupt Filed with the Moscow Arbitrazh Court, 6 March 2006, Exh. R-3885; *Creditors Petition Russian Court to Declare Yukos Bankrupt*, World Markets Analysis, 13 March 2006, Exh. R-3882.

[1336] Letter from Yukos' President S. Theede to the Head of the Interdistrict Department for Special Enforcement Proceedings of the Chief Directorate of the Federal Bailiffs Service for Moscow V.A. Savostov (undated), p. 3, Exh. C-1180; Claimant's Post-Hearing Brief ¶ 125.

[1337] Ruling of the Moscow Arbitrazh Court, 28 March 2006, p. 3, Exh. C-307; Memorial ¶ 425; Claimants' Skeleton ¶ 47.

[1338] Memorial ¶ 427; Counter-Memorial ¶ 561; Ruling of the Moscow Arbitrazh Court, 27 March 2006, p. 1, Exh. C-305.

[1339] Rejoinder ¶ 1098.

[1340] Ruling of the Moscow Arbitrazh Court, 27 March 2006, p.1, Exh. C-305.

[1341] Register of Yukos Creditors' Claims, 30 October 2007 (Claim No. 2), p. 34, and (Claim No. 3), p. 109, Exh. C-353.

1075. On 28 March 2006, the Moscow Arbitrazh Court ordered the commencement of bankruptcy proceedings, placed Yukos under supervision, appointed Mr. Rebgun as interim administrator, and formally substituted Rosneft for the Western Banks as creditor.[1342]

1076. The Tribunal recalls that around that time Mr. Theede appointed Mr. Aleksanyan to represent Yukos in connection with the bankruptcy proceedings, but that within days of his appointment, Mr. Aleksanyan was arrested on 6 April 2006 at his house by masked and armed men on charges of money laundering and embezzlement allegedly committed when he was head of Yukos' legal department.[1343]

### (b) The Treatment of Bankruptcy Claims; the Creditors' Meeting; the Declaration of Yukos' Bankruptcy

1077. In accordance with Russian bankruptcy law, it was for Mr. Rebgun, as interim administrator of Yukos, to convene a first meeting of Yukos' creditors. At that meeting, Yukos' creditors would, under the options available under Russian Bankruptcy Law, vote either in favour of a Rehabilitation Plan proposed by Yukos or for the alternative of a liquidation of Yukos.

1078. In anticipation of these steps, on 1 June 2006, Yukos convened an extraordinary general shareholders' meeting and approved, by majority vote, the Rehabilitation Plan proposed by Yukos' management.[1344] Also, the shareholders appointed Mr. Osborne as their representative in the bankruptcy proceedings.

1079. Claimants' Rehabilitation Plan was based on, *inter alia*:[1345]

i) The remaining assets valued at USD 31 billion exceeding the USD 29.5 billion in tax claims filed with Mr. Rebgun;

ii) a two year program to pay off the claims in bankruptcy;

---

1342 Rulings of the Moscow Arbitrazh Court, 28 March 2006, Exh. C-306 and Exh. C-307.

1343 *Top Yukos official Aleksanyan detained in Moscow*, RIA Novosti, 6 April 2006, Exh. C-796; *Arrest of Yukos Oil Company Executive Vice-President is a Brutal and Unjust Attack on the Company's Attempts to Secure a Fair Bankruptcy Process*, Yukos Press Release, 7 April 2006, Yukos Website, Exh. C-797; *Ioukos, un deuxième président en prison*, Libération, 8 April 2006, Exh. C-798; *Le Kremlin s'acharne contre le groupe pétrolier Youkos*, Le Figaro, 13 April 2006, Exh. C-799; Theede WS ¶ 30.

1344 Minutes of Extraordinary General Meeting of Yukos' Shareholders held on 1 June 2006, Exh. C-311.

1345 Memorial ¶ 458; Letter from Fulbright & Jaworski LLP to Chadbourne & Parke LLP, 1 June 2006, enclosing Yukos' Outline of Proposed Financial Rehabilitation Plan, Exh. C-312 (hereinafter "Rehabilitation Plan").

iii) the creation of a "Cash Pool separate from the Company," funded by constant cash flows generated by Yukos' production, refining and marketing subsidiaries (approximately USD 3–3.5 billion of annual Earnings Before Interest, Taxes, Depreciation and Amortification ("**EBITDA**");

iv) the sale of non-core assets: approximately USD 8.9 billion from the sale of Russian assets (20 percent stock of Sibneft ordinary shares, approximately USD 4.2 billion; 23.7 percent of YNG's outstanding share capital in the form of preferred shares (estimated at USD 3.6 billion); 100 percent of shares in Arctic Gas, approximately USD 1.1 billion) and approximately USD 1.5 billion from foreign assets (from the sale of its 53.7 percent stake in Lithuanian oil company Mazeikiu Nafta and 49 percent stock in Slovakian oil transport major Transpetrol); and

v) supplementing the Cash Pool with amounts awarded in pending international arbitrations and Russian litigation where Yukos was seeking approximately USD 18 billion.

1080. On the same day that the shareholders approved the Rehabilitation Plan (*i.e.*, on 1 June 2006), Yukos' counsel transmitted an "Outline of the Proposed Financial Rehabilitation Plan" to Mr. Rebgun's counsel in the U.S. (Chadbourne & Parke LLP), requesting that the Rehabilitation Plan be placed on the agenda of the first meeting of Yukos' creditors, and circulated to all of Yukos' registered creditors.

1081. On 2 June 2006, Mr. Rebgun sent to Yukos' registered creditors and to Yukos' CEO, Mr. Theede, a notice informing them that the first creditors' meeting would be held on 16 June 2006 and inviting them to consult the materials that would be discussed at the meeting in his office from 9 to 15 June 2006.[1346]

1082. In the event, the first meeting of Yukos' creditors did not take place as scheduled on 16 June 2006. On 8 June 2006, the first meeting of Yukos' creditors was adjourned by the Moscow Arbitrazh Court pending a 14 June 2006 hearing on the admission into bankruptcy proceedings of outstanding tax claims by the Federal Taxation Service for 2000 to 2004. Mr. Rebgun, in turn, requested a postponement of the Court's hearing on Yukos' bankruptcy.[1347]

---

1346 Notice of the First Yukos Creditors' Meeting to be held on 16 June 2006, 2 June 2006, Exh. C-314.

1347 Memorial ¶¶ 432–34, 454.

1083. At the hearing of 14 June 2006, a bankruptcy judge (not a tax judge) of the Moscow Arbitrazh Court ruled in favour of the Federal Taxation Service "after taking just 15 minutes to consider 127,000 pages of information submitted by Russian tax officials," admitting in their entirety as valid bankruptcy claims the tax authorities' claims based on years 2000–2003, plus 2004. In so doing, the judge confirmed the Federal Taxation Service as Yukos' largest creditor, with registered claims of USD 13.06 billion (amounting to 60.5 percent of all registered bankruptcy claims).[1348]

1084. Some two weeks later, the Court's hearing on Yukos' bankruptcy was postponed to 1 August 2006. The Court granted the postponement, noting that the "first meeting of creditors did not take place because not all of the creditors' claims submitted before the established deadline have been reviewed by the Court."[1349]

1085. On 28 June 2006, Mr. Rebgun sent a revised notice of the first creditors' meeting to be held on 20 July 2006 and invited registered creditors to consult the bankruptcy materials from 14 to 19 July 2006.[1350] Claimants assert that Mr. Rebgun did not circulate the Rehabilitation Plan that had been proposed by Yukos with his original notice of 2 June 2006.[1351] Indeed, the existence of the Rehabilitation Plan appears to have been notified to the creditors by Mr. Rebgun only in his revised notice of 28 June 2006, and made available for review between 14 and 19 July.

1086. On 17 July 2006, the Moscow Arbitrazh Court admitted into the bankruptcy proceedings four claims by YNG (now Rosneft's subsidiary) based on the sale of oil produced by YNG and sold to Yukos' trading companies in 2004. The Court decided that Yukos, not the trading companies, was liable to pay for the purchased oil. Thus, YNG's registered claims (Rosneft's) were USD 4.42 billion (including penalties) or 22.16 percent of the claims admitted into the bankruptcy proceedings at the time.[1352]

---

1348 *Judge sets speed-reading record…*, Reuters, 16 June 2006, Exh. C-809; Claimants' Summary Chart of Registered Creditors' claims, Exh. C-594 (hereinafter "Summary Chart of Creditors").

1349 Ruling of the Moscow Arbitrazh Court, 27 June 2006, Exh. C-315.

1350 Notice of the First Yukos Creditors' Meeting to be held on 20 July 2006, 28 June 2006, Exh. C-316.

1351 Memorial ¶ 453.

1352 Resolutions of the Ninth Arbitrazh Court of Appeal, 31 August 2006 and 7 September 2006, Exh. C-339 and Exh. C-340. On 20 July 2006, a further 29 claims were admitted on behalf of YNG (by now Rosneft's subsidiary). Summary Chart of Creditors, Exh. C-594; Claimants' Skeleton ¶ 52; Memorial ¶¶ 435–36; Reply ¶ 399.

1087. In accordance with Mr. Rebgun's revised notice of 28 June 2006, the first meeting of Yukos' creditors was held on 20 July 2006. Creditors were offered two alternative scenarios: (1) the Rehabilitation Plan proposed by Yukos' management; and (2) the Analysis of Yukos' Financial Situation proposed by Mr. Rebgun. At the request of Federal Taxation Service, the meeting was adjourned to 25 July 2006 to allow Mr. Rebgun to complete his Analysis with a separate exhibit analyzing the possibility of Yukos' breakeven activities.[1353]

1088. Mr. Rebgun's Analysis did not contemplate the restoration of Yukos' financial situation. Instead, Mr. Rebgun concluded that Yukos' remaining assets, totalling approximately USD 17.75 billion after a deduction of a 24 percent profit tax, were not sufficient to cover the USD 18.3 billion of registered bankruptcy claims. On this basis, Mr. Rebgun recommended that Yukos be declared bankrupt and that receivership proceedings against Yukos be initiated.[1354]

1089. On 25 July 2006, when the creditors' meeting that had been adjourned resumed, the creditors voted against the Rehabilitation Plan and recommended that Yukos be declared bankrupt. Twenty-four creditors were admitted as voting participants to the creditors' meeting. The Tribunal notes that Respondent, through the Federal Taxation Service, and indirectly through Rosneft (which had acquired the Western Banks' claim under the A Loan) and YNG (now Rosneft's subsidiary), had 93.87% of the votes.[1355]

1090. On 4 August 2006, Yukos was declared bankrupt by the Moscow Arbitrazh Court and placed under receivership, which was to be completed within one year.[1356]

### (c) The Liquidation of Yukos' Remaining Assets

1091. On 9 October 2006, the Moscow Arbitrazh Court admitted further claims by YNG into the bankruptcy proceedings. These claims, worth USD 5.5 billion, were for alleged "lost profits"

---

[1353] Analysis of Yukos' Financial Situation, 2006, Exh. C-317; Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Case as Exhibit B to his Status Report of 7 August 2006, Exh. C-318; Summary Chart of Creditors, Exh. C-594; Memorial ¶¶ 458–61; Counter-Memorial ¶¶ 620–32.

[1354] Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Case as Exhibit B to his Status Report of 7 August 2006, pp. 7–8, Exh. C-318.

[1355] Protocol of the First Meeting of Yukos' Creditors held on 20 July 2006, 25 July 2006, Exh. C-319; Memorial ¶ 464.

[1356] Decision of the Moscow Arbitrazh Court, 1 August 2006, Exh. C-324.

during 2000 to 2003. Thus, from July to October 2006, the Russian courts admitted over USD 9.9 billion of claims by YNG into Yukos' bankruptcy.[1357]

1092. YNG was fully consolidated into Rosneft as of 1 October 2006.[1358] As a result of this consolidation, on 9 November 2006, the Moscow Arbitrazh Court ordered that YNG be replaced by Rosneft as a bankruptcy creditor, thereby attributing to Rosneft all of the claims registered to that time in the name of YNG. Eventually, adding a few minor claims, Rosneft held USD 10.69 billion or 37.17% of all registered bankruptcy claims.[1359]

1093. Under Russian bankruptcy law, Mr. Rebgun needed to select an appraiser in connection with the liquidation of Yukos' assets. On 23 October 2006, Mr. Rebgun selected a consortium of five appraisers headed by ZAO ROSECO ("**ROSECO**").[1360]

1094. On 15 January 2007, ROSECO issued an appraisal report on Yukos' assets, including the preliminary results of an appraisal of its subsidiaries and dependent companies.[1361] There is some uncertainty, however, over what exactly the appraisers determined in respect of the value of Yukos' remaining assets.

1095. On 19 January 2007, Mr. Rebgun reportedly declared that his appraisers had valued Yukos' assets at USD 22 billion.[1362] It was also reported that Mr. Rebgun later revised his valuation of Yukos' assets to USD 25.6 and 26.8 billion and indicated that "the liquidation discount during the sale would not exceed 30 percent."[1363] Another article reported that the consortium of appraisers had valued Yukos' remaining assets at USD 33 billion.[1364]

1096. Between March and August 2007, 17 bankruptcy auctions took place. The Tribunal observes that Respondent held (directly or through Rosneft) 97.67 percent of all claims against Yukos

1357 Ruling of the Moscow Arbitrazh Court, 9 October 2006, Exh. C-343; Claimants' Skeleton ¶ 52.

1358 Rosneft 2007 U.S. GAAP Consolidated Financial Statements, p. 8, Exh. C-377; Memorial ¶ 437.

1359 Ruling of the Moscow Arbitrazh Court, 9 November 2006, Exh. C-344 and Summary Chart of Creditors, Exh. C-594; Memorial ¶ 438.

1360 Receiver's Report on His Activities and the Results of the Receivership for the Period from 4 August 2006 through 1 November 2007, 1 November 2007, p. 3, Exh. C-361 (hereinafter "Receiver's Report").

1361 Ruling of the Moscow Arbitrazh Court, 12 November 2007, p. 7, Exh. C-362.

1362 *Yukos assets valued at $22 bln – bankruptcy receiver spokesman*, RIA Novosti, 19 January 2007, Exh. C-828; Claimant's Post-Hearing Brief ¶ 129.

1363 *21 Yukos Assets Bundled for Auction*, The Moscow Times, 5 March 2007, Exh. C-831.

1364 *Appraisers say Yukos worth over $33 bln*, RIA Novosti, 22 January 2007, Exh. C-829; Claimant's Post-Hearing Brief ¶ 129; Memorial ¶ 469.

and received (directly or through Rosneft) approximately 99.71 percent of the bankruptcy proceeds.[1365] The most important assets were auctioned off as follows:[1366]

- Lot 1 (27 March 2007): remainder of Yukos' stake (9.44 percent) in YNG sold to Rosneft, acting through its indirect subsidiary OOO RN-Razvitiye, for USD 7.59 billion;
- Lot 2 (4 April 2007): 20 percent minus 1 share in Gazpromneft (ex-Sibneft), Urengoil and Arctic Gas sold to OOO EniNeftegaz (the Russian subsidiary of Italian companies Eni (60 percent) and Enel (40 percent)) for USD 5.83 billion; transferred to Gazprom in 2009; immediately announced that EniNeftegaz would cede control of the assets to Gazprom under option agreements signed prior to the auction.
- Lot 5 (18 April 2007): Manoil sold to Rosneft.
- Lot 10 (3 May 2007): Tomskneft, Achinsk, Angarsk, East Siberian and Strezhevskoy sold to Rosneft (via Neft-Aktiv) for $6.82 billion.
- Lot 11 (10 May 2007): Samaraneftegaz, Syzran, Novokuybyshevsk and Kuybyshev sold to Rosneft for USD 6.4 billion.

1097. Between August and October 2007, the Federal Taxation Service successfully applied for "late" claims, consisting chiefly of claims for 24 percent profit taxes on the proceeds arising from the bankruptcy auctions.[1367] These claims amounted to USD 8.82 billion.[1368]

1098. On 31 October 2007, upon liquidation, Yukos still had some USD 9 billion in unsatisfied liabilities. One third of these were tax claims.[1369]

---

1365 Receiver's Report, pp. 30–43, Exh. C-361.

1366 Claimants' Rebuttal Slides, p. 32.

1367 Memorial ¶¶ 490–91; Counter-Memorial ¶¶ 665–69; Reply ¶¶ 418–20; Rejoinder ¶¶ 1182–83.

1368 Respondent explains at Counter-Memorial ¶ 665 n.1100:

> Pursuant to Art. 142(4) of the Russian Bankruptcy Law, any claim submitted after closure of the register of claims (in the case of Yukos, on Oct. 12, 2006), as well as any claim for mandatory payments arising after the commencement of receivership (irrespective of when it was filed against the debtor), is validly filed as a "late" claim and recorded on a separate list. "Late" claims are satisfied after full satisfaction of timely claims included in the register of bankruptcy claims. *See* Art. 142(4) of the 2002 Russian Bankruptcy Law [Exh. R-776]."

1099. On 15 November 2007, the Moscow Arbitrazh Court formally endorsed all of Mr. Rebgun's activities as receiver, closed Yukos' receivership, and ordered that Yukos be struck off the register of legal entities.[1370] Yukos was struck off the register of companies and its shares were legally extinguished on 21 November 2007.[1371]

### 3. Parties' Arguments and Tribunal's Observations

1100. In broad terms, Claimants allege that the Russian Federation decided to "push Yukos into bankruptcy in order to redistribute its remaining assets." In their Memorial, Claimants set out what they characterized as Russia's orchestrated plan to bankrupt and liquidate Yukos:

> The Russian Federation ensured, through the initiation of bankruptcy proceedings at the behest of Rosneft and using the cover of a consortium of Western banks (1), and through the biased and discriminatory conduct of the proceedings by its courts, that the Russian State and Rosneft would hold over 97% of the alleged claims against Yukos in the bankruptcy (2). Having also made certain that Yukos' rehabilitation plan would be rejected (3), the Russian Federation completed its expropriation scheme by auctioning the Company's remaining assets. As a result of the bankruptcy and liquidation of Yukos, the Russian State received directly more than 60.5% of the bankruptcy proceeds and, through Rosneft, more than 39.21% of the bankruptcy proceeds and all of Yukos' main production assets (4).[1372]

1101. Respondent rejects this suggestion, and argues instead that it was Yukos' management that forced the company into bankruptcy:

> [T]he bankruptcy and ultimately the liquidation of Yukos was not the aim or the result of a massive, global plot orchestrated by the Russian Government, but rather the inevitable consequence of the consistent and repeated lawless and reckless misconduct of the Oligarchs and the Yukos management they installed to conduct their—including Claimants'—investment.[1373]

1102. According to Respondent, "Claimants have failed to establish their primary contentions regarding Yukos' bankruptcy proceedings: that the bankruptcy was instigated 'by the Russian Federation through State-owned Rosneft,' that 'the only logic behind the decision to liquidate

---

1369 Yukos Liquidation Balance Sheets, 31 October 2007, Exh. R-753 and Analysis of Financial Condition of Yukos Oil Company OJSC Conclusions and Actions (undated), p. 36, R-748.

1370 Ruling of the Moscow Arbitrazh Court, 12 November 2007, Exh. C-362.

1371 Certificate Recording an Entry in the Unified Register of Legal Entities, 21 November 2007, Exh. C-363.

1372 Memorial ¶ 412.

1373 Counter-Memorial ¶ 540.

Yukos was to expropriate the company,' and that the proceedings were conducted improperly so that the Russian Federation could 'take its assets.'[1374]

1103. The Parties' arguments are related to and can be organized under the following two headings: (a) why was the bankruptcy initiated and who was truly behind it? And (b) were the bankruptcy proceedings conducted properly and fairly?

1104. The Parties' arguments and the Tribunal's observations on each of these are presented below.

### (a) Why was the Bankruptcy Initiated and Who was Truly Behind It?

1105. It is not contested that the non-payment of the A Loan was an important factor leading to the bankruptcy of Yukos, since it was the creditor under the A Loan, the Western Banks, who initiated the bankruptcy (consistent with terms agreed with Rosneft in the Confidential Sale Agreement). There is disagreement, however, over the following two issues related to the non-payment of the A Loan:

i) Who was responsible for the non-payment of the A Loan – was Yukos prevented from paying by Respondent's conduct, or did Yukos have some control over the matter?

ii) Was the Confidential Sale Agreement a reasonable commercial arrangement between the Western Banks, as creditor, and Rosneft, as parent of YNG, the guarantor of the A Loan, or was it imposed on the Western Banks as part of Respondent's deliberate plan (executed through or with the assistance of Rosneft) to expropriate the remaining assets of Yukos?

1106. Each of these issues is analyzed in the respective subsections below, followed by the Tribunal's observations on why the bankruptcy was initiated and who was truly behind it.

#### (i) Non-Payment of the A Loan

1107. The Parties present opposing views on the reasons for which the A Loan had not been paid off by Yukos by the end of 2005.

1374 Respondent's Post-Hearing Brief ¶ 122 (internal footnotes omitted).

1108. Respondent argues that the Western Banks were not paid simply because "Yukos adamantly refused to pay."[1375] In other words, according to Respondent, "Yukos' dilatory and obstructionist treatment of its commercial creditors paralleled closely its treatment of its tax creditors."[1376] Respondent advances four arguments, as summarized at paragraphs 125 to 129 of its Post-Hearing Brief.

1109. Firstly, starting in January 2004, Yukos refused the syndicate's requests for full prepayment of the loan and denied the syndicate's requests to subordinate the B Loan to the A Loan. Secondly, Yukos "re-routed" its exports and chose to leave the banks with an unsecured non-performing loan. Thirdly, Yukos failed to satisfy the English Judgment even though it had the available resources to pay it, frustrating collection efforts in the United States and in the Netherlands. Fourthly, Yukos engaged in "bad-faith negotiations" with the syndicate, which eventually led the syndicate to contact Rosneft and come to an agreement with it.

1110. Claimants generally argue that "Yukos worked closely with [the syndicate] to ensure payment of the debt" but that "at each step, the Russian Federation's actions impeded the Company's efforts."[1377] Claimants submit that "[h]ad the A Lenders not received an offer from Rosneft in the interim, they too would have been paid out of the proceeds of the sale of the Dutch assets, along with Moravel."[1378]

1111. Each of Respondent's specific arguments in relation to the non-payment of the A Loan is addressed in the respective subsections below.

*(a) Yukos' Refusal to Fully Prepay the A Loan or to Subordinate the B Loan*

1112. Respondent argues that "[t]rouble arose almost immediately after the A Loan was funded."[1379] It claims that the syndicate "first raised the possibility of Yukos' bankruptcy" in early 2004.[1380]

---

1375 Respondent's Post-Hearing Brief ¶ 124.

1376 Rejoinder ¶ 1052.

1377 Claimants' Post-Hearing Brief ¶ 117 (footnote omitted).

1378 Claimants' Post-Hearing Brief ¶119. The debt of Moravel Investment Limited (hereinafter "Moravel") was paid in 2008 through the proceeds from the sale of Yukos' stake in the Lithuanian oil company Mazeikiu Nafta. Reply ¶ 391; Transcript, Day 20 at 229 (Claimant's rebuttal): "Indeed, Moravel would eventually be paid out from the proceeds of the sale of Mazeikiu Nafta, and pursuant to a court order, and the banks would have similarly been paid out from the proceeds of the sale of that asset had they not in the meantime received an offer that was difficult to refuse."

1379 Rejoinder ¶ 1057.

1380 *Ibid.*

In January 2004, the following options were discussed: full prepayment of the A Loan; partial acceleration of the A Loan; additional security; and subordination of the B Loan to the A Loan.[1381] Respondent, relying on a news article, claims that the syndicate was "especially concerned" with the so-called "giga-dividend."[1382]

1113. After the syndicate served notice on Yukos of a potential event of default in April 2004,[1383] Respondent asserts that Yukos "compelled" its production subsidiaries YNG, Samaraneftegaz, and Tomskneft to provide guarantees[1384] and agreed to make pre-payments.[1385] Respondent notes that Yukos insisted that the A Loan and the B Loan be treated *pari passu*.[1386]

1114. Respondent emphasizes that if Yukos had subordinated the B Loan, the syndicate would have been paid in full.[1387] In response to Claimants' argument that the loans were *pari passu*,[1388] Respondent underlines that the B Loan "was nothing more and nothing less than a shareholder loan."[1389] Therefore, according to Respondent, there is nothing that prevented Yukos (or Claimants) from agreeing to subordination.[1390]

1115. While Claimants defend the 2003 interim "giga dividend," and assert that they never favored the B Loan over the A Loan (treating the two loans *pari passu*),[1391] they do not address Respondent's argument that the B Loan was a shareholder loan and that they could have agreed to subordinate it to the A Loan.

---

1381 *Ibid.* ¶ 1057; Société Générale Meeting Agenda, Paris, 22 January 2004, Exh. R-3823.

1382 Rejoinder ¶ 1057.

1383 Letter from Société Générale to Yukos Oil Company re: US$ 1.6 billion Loan Agreement dated 30 September 2003 with "Yukos Oil Company," 30 April 2004, Exh. R-3827.

1384 Rejoinder ¶ 1058; Financial and Performance Guarantee between Yuganskneftegaz and Société Générale S.A., 24 May 2004, Exh. R-581; Financial and Performance Guarantee between Yuganskneftegaz and Société Générale S.A., 25 May 2004, Exh. R-582.

1385 Rejoinder ¶ 1058; Yukos Oil Company Notice of Prepayment, 25 May 2004, Exh. R-3832; Yukos Oil Company Notice of Prepayment, 22 June 2004, Exh. R-3833.

1386 Rejoinder ¶ 1058.

1387 Counter-Memorial ¶ 557; Transcript, Day 19 at 60–63 (Respondent's closing).

1388 Transcript, Day 20 at 227–28 (Claimants' rebuttal).

1389 Rejoinder ¶ 1056; Transcript, Day 19 at 60 (Respondent's closing): "Although Yukos nominally borrowed $1.6 billion from SocGen, it was fully collateralised in cash by Group Menatep. SocGen drew on the collateral before making the loan through an intermediary bank. And as a result, ultimately GML's rights in the loan were assigned to Moravel, which was its wholly owned subsidiary. So there is no doubt that this was a shareholder loan from the outset, not a commercial loan."

1390 Transcript, Day 21 at 157 (Respondent's rebuttal).

1391 Reply ¶¶ 384–85; Transcript, Day 20 at 227–28 (Claimants' rebuttal).

### *(b) The Export Contracts as Security for the A Loan*

1116. On 2 July 2004, the syndicate declared an Event of Default, following the bailiff's cash freeze orders.[1392] Respondent explains that, as Yukos claimed that it was unable to pay the relevant amounts, the syndicate did not call the loan "but instead relied on the default as the basis to access funds under the export trade guarantees."[1393]

1117. The syndicate received payment through this security mechanism[1394] until the end of 2004 and recovered around half of Yukos' USD 1 billion obligation.[1395] Respondent notes that on 27 December 2004, following the sale of YNG, Yukos notified the syndicate that it would cease payment under the A Loan.[1396] Respondent asserts that Yukos "continued to export oil produced by its other oil production subsidiaries Samaraneftegaz and Tomskneft" but that it "simply manipulated the export stream so that the oil was not exported pursuant to the specific export agreements used to secure the A Loan."[1397]

1118. At the Hearing, Mr. Theede asserted that there was "no cash from exported oil to be used to pay the banks" because of a sweep by the tax authorities.[1398] Respondent responds that this is "simply false,"[1399] and seeks to demonstrate that none of the funds under the export guarantee came from Yukos accounts, whether in Russia or elsewhere.[1400]

1119. Claimants argue that "with the sham auction of [YNG] in December 2004, [YNG] stopped shipping oil under the export contracts" and that therefore it was Respondent who "obstructed payment of the A Loan."[1401]

---

1392 Rejoinder ¶ 1059; Letter From Société Générale S.A. To Yukos Oil Company, re: Event of Default, 2 July 2004, Exh. R-3835.

1393 Rejoinder ¶ 1060.

1394 Respondent provides a detailed explanation of this mechanism at note 1771 of its Rejoinder.

1395 Rejoinder ¶ 1062.

1396 Rejoinder ¶ 1063.

1397 *Ibid.*; Transcript, Day 19 at 63-66 (Respondent's closing).

1398 Transcript, Day 10 at 103-04 (cross-examination of Mr. Theede).

1399 Respondent's Post-Hearing Brief ¶ 127.

1400 *Ibid.*, referring to Banks' Petition to Declare Yukos Bankrupt Filed with the Moscow Arbitrazh Court, 6 March 2006, Exh. R-3885.

1401 Claimants' Post-Hearing Brief ¶ 118; *see* Transcript, Day 20 at 228 (Claimants' rebuttal).

*(c) The English Judgment and the Syndicate's Unsuccessful Collection Efforts*

1120. Respondent asserts that, as a result of Yukos' re-routing of its export streams, the syndicate was left with "what had become, effectively, an unsecured loan."[1402] The syndicate therefore reduced its claim to judgment, obtaining the English Judgment in June 2005.[1403]

1121. Respondent faults Yukos for seeking to frustrate the syndicate's efforts to collect on the English Judgment, in the United States, the Netherlands, and Russia.[1404] Respondent puts particular emphasis on the Dutch Stichtings.[1405] Respondent argues that Yukos must be faulted for its use of the Stichtings to put its foreign assets out of reach of not just Rosneft or the tax authorities, but also of the Western Banks. Respondent contends that that the creation of the Stichtings "constitutes a blatant violation of Russian bankruptcy and criminal law."[1406] Respondent also submitted with its Rejoinder an expert report by Professor Dr. Albert Jan van den Berg (the "**Van den Berg Report**"), arguing that the creation of the Stichtings was illegal under Dutch law.[1407]

1122. Professor Van den Berg concludes that the creation of the Stichtings was:

> illegal, as it goes against the Dutch law principle, discussed in length above, that does not permit a company, or its directors, to transfer its assets for the purpose of making it more difficult for a creditor to satisfy its claims against the company and its assets, or for the new ultimate parent company to exercise control, even when the company reacts to what it believes to be illegitimate acts.
>
> In this connection, the establishment of the Stichting-structure (including the issuance of depositary receipts) as a protective device was not valid either, as it qualifies as a permanent protective device and, in any event, was established to make it more difficult for creditors to collect on debts.[1408]

---

[1402] Rejoinder ¶ 1064.

[1403] Rejoinder ¶¶ 1073–75; English Judgment, Exh. R-455.

[1404] Respondent's Post-Hearing Brief ¶ 127; Rejoinder ¶¶ 1076–92.

[1405] Rejoinder ¶ 1076; Transcript, Day 19 at 66–67 (Respondent's closing); Transcript, Day 21 at 165 (Respondent's rebuttal).

[1406] Counter-Memorial ¶¶ 537–38; *Criminal Code of the Russian Federation No. 63-FZ*, 13 June 1996, Article 195, Exh. R-720.

[1407] Rejoinder ¶ 86; Van den Berg Report.

[1408] Van den Berg Report ¶¶ 94–95.

1123. Claimants chose not to cross-examine Professor Van den Berg at the Hearing;[1409] his conclusions stand unrebutted.

1124. In response to Respondent's claim that the Stichtings were created to frustrate the syndicate's collection efforts, Claimants state that Respondent "misrepresents the purpose" of the Stichtings.[1410] Claimants argue that the Stichtings "sought to protect certain [assets] from further attack by the Respondent and in the best interests of the Yukos group, its management, employees, shareholders and legitimate creditors."[1411] At the Hearing, Mr. Theede asserted that the Stichtings were created to remove certain assets from the reach of Respondent:[1412]

> after [the YNG auction] happened, it became very obvious that we were not going to be able to do anything to protect our Russian assets; they were going to take them away from us, one way or another. And of course it was going to be through taxes: that was the decided approach.
>
> But we were presented with a way to add some additional security to our international assets.[1413]

1125. Claimants emphasize "the big picture": Yukos was facing tax claims in Russia and its assets were frozen.[1414] Claimants assert that Yukos repatriated almost all of the cash it had offshore.[1415] Claimants contend that Yukos was actively trying to sell the Dutch assets to satisfy the English Judgment, and that, had the syndicate not accepted an offer it could not refuse from Rosneft in the meanwhile, the proceeds of the sale of Mazeikiu Nafta would have been applied to the English Judgment.[1416] Claimants claim that Respondent was actively preventing Yukos from successfully selling the Dutch assets.[1417]

---

1409 Letter from Claimants to the Arbitral Tribunal, 20 September 2012 (confirming Claimants' decision not to cross-examine Professor Van den Berg at the hearing).

1410 Reply ¶ 389.

1411 Reply ¶ 390.

1412 Transcript, Day 10 at 106–10 (cross-examination of Mr. Theede).

1413 Transcript, Day 10 at 108 (cross-examination of Mr. Theede).

1414 Transcript, Day 17 at 125–26 (Claimants' closing).

1415 Transcript, Day 17 at 120–24 (Claimants' closing, excerpting relevant portions of Mr. Theede's and Mr. Misamore's testimonies).

1416 Transcript, Day 10 at 117–18 (cross-examination of Mr. Theede); Transcript, Day 20 at 228–29 (Claimants' rebuttal); Claimants' Post-Hearing Brief ¶¶ 119, 124.

1417 Transcript, Day 10 at 105–106 (cross-examination of Mr. Theede).

1126. Respondent criticizes Claimant's assertion that Yukos was unable to satisfy the English Judgment because of the asset freeze.[1418] Respondent emphasizes that counsel for Yukos in the English proceedings stated that the

> evidence would show that Yukos had assets outside Russia free from the Russian court's freezing order which could have been, and which still could be, exploited to raise money with which to make payments under the Loan Agreement as they became due.[1419]

1127. Respondent also notes that Mr. Misamore conceded at the Hearing that when Stichting 2 was formed in September 2005, it held approximately USD 500 million in cash, more than enough to satisfy the debt to the syndicate.[1420]

1128. In response to Claimants' argument that Yukos was trying to sell the Dutch assets to satisfy the judgment,[1421] Respondent claims that the proceeds were used to pay bonuses and to pay Moravel.[1422]

*(d) Yukos' Negotiations with the Syndicate*

1129. Respondent submits that Yukos engaged in bad faith negotiations with the syndicate.[1423] It notes that Yukos offered the syndicate a "poisoned chalice": seats on the board of a stichting in lieu of actual payment.[1424] Respondent claims that once Yukos had successfully obstructed collection efforts in the Netherlands, it withdrew its settlement offer to the syndicate.[1425]

1130. Claimants assert that, had the syndicate not been paid by Rosneft, it would have eventually been paid by Yukos.[1426]

1131. Claimants also rely on an undated letter sent by Mr. Theede to the bailiff, probably between 10 and 14 March 2006.[1427] In that letter, Mr. Theede asserts that Yukos finds itself in a

---

1418 Respondent's Post-Hearing Brief ¶ 129.

1419 English Judgment ¶ 15, Exh. R-455.

1420 Respondent's Post-Hearing Brief ¶ 127; Transcript, Day 9 at 223–24 (cross-examination of Mr. Misamore).

1421 Transcript, Day 20 at 228–29 (Claimants' rebuttal); Transcript, Day 10 at 112 (cross-examination of Mr. Theede).

1422 Transcript, Day 19 at 45–46 (Respondent's closing).

1423 Respondent's Post-Hearing Brief ¶ 128.

1424 Rejoinder ¶¶ 1081, 1083.

1425 Rejoinder ¶ 1083; Respondent's Post-Hearing Brief ¶ 128.

1426 Claimants' Post-Hearing Brief ¶ 119.

"straightjacket" and asks the bailiff to lift the freeze to enable Yukos to pay the syndicate.[1428] Respondent criticizes Claimants' reliance on this letter noting that the letter was sent *after* the bankruptcy petition was filed.[1429]

#### (ii) The Confidential Sale Agreement Between the Western Banks and Rosneft

1132. Claimants argue that, while it was the Western Banks that formally initiated the bankruptcy of Yukos, it was the Russian Federation, acting through Rosneft, that orchestrated the commencement of the bankruptcy. In particular, Claimants place great emphasis on the Confidential Sale Agreement that was entered into between the Western Banks and Rosneft on 13 December 2005. Pursuant to that Agreement, Rosneft agreed to satisfy the outstanding debt owed by Yukos to the Western Banks (over USD 455 million plus interest) in exchange for the Western Banks agreeing to take the steps described in Schedule 8 of the Confidential Sale Agreement, entitled "Application for Bankruptcy."

1133. Claimants assert that each of Rosneft, on the one hand, and the Western Banks, on the other, fulfilled their respective roles under the Confidential Sale Agreement meticulously. Thus, on 6 March 2006, having completed the other steps contemplated under the Confidential Sale Agreement, the Western Banks filed a petition with the Moscow Arbitrazh Court to declare Yukos bankrupt.[1430] On 14 March 2006, the Moscow Arbitrazh Court formally substituted Rosneft in the place of the Western Banks for the purposes of the bankruptcy proceedings.[1431]

1134. Respondent explains that the Confidential Sale Agreement was concluded between Rosneft and the Western Banks because of the "convergence of their commercial interests":

> The SocGen syndicate simultaneously also sought payment of the same debt from Rosneft pursuant to the 2004 loan guarantee that Yukos had foisted on YNG, which Rosneft then owned. Although Rosneft disputed the validity of the guarantee, Rosneft required forbearance from the same banks on covenant breaches arising from the YNG acquisition, and Rosneft needed the bank's cooperation for its planned IPO. The convergence of the syndicate's and Rosneft's commercial interests resulted in their agreeing that Rosneft

---

1427 Letter from Mr. Theede to Mr. Savostov (undated), Exh. C-1180; Transcript, Day 20 at 230–33 (Claimants' rebuttal); Theede WS ¶ 29.

1428 Letter from Mr. Theede to Mr. Savostov (undated), Exh. C-1180.

1429 Transcript, Day 21 at 159 (Respondent's rebuttal); Respondent's Post-Hearing Brief ¶ 128 (the letter is "typical of Yukos' consistent strategy of doing too little, too late, and then blaming others.")

1430 Banks' Petition to Declare Yukos Bankrupt Filed with the Moscow Arbitrazh Court, 6 March 2006, Exh. C-303.

1431 Ruling of the Moscow Arbitrazh Court, 28 March 2006, Exh. C-307.

> would pay the syndicate in full, but only after the syndicate had pursued all legal avenues to obtain payment from Yukos, the primary obligor. If Rosneft instead paid, the syndicate's rights under the A Loan agreement were to be assigned to Rosneft.[1432]

1135. Respondent disagrees with Claimants that the confidentiality clause in the Confidential Sale Agreement evidences a "conspiracy on the part of the SocGen syndicate to act secretly on behalf of Rosneft, which Claimants improperly equate with Respondent." Instead, Respondent contends that the confidentiality clause was a standard commercial term "necessary to preserve the possibility that Yukos would pay the SocGen syndicate before Rosneft became unconditionally obligated to do so, and remained in effect only for so long as Yukos' payment would have discharged Rosneft's own obligations to pay the syndicate."[1433]

1136. Respondent argues that the syndicate "ha[d] been nothing if not patient during this whole process"[1434] and that, in its frustrated effort to satisfy the English Judgment, the syndicate in last resort turned to Rosneft for payment under the YNG guarantee.[1435] After "a little bit of a dance going on between them," the syndicate and Rosneft concluded a mutually advantageous deal.[1436]

1137. Respondent asserts that the syndicate originally pressed Rosneft for payment under the YNG guarantee[1437] but eventually came to a commercially sound arrangement with it.[1438] Respondent claims that these propositions stand unrebutted.[1439]

1138. Claimants contend that Yukos "work[ed] closely" with the syndicate until the syndicate received from Rosneft an offer it could not refuse.[1440] In the words of Mr. Theede, "banks being banks, that was an easy, low-risk way out of this for them, and so that's what happened and that's what they did."[1441] Having said this, Claimants note that "there is no commercial

---

1432 Respondent's Skeleton ¶ 58.

1433 Respondent's Skeleton ¶ 59.

1434 Respondent's Post-Hearing Brief ¶ 129, quoting *Creditors Petition Russian Court to Declare Yukos Bankrupt*, World Markets Research Centre, 13 March 2006, Exh. R-3882.

1435 Respondent's Post-Hearing Brief ¶ 129; Counter-Memorial ¶¶ 577–80; Rejoinder ¶¶ 1065–71; Transcript, Day 19 at 69–72 (Respondent's closing).

1436 Transcript, Day 19 at 69–72 (Respondent's closing); *see* Confidential Sale Agreement, Exh. C-300.

1437 Counter-Memorial ¶¶ 577–80; Rejoinder ¶¶ 1065–71.

1438 Post-Hearing Brief ¶ 129; Counter-Memorial ¶¶ 575–83; Rejoinder ¶¶ 1086–88.

1439 Post-Hearing Brief ¶ 129; Transcript, Day 10 at 113–14 (cross-examination of Mr. Theede).

1440 Claimants' Post-Hearing Brief ¶ 119; Transcript, Day 20 at 228–29 (Claimants' rebuttal).

1441 Transcript, Day 10 at 113 (cross-examination of Mr. Theede).

rationale for why Rosneft would insist upon the further and highly unusual step that the A Lenders initiate bankruptcy proceedings against Yukos, save for the sake of appearances."[1442]

1139. The Parties also disagree when it comes to the significance of the separate and parallel bankruptcy petition filed by YNG (then a subsidiary of Rosneft) on 24 March 2006. According to Respondent, the YNG petition "alone disposes of Claimants' contention that the bankruptcy filing by the SocGen syndicate had been orchestrated by the Russian Federation so as to allow Rosneft not to 'appear as the instigator of Yukos' bankruptcy.'"[1443]

1140. According to Claimants, Rosneft had decided to "hedge its bets" by filing a separate bankruptcy petition through YNG in the event the court would reject the petition filed by the banks.[1444] Claimants further contend that having the syndicate file its petition prior to YNG was "evidently important to Rosneft and the Kremlin's public relations efforts."[1445] Finally, Claimants argue that the YNG petition refutes Respondent's argument that Yukos itself caused the bankruptcy by failing to pay the syndicate: "Respondent offers no explanation as to how the Claimants suffered additional damages because it was the Société Générale syndicate who initiated the bankruptcy rather than Rosneft."[1446]

### (iii) Tribunal's Observations

1141. Having considered the extensive record and the maze of documents as well as the Parties' arguments, the Tribunal concludes that while it is undisputed that the Western Banks formally initiated the bankruptcy proceedings, and that Yukos is partly to blame for giving the Banks the incentive to enter into the Confidential Sale Agreement with Rosneft, the role of Rosneft and of Respondent in creating the conditions for Yukos' bankruptcy cannot be ignored.

1142. Turning firstly to the fault that Yukos bears in this matter, the Tribunal largely accepts Respondent's arguments that Yukos could have paid the A Loan in full prior to the end of 2005, whether by subordinating the B Loan to the A Loan, allowing the export contracts to continue to operate as security for the Western Banks, or indeed using assets that were placed into the

---

1442 Claimants' Post-Hearing Brief ¶ 121 (underlining in original).

1443 Counter-Memorial ¶ 572 (quoting Memorial ¶ 427); *see* Rejoinder ¶ 1090.

1444 Memorial ¶ 427; *Yuganskneftegaz demands Yukos' bankruptcy over $1 million debt*, Vedomosti, 3 April 2006, Exh. C-795.

1445 Claimant's Post-Hearing Brief ¶ 300.

1446 *Ibid.*

Stichtings. It can therefore be said that Yukos is not without fault in connection with the initiation of the bankruptcy, since it contributed to creating conditions that gave the Western Banks every incentive to enter into the Confidential Sale Agreement with Rosneft, and it was pursuant to that Confidential Sale Agreement that the Banks initiated bankruptcy proceedings against Yukos in exchange for payment from Rosneft under the A Loan. As Mr. Theede testified, banks being banks, the solution presented by the Confidential Sale Agreement was "an easy, low-risk way out of this for them."[1447]

1143. However, to focus only on these narrow reasons for non-payment of the A Loan, and on the commercial considerations that drove the Western Banks to enter into the Confidential Sale Agreement, is to miss the bigger picture. The Tribunal observes that Yukos was current in its payments to the Western Banks until December 2004, when YNG was auctioned to Rosneft. Had YNG not been seized, therefore, it is reasonable to assume that Yukos would not have had problems repaying the A Loan. By the same token, given the circumstances under which YNG was seized (discussed in Chapter VIII.F of this Award), it stands to reason that Yukos felt justified in forcing Respondent, through Rosneft, to pay the Western Banks under the YNG guarantee, rather than paying the debt itself.

1144. The Tribunal therefore cannot accept Respondent's argument that because Yukos, even after the seizure of YNG, *could have* paid the Western Banks under the A Loan but did not do so, there is no link to be made between Rosneft (and, indeed, Respondent) and the bankruptcy. The big picture established by the record, including in respect of the tax assessments and the auction of YNG, suggests otherwise.

1145. The Tribunal's conclusion is also supported by two particular facts more closely related to the enforcement of the A Loan in Russia.

1146. Firstly, the Tribunal notes that the Western Banks entered into the Confidential Sale Agreement with Rosneft very soon after the Federal Arbitrazh Court for the Moscow District reversed an earlier decision that had authorized the enforcement of the English Judgment, and that the same Court ultimately allowed the Western Banks to proceed with its enforcement after it had entered into the Confidential Sale Agreement. This suggests to the Tribunal, at best, a very happy coincidence as between the decision of the Court and the interests served by the terms presented to the Western Banks in the Confidential Sale Agreement. It is also consistent with

1447 Transcript, Day 10 at 113 (cross-examination of Mr. Theede).

Claimants' argument that the decisions of the Court and the conduct of Rosneft were being coordinated as part of a deliberate strategy to drive Yukos into bankruptcy.

1147. Secondly, if Rosneft itself (or the State, as its owner) were not interested in orchestrating the initiation of the bankruptcy proceedings against Yukos, why was the requirement to initiate bankruptcy included in the Confidential Sale Agreement? In other words, while the Tribunal can accept both that the Western Banks had a commercial interest in getting paid by Rosneft (especially after the 5 December 2005 decision of the Federal Arbitrazh Court that reversed the enforcement of the English Judgment) and that Rosneft had a commercial interest in having the Western Banks' claim against Yukos assigned to it in exchange for such payment, the Tribunal does not see any evident commercial rationale for the inclusion in the Confidential Sale Agreement of the requirement that the Banks initiate bankruptcy in order to be paid.

1148. It thus appears to the Tribunal that the Western Banks, since Yukos was not reimbursing the loan, were actively "encouraged" to enter into the Confidential Sale Agreement in order to accomplish their objective of being paid. While, as the Tribunal said earlier, Yukos must shoulder some of the blame for not paying the Western Banks and thereby increasing its exposure to the risk that it could be petitioned into bankrupcy, it appears undeniable to the Tribunal that initiating bankruptcy was not a goal of the Western Banks, but rather the objective of Rosneft, in the interests of its owner, the Russian Federation. The Tribunal concludes that in the end the bankruptcy was initiated by the Russian Federation. The separate and parallel bankruptcy petition filed by Rosneft-controlled YNG on 24 March 2006 reinforces this conclusion.

1149. The Tribunal, in light of the evidence reviewed above, finds the following passage from Claimants' Post-Hearing Brief compelling and adopts it as its own:

> The only rational explanation for the highly unusual manner in which the bankruptcy proceedings against Yukos were initiated was to act as a cover for the Russian Federation's involvement, allowing the Russian government to keep its word—in the context of ongoing legal proceedings, including these arbitrations—that it was not interested in the bankruptcy of Yukos (and thus maintaining the appearance that it was commercial parties—not the State—that sought Yukos' bankruptcy), while achieving its desired end.[1448]

[1448] Claimants' Post-Hearing Brief ¶ 123.

### (b) Were the Bankruptcy Proceedings Conducted Properly and Fairly?

1150. Claimants paint the bankruptcy as "the final act of the destruction" of Yukos.[1449] Claimants argue that Respondent (or entities whose conduct is attributable to Respondent)[1450] not only initiated the bankruptcy, but also (i) ensured that it monopolized the bankruptcy process by discriminatory rejection and allowance of bankruptcy claims; [1451] (ii) ensured the rejection of Yukos' proposed Rehabilitation Plan;[1452] and (iii) confiscated the residual assets of Yukos through sham auctions and Yukos' eventual liquidation.[1453]

1151. Claimants claim that Respondent monopolized the bankruptcy and, directly or indirectly, obtained 97.67 percent of all bankruptcy claims, obtained approximately 93.87 percent of the votes in the creditors' meeting, claimed USD 6 billion in profit tax on the auction proceedings, acquired over 95 percent of Yukos' remaining assets in the bankruptcy, and received as creditor approximately 99.71 percent of the bankruptcy proceeds.[1454]

#### (i) The Courts' Treatment of Bankruptcy Claims

1152. Claimants argue that the Russian courts never had the interests of Yukos or its rehabilitation in mind when conducting the bankruptcy proceedings. Firstly, the Russian courts ensured that the Russian State would become Yukos' main creditor in the bankruptcy proceedings by postponing the date of the first meeting of Yukos' creditors to give the State "more time to prove new tax claims" against Yukos.[1455] These tax claims comprised Yukos' outstanding alleged tax liabilities for the years 2000 to 2003. As noted above, at the hearing of the Moscow Arbitrazh Court on 14 June 2006, the bankruptcy judge ruled in favour of the Federal Taxation Service, setting "a new speed reading record" after taking just 15 minutes to consider 127,000 pages of information submitted by Russian tax officials.[1456] As a result of that judgment, the

---

1449 Memorial ¶ 411.

1450 For the Tribunal's discussion of attribution, see Chapter X.A of this Award.

1451 *Ibid.* ¶¶ 431–51.

1452 *Ibid.* ¶¶ 452–67.

1453 *Ibid.* ¶¶ 468–94.

1454 Claimants' Post-Hearing Brief ¶¶ 126–33.

1455 *Yukos creditors' meeting delayed by Moscow court*, Reuters, 8 June 2006, Exh. C-808.

1456 *Judge sets speed-reading record…*, Reuters, 16 June 2006, Exh. C-809.

Federal Taxation Service became Yukos' single largest creditor with registered claims amounting to approximately USD 13.06 billion.[1457]

1153. Secondly, Claimants contend that the Russian courts ensured that State-controlled Rosneft—of which the Russian State has been the majority shareholder since the company's privatization in the nineties—would become Yukos' second largest creditor in the bankruptcy. On 17 July 2006, the Moscow Arbitrazh Court admitted into the bankruptcy proceedings four claims by YNG, which by that that time had already become a subsidiary of Rosneft:

> The claims were based on the sale of oil produced by Yuganskneftegaz and sold to Yukos' trading companies in 2004: the Court decided that Yukos, and not the trading companies—notwithstanding that those companies were Yuganskneftegaz's counterparties under the relevant oil sale contracts—was liable to pay for the oil sold.[1458]

1154. Thirdly, in Claimants' view, the Russian courts ensured that creditor claims belonging to Yukos-related entities or to Yukos' shareholders would not be recognized in the bankruptcy proceedings. For example, in its Memorial on the Merits, Claimants explain the Russian courts' treatment of Moravel Investment Limited, a GML affiliate:

> This was the case, for example, for the claim filed by Moravel Investment Limited ("Moravel"), a GML affiliate, on the basis of an LCIA award of September 16, 2005, rendered by an arbitral tribunal comprised of Peter Leaver QC, Jonathan Hirst QC and J. William Rowley QC, Chairman. The award ordered Yukos to pay to Moravel US$ 655,725,238.60 in principal plus corresponding interest, which was outstanding under the B Loan Agreement concluded between Yukos and Société Générale in September 2003 for the purposes of Yukos' merger with Sibneft. This loan was identical, in all material aspects, to the A Loan which had been assigned to Rosneft by the Western Banks headed by Société Générale and on the basis of which Rosneft had been admitted into the bankruptcy proceedings. However, unlike Rosneft's claim, for which the Russian courts had recognized the English Judgment rendered in favor of the Western banks (later assigned to Rosneft), the courts refused the enforcement of the awards in favor of Moravel.[1459]

1155. Russian courts accorded similar treatment to the remaining Yukos affiliates with outstanding claims against Yukos, such as Yukos Capital SARL, Glendale Group Limited, OOO Yu-Mordovia, OOO Yukos Vostok Trade, ZAO Yukos-M, OOO Siberian Internet Company, OOO Trading House Yukos-M, ZAO Krasnoyarskgeofizika, ZAO Lipetsknefteprodukt, and

---

1457 Resolution of the Ninth Arbitrazh Court of Appeal, 11 August 2006, Exh. C-336; Decision of the Moscow Arbitrazh Court, 2 October 2006, Exh. C-201; Register of Yukos Creditors' Claims, 30 October 2007, Exh. C-353; Summary Chart of Creditors, Exh. C-594.

1458 Memorial ¶ 435.

1459 Memorial ¶ 441 (internal footnotes omitted).

OOO Alta-Trade. As Claimants contend, "the common ground for denying the claims of these companies was the alleged lack of evidence of the existence of the claims."[1460]

### (ii) The Rejection of Yukos' Rehabilitation Plan

1156. On 1 June 2006, Yukos' general shareholders' meeting approved Yukos' Financial Rehabilitation Plan and appointed Mr. Osborne as the shareholders' representative in the bankruptcy proceedings.[1461] Claimants point out that according to Yukos' Rehabilitation Plan, Yukos was in a position to pay off its alleged liabilities fully within two years.[1462] Mr. Rebgun, the appointed administrator, was required to circulate Yukos' Rehabilitation Plan to all Yukos' registered creditors. According to Claimants, Mr. Rebgun did not do so, although Respondent alleges that Mr. Rebgun made the Rehabilitation Plan available for the creditors' review before the creditors' meeting.

1157. Mr. Rebgun's own proposal to the creditors was to sell all Yukos' assets to satisfy the creditors' claims and then liquidate the company. At the creditors' meeting of 25 July 2006, at which the Federal Taxation Service and Rosneft held 93.87 percent of votes, Yukos' Rehabilitation Plan was rejected, and the creditors decided to liquidate Yukos, "which had the added bonus of creating an additional claim for the tax authorities of 24% profit tax on the auction proceedings, a claim on which it would collect US$ 6 billion."[1463]

1158. In their Post-Hearing Brief, Claimants further contend that:

> During the hearing, the Respondent made a limited number of unfounded attacks on Yukos' Financial Rehabilitation Plan. For example, the Respondent alleged that Yukos' Financial Rehabilitation Plan was "highly speculative" as the "cash pool" was to be funded from "uncertain revenues" including US$ 18 billion from "litigation claims." However, as even the most cursory review of the Plan reveals, "litigation claims" were not ascribed a value in determining the aggregate value of Yukos' assets available to pay claims and were merely intended to supplement the "cash pool", if and when anything was received.[1464]

1159. Yukos' creditors gathered for their first meeting on 20 July 2006. Yukos' management proposed a Rehabilitation Plan[1465] and Mr. Rebgun proposed its Analysis of Yukos' Financial

---

[1460] Memorial ¶ 448.

[1461] Minutes of Extraordinary General Meeting of Yukos' Shareholders held on 1 June 2006, Exh. C-311.

[1462] Claimants' Skeleton ¶ 55.

[1463] Claimants' Post-Hearing Brief ¶ 127.

[1464] *Ibid.* ¶ 128.

[1465] Rehabilitation Plan, Exh. C-312.

Situation.[1466] After the meeting was adjourned and resumed on 25 July 2006, the Federal Taxation Service, representing together with Rosneft 93.87 percent of the votes, voted against the Rehabilitation Plan and in favor of the liquidation of Yukos.[1467]

1160. Claimants argue that the decision to liquidate was "preposterou[s], even from an economic standpoint"[1468] and that "[t]he absurdity of Yukos' fate was only the flip side of the coin of the Russian Federation's and Rosneft's fortune."[1469] Claimants allege that there was an "obvious conflict of interest" in the vote as the sales of Yukos' assets were subject to a 24 percent profit tax, "which meant that liquidation would bring an enormous windfall to the Federal Taxation Service".[1470]

1161. Respondent denies all allegations of impropriety in relation to Mr. Rebgun's conduct of the creditors' meeting and the rejection of Yukos' Rehabilitation Plan:

> All registered creditors and the representatives of the debtor had an opportunity to review the Rehabilitation Plan and the analysis of Yukos' financial situation (along with relevant enclosures) prepared by Mr. Rebgun at his offices during the week preceding the meeting (and for five full days, from July 20, 2006 until July 25, 2006).[1471]

1162. Respondent contends that the Rehabilitation Plan was rejected because it was flawed and overly optimistic:

> Yukos' management, actively supported by the Claimants, had the opportunity to present a rehabilitation claim to the meeting of creditors. The rough outline management submitted was, however, legally defective and did not provide any basis for creditors to prefer rehabilitation to liquidation. It was not properly presented to or approved by Yukos shareholders, did not meet the legal requirements that the company's tax claims be satisfied within six months, and did not ensure full, let alone timely, payment of Yukos' creditors' claims.[1472]

1163. Respondent argues that the Rehabilitation Plan was "a blatant and untenable attempt on the part of the Oligarchs to secure their own interests over those of the creditors" and that "the

---

1466 Analysis of Yukos' Financial Situation 2006, Exh. C-317; see Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Proceeding as Exhibit B to his Status Report of 7 August 2006, Exh. C-318.

1467 Protocol of the First Meeting of Yukos' Creditors held on 20–25 July 2006, Exh. C-319.

1468 Memorial ¶ 466.

1469 Memorial ¶ 467.

1470 Reply ¶ 418.

1471 Counter-Memorial ¶ 607.

1472 Respondent's Skeleton ¶ 62*; see also* Respondent's Post-Hearing Brief ¶ 123.

creditors' decision to reject the plan was reasonable and taken in accordance with Russian law, which vests full discretion with the creditors, consistently with international practice."[1473]

1164. Respondent underlines that in Russia, "the vote for the liquidation or rehabilitation of the debtor is within the full discretion of the creditors."[1474]

1165. On the question of the late claims, Respondent does not contest that the Federal Taxation Service claimed USD 8.82 billion in profit taxes out of the proceeds of the bankruptcy and eventually received USD 6.02 billion; it submits however, that "[t]hese are standard '*late*' claims that arise in connection with any sale generating profits, including in the context of rehabilitation proceedings"[1475] and that there is therefore nothing improper about them.

**(iii) The Declaration of Yukos' Bankruptcy**

1166. On 1 August 2006, the Moscow Arbitrazh Court stated that it had "established that the debtor showed the signs of bankruptcy as defined in Article 3 of the Federal Law 'On Insolvency (Bankruptcy)'" and that Yukos had "not fulfilled its monetary obligations towards its creditors for three months from the time when these obligations should have been fulfilled," without making any reference to the difference between Yukos' liabilities and its assets.[1476]

1167. The Claimants assert that on 1 August 2006, when Yukos was declared bankrupt, "Yukos' assets exceeded its alleged liabilities, and . . . the Company was clearly solvent."[1477] The Claimants further suggest that "there was nothing inevitable about the bankruptcy of Yukos" and that "Yukos could have avoided bankruptcy if allowed to pay off its fabricated tax debts."[1478] To support this claim, Claimants refer to the Rehabilitation Plan proposed by Yukos' management, which proposed "to leave intact Yukos' 'core assets' as a viable ongoing company, while addressing and paying in full all valid creditors' claims."[1479]

---

1473 Counter-Memorial ¶ 611.

1474 Counter-Memorial ¶ 632. This is consistent with international practice, *see* Counter-Memorial ¶ 1501.

1475 Rejoinder ¶ 1182.

1476 Decision of the Moscow Arbitrazh Court, 1 August 2006, Exh. C-324.

1477 Memorial ¶ 822.

1478 Memorial ¶ 825.

1479 Claimants' Post-Hearing Brief ¶128; *see also* Rehabilitation Plan, Exh. C-312.

1168. By contrast, Respondent points out that the insolvency test applicable to the initiation of bankruptcy proceedings against Yukos was an "illiquidity test," based on the debtor's inability to discharge a certain debt "within three months of its due date."[1480] According to Respondent, this "illiquidity test" was satisfied when the Western Banks filed a petition for Yukos' bankruptcy.[1481] Further, the question of whether the bankruptcy proceedings will result in the adoption of a financial rehabilitation plan and the company's survival or in the company's liquidation depends on whether the financial rehabilitation plan provides for the discharge of all the creditors' claims within certain applicable time limits.[1482] Respondent points out that the debt repayment schedule in the Rehabilitation Plan did not do so.[1483]

1169. Respondent denies all allegations of impropriety or bias relating to the way the Russian courts conducted the bankruptcy proceedings:

> As confirmed by the Moscow Arbitrazh Court, the syndicate's petition satisfied the insolvency test under Russian bankruptcy law applicable at the time, which was based on the debtor's inability to discharge a debt exceeding US$ 3,500 within three months of its due date.
>
> Nothing in Russian law in this regard concerning the initiation of bankruptcy proceedings is at odds with international practice. In a number of other jurisdictions, the so-called "illiquidity test: (*i.e.*, the debtor's inability to pay its debts as they become due) is sufficient to initiate bankruptcy proceedings.[1484]

1170. In any event, Respondent claims that Yukos' liabilities did exceed its assets, a position Respondent seeks to support by stressing that, after the sale of Yukos' assets, liabilities of Yukos in an amount of USD 9.2 billion remained unsatisfied.[1485]

### (iv) The Liquidation of Yukos' Remaining Assets

1171. According to Claimants, the last stage in the "confiscation of Yukos"[1486] was the bankruptcy auctions of Yukos' remaining assets.[1487]

---

1480 Counter-Memorial ¶¶ 584, 1491; Article 3(2) of the Russian *Federal Law on Insolvency (Bankruptcy)*, Exh. R-776.

1481 Counter-Memorial ¶ 1491.

1482 Article 84(3) of the Russian Federal Law on Insolvency (Bankruptcy), Exh. R-776; Protocol of the First Meeting of Yukos' Creditors held on 20–25 July 2006, p. 11, Exh. C-319; Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Proceeding as Exhibit B to his Status Report of 7 August 200, p. 86, Exh. C-318.

1483 Counter-Memorial ¶ 623.

1484 Counter-Memorial ¶ 584–85; *see also* Respondent's Post-Hearing Brief ¶¶ 130–34.

1485 Counter-Memorial ¶ 669; Rejoinder ¶ 1161, Respondent's Post-Hearing Brief ¶ 134; Respondent's Opening Slides, p. 452.

1172. Claimants' argument regarding the auctions does not point to specific acts. While Claimants fault Rosneft for the initiation of the bankruptcy, the courts for the discriminatory rejection and allowance of claims, the Federal Taxation Service and Rosneft for the rejection of the Rehabilitation Plan, they fault "the Russian Federation" for the auctions.[1488] Claimants state "[t]he results of the auctions speak for themselves."[1489] Claimants argue that the small number of bidders, the speed of the auctions, the below-market-value resulting prices, and the overall benefits to Respondent leave no doubt about Respondent's "monopolization" of the auctions.[1490]

1173. Claimants note that Respondent as creditor in the bankruptcy was involved in the auctions in four ways. Firstly, it approved the procedure for the auctions[1491] and Mr. Rebgun's allotment of Yukos' assets into twenty lots.[1492] Secondly, it selected the Russian Federal Property Fund to organize and conduct the auctions.[1493] Thirdly, it set the starting price for the auctioned assets.[1494] Fourthly, it "actively communicated with [Mr. Rebgun] on other issues as well."[1495]

1174. Respondent underlines that this involvement was in accordance with Russian law and emphasizes that Respondent as creditor in the bankruptcy did not have the power to control the identity of the bidders, and that in each instance the starting price for the auctioned assets was at least equal to the appraised market value.[1496]

1175. Claimants assert that "[a]s creditor, the Russian Federation received, either directly or through Rosneft, approximately 99.71% of the bankruptcy proceeds."[1497] This occurred through

---

1486 Memorial ¶ 468.

1487 Memorial ¶¶ 468–94.

1488 Reply ¶ 438.

1489 Reply ¶¶ 421, 432.

1490 Reply ¶ 425.

1491 Counter-Memorial ¶ 633; Finalization Order, Exh. R-752; *see also* Receiver's Report, pp. 28–29, Exh. R-751.

1492 Memorial ¶ 470.

1493 Memorial ¶ 470; *see also* Ruling of the Moscow Arbitrazh Court, 12 November 2007, p. 8, Exh. C-362.

1494 Reply ¶ 425.

1495 Reply ¶ 425, citing Ruling of the Moscow Arbitrazh Court, 12 November 2007, pp. 8–9, 21, Exh. C-362.

1496 Rejoinder ¶ 1162; Counter-Memorial ¶¶ 633–38; *see also* Procedure for the Conduct of Public Auctions in Respect of the Assets of OAO NK Yukos during the Receivership Proceedings, Clauses 2.1–2.3, 20 February 2007, Exh. R-3943 and Minutes No. 5 of the Meeting of the Creditors' Committee of OAO NK Yukos, 21 February 2007, Exh. R-3944; Russian Bankruptcy Law 2002, Articles 110(5) and 111(3), Exh. R-3892.

1497 Claimants' Post-Hearing Brief ¶ 132.

"Rosneft [having] won 11 out of the 17 bankruptcy auctions, including acquiring Samaraneftegaz (Lot No. 11) and Tomskeneft (Lot No. 10)."[1498]

1176. In their Skeleton Argument, Claimants summarize the eleven auctions that completed the bankruptcy proceedings as follows:

> Yukos' remaining assets were transferred to the Russian State at well below their fair market value through a series of 17 auctions held between March 2006 and August 2007. Rosneft thereby directly or indirectly acquired Yukos' key remaining assets, including Samaraneftegaz (Lot No. 11) and Tomskneft (Lot No. 10), which were sold at a gross discount of approximately 37% and 33%, respectively, of their fair market value. For its part, Gazprom acquired through Eni/Enel the 20% minus 1 share stake in Sibneft that the Russian Federation had persistently refused to let Yukos sell to pay off alleged tax debts. As with the sham auction of Yuganskneftegaz, there was no genuine competition in the bankruptcy auctions and, in many instances, including those for Samaraneftegaz and Tomskneft, the only participants were Rosneft and a previously unknown entity whose sole role was to satisfy the formal requirement that there be a minimum of 2 bidders.
>
> Finally, when, by the end of July 2007, it became clear that despite the low auction prices, the bankruptcy might still generate some surplus, further claims were admitted in the bankruptcy proceedings on behalf of the Russian State, through the Federal Taxation Service and Rosneft. This ensured the completeness of Yukos' destruction and the transfer of its value and assets to the Russian State. Thus, the Russian Federation received, either directly or through State-owned Rosneft or Gazprom, approximately 99.71% of the bankruptcy proceeds and over 95% of Yukos' remaining assets, including all of Yukos' main production assets.
>
> On November 12, 2007, the Moscow Arbitrazh Court formally endorsed all the activities of Yukos' receiver Mr. Rebgun, closed the Company's receivership and ordered that Yukos be struck off the register of legal entities. The latter happened on November 21, 2007.[1499]

1177. Respondent contends that Yukos' bankruptcy auctions were held in full compliance with Russian law, and that Mr. Rebgun had secured appraisals for the fair value of the assets:

> Once Yukos' liquidation was properly approved, the company's assets were sold at auction in accordance with Russian law and international practice. Yukos' receiver obtained appraisals for the fair value of the assets, and used those appraisals to set minimum bids in the auctions, all of which were exceeded, some by very large margins. The auctions were open to domestic and foreign bidders, adequately noticed and advertised, and competitive. To the extent that any bidders may have been discouraged from participating, this was again the result of Claimants and Yukos having threatened potential bidders with legal action. While the aggregate results exceeded Yukos' own (and other) contemporaneous fair market value estimates, more than US$ 9 billion in creditor claims nonetheless remained unsatisfied.[1500]

---

1498 Claimants' Post-Hearing Brief ¶ 131.

1499 Claimants' Skeleton ¶¶ 58–60 (internal footnotes omitted).

1500 Respondent's Skeleton ¶ 63; *see also* Respondent's Post-Hearing Brief ¶¶ 133–34.

# Exhibit J: Deutsche Bank Annual Review 2006

This Exhibit contains excerpts from Deutsche Bank's 2006 Annual Review documenting its acquisition of United Financial Group (UFG), its reported position as a market leader in Russia, and contemporaneous statements concerning strong advisory revenues. The materials provide corporate and financial context relevant to Plaintiff's allegations concerning Deutsche Bank's expanding Russian commercial interests and the institutional conflict alleged in this action.

Dear Shareholders,

2006 was a year of great success and achievement for Deutsche Bank. We delivered outstanding financial performance; we invested significantly in our platform, improving our delivery to both existing and new clients across the world; and we charted the course of our future strategy by launching the next phase of our management agenda.

Business conditions were favourable in 2006. The global economy produced very respectable growth, expanding by 5%. A slight deceleration in the U.S. economy was counterbalanced by a sustained upswing in the Eurozone and by strong momentum in leading growth economies, notably China and India. The Eurozone economy was boosted by the renewed strength in Germany. The world's financial markets saw corrections towards mid-year before rallying to new highs.

Deutsche Bank took full advantage of these favourable economic conditions. Revenues for the year rose 11% to € 28.3 billion, and this growth produced significantly higher profits. Pre-tax profits rose 33% to € 8.1 billion, while net income rose by 70% to € 6.0 billion. Pre-tax return on average active equity, as per our target definition, was 31%, up from 25% in 2005, and comfortably ahead of our over-the-cycle target of 25%. Earnings per share rose by 66% to € 11.55, consistent with our target of double-digit earnings per share growth over the cycle. These outstanding results enable us to deliver excellent value to our shareholders. Our share price rose 24% during the year, outperforming both the DAX and the Euro-STOXX banks indices, and at our upcoming Annual General Meeting we will recommend a dividend of € 4.00 per share – up 60% compared to € 2.50 per share in 2005.

All our businesses enjoyed a record year. In the Corporate and Investment Bank (CIB), underlying pre-tax profits rose 24% to € 5.9 billion. Of this, Corporate Banking & Securities contributed € 5.2 billion. We saw exceptional results in Debt and Equity Sales & Trading. Also, both Origination and Advisory produced the best revenues ever, reflecting

**Dr. Josef Ackermann**

Chairman of the Management Board and the Group Executive Committee



# Group Executive Committee





1
**Anthony Di Iorio, born 1943**
Management Board member since 2006. Chief Financial Officer, responsible for Finance, Tax, Capital Market Communications/Investor Relations and Corporate Insurance.

2
**Dr. Josef Ackermann, born 1948**
Management Board member since 1996. Chairman of the Management Board and the Group Executive Committee, responsible for Corporate and Investment Bank, Private Clients and Asset Management, Corporate Investments, Regional Management as well as Corporate Communications, Corporate Development and Economics/DB Research.

**Jürgen Fitschen, born 1948**
Global Head of Regional Management and Chairman of the Management Committee Germany.

6
**Rainer Neske, born 1964**
Head of Private & Business Clients.

3
**Anshu Jain, born 1963**
Head of Global Markets.

7
**Kevin Parker, born 1959**
Head of Asset Management.


4


5


8


9


10

4
**Dr. Tessen von Heydebreck, born 1945**
Management Board member since 1994. Chief Administrative Officer, responsible for Corporate Social Responsibility, Human Resources, Legal, Compliance and Audit.

8
**Dr. Hugo Bänziger, born 1956**
Management Board member since 2006. Chief Risk Officer, responsible for Risk & Capital Management, Corporate Security and Treasury & Capital Management.

5
**Michael Cohrs, born 1956**
Head of Global Banking.

9
**Pierre de Weck, born 1950**
Head of Private Wealth Management.

10
**Hermann-Josef Lamberti, born 1956**
Management Board member since 1999. Chief Operating Officer, responsible for Cost and Infrastructure Management, Information Technology, Operations, Building and Facilities Management as well as Purchasing.

**Members of the Management Board of Deutsche Bank AG.**

## CLIENTS

Global expertise for demanding clients

| Structural Data | | 2006 | 2005 | 2004 |
|---|---|---|---|---|
| **Number of clients** | | | | |
| Corporate and Investment Bank | | 54,214 | 54,812 | 54,524 |
| Private Clients and Asset Management | Private & Business Clients | 14,100,000 | 13,410,000 | 13,331,000 |
| | Asset and Wealth Management | | | |
| | Retail Asset Management[1] (Germany/Luxembourg) | 2,530,000 | 2,500,088 | 2,527,598 |
| | Institutional Asset Management | 2,273 | 2,580 | 3,722 |
| | Private Wealth Management[1] | 154,000[2] | 123,000 | 111,000 |

| Key Figures | | 2006 | 2005 | 2004 |
|---|---|---|---|---|
| Corporate and Investment Bank | Euromoney Poll of Polls, ranking | 1 | 2 | 1 |
| | Euromoney FX Poll, ranking | 1 | 1 | 2 |
| | Euromoney Awards for Excellence, number of awards won | 21 | 19 | 24 |
| | International Financing Review (IFR) Awards (majors) | 26 (7) | 12 (4) | 8 (1) |
| Private Clients and Asset Management | Top rankings in Standard & Poor's Fund Awards for DWS Investments, category "Larger Group"[3] | | | |
| | Germany | 2 | 3 | 3 |
| | Austria | 1 | 1 | 3 |
| | Switzerland | 1 | 2 | 2 |

| Special Projects | |
|---|---|
| Corporate and Investment Bank | Completion of acquisitions of MortgageIT Holdings and Chapel Funding in the U.S.A. and UFG in Russia. |
| | Joint bookrunner of the world's largest ever initial public offering in China (Industrial and Commercial Bank of China). |
| | Launch of brokerage business on the Tadawul (Stock Exchange) in the Kingdom of Saudi Arabia. |
| | Initiated a custody service on the Dubai International Financial Exchange (DIFX) which will provide international investors with direct settlement access to all DIFX-listed debt and equity products. |
| Private & Business Clients | Acquisition of Berliner Bank and norisbank in Germany. |
| Retail Asset Management | Launch of DWS Noor, Deutsche Bank's first range of Shari'a compliant funds. |
| Institutional Asset Management | RREEF, the investment manager for alternative assets, makes first investments in China. |
| Private Wealth Management | Acquisition of the Tilney Group in the UK with €12 billion in assets under management. |
| | Entry into the Chinese onshore market through office opening in Shanghai. |

[1] Number of accounts; Private Wealth Management without Private Client Services (U.S.A.).
[2] Inclusive Tilney Group (UK) acquired in 2006.
[3] "Larger Group" definitions:
Germany, Austria: 15 or more funds across at least five different sectors.
Switzerland: 10 or more funds across at least four different sectors.

Our Advisory business continued to gain momentum in strong markets, ending the year 65% higher in volume terms. In Europe, our transaction volumes increased by 62%, and we finished the year as market leader in Germany, the UK, Russia and CEMA (Central and Eastern Europe, Middle East & Africa). In the U.S., our transaction volumes increased by 57% and our progress was boosted by several large and high-profile mandates.

In ECM, we maintained our place among the world's leading houses, strengthening our position in key markets and product areas. In global convertible bond issuance we finished the year at No. 2 with a significant increase in volumes over 2005. In the U.S. we continued to gain market share. In Europe we were the No. 1 Real Estate ECM House, while our successful investments in emerging markets helped us progress in the Middle East and Africa. In Asia/Pacific outside Japan, we ranked 6th, up 2 positions from 2005, and we acted as joint book-runner on the world's largest ever initial public offering in China.

Our LDCM group delivered another record year. In the U.S., we had a lead role in 8 out of the 10 largest Leveraged Buy Outs (LBOs) in 2006. Our leveraged finance business in Europe maintained its leadership position in European High Yield for the sixth straight year. Deal highlights included the largest European LBO ever along with a number of award-winning innovative deals for both corporates and the fast-growing financial sponsor segment.

Our CRE business enjoyed another year of significant growth. Expansion in the U.S. was boosted by financings for large acquisitions and take-private transactions, whilst we saw a record year in Real Estate Collateralized Debt Obligations (CDOs). CRE continued its successful build-out in Europe. Our focus on growth in Asia/Pacific saw the opening of four new offices in 2006: Shanghai, Hong Kong, Sydney and Mumbai.

Our AFL business also had a successful year. In Germany, we set a milestone in product innovation by arranging the first ever closed-end fund investing in a pre-defined portfolio of patents. We acted as Joint Lead Arranger for Senior Debt and as Sole Arranger for Mezzanine Debt in the first Public-Private-Partnership (PPP) project in the German health-care sector. In Singapore, we established a regional desk for our AFL business.

**Corporate Finance: strong increase in European M&A**

Market share of completed deals in %




☐ Ranking in peer comparison
Source: Thomson Financial

**AWARDS 2006**
**Euromoney:**
"Western Europe: Best Investment Bank"
**Euroweek:**
"Best High Yield Bond House"
**Financial News:**
"Best Equity-linked House of the Year"
"Best M&A House in Germany"
**International Financing Review:**
"US Leveraged Finance House"
**The Banker:**
"EMEA Investment Bank of the Year"
"High Yield Bond House of the Year"
"Leveraged Finance House of the Year"

# Exhibit K: The 2015–2016 Yukos ADR Correspondence

This Exhibit contains email communications between ILVEYS INC. and Deutsche Bank Depositary Receipts concerning the active Yukos claims and distribution process. The correspondence documents ILVEYS INC.'s effort to identify DBTCA's role, the referral of its inquiry to New York and Deutsche Bank's lawyers, and the January 21, 2016 representation that Deutsche Bank was "not involved in any Yukos claims process." The correspondence supports Plaintiff's allegations of fraudulent concealment and active misrepresentation.

Original Russian-language communications and English translations are included.

Gmail

I I <ilveysinc@gmail.com>

## Fw: Question

**Zoya Soldatova** <zoya.soldatova@db.com> January 21, 2016 at 4:56 PM
To: ilveysinc@gmail.com

Hello,

Thank you for your email.

Deutsche Bank is not involved in any Yukos claims process and therefore we are unable to provide any further information. We were not aware of any such process until you sent us the link to the Yukos claims website (www.yukosclaims.com). Claim forms can be accessed via this website and it also sets out details of the required supporting documentation . You should contact the Yukos claims administration team if you have any further questions"

Kind regards,

Zoya Soldatova

Depositary Receipts
Institutional Cash & Securities Services
Global Transaction Banking

Deutsche Bank Ltd
82 Sadovnicheskaya Street, Building 2, 115035 Moscow, Russia
Tel. +7 495 7975209
Fax +7 495 7975099
Mobile +7 9168589628
Email zoya.soldatova@db.com

Passion to Perform

| | |
|---|---|
| From: | I I <ilveysinc@gmail.com> |
| To: | Zoya Soldatova/db/dbcom@DBEMEA, |
| Date: | 14.01.2016 14:32 |
| Subject: | Re: Fw: Question |

Hello!
Have you sent our letter to NY? When can we expect a response?

Best regards, Vladimir

On December 23, 2015, at 1:07 PM, Zoya Soldatova < zoya.soldatova@db.com > wrote:
Hello, We have received your question and will forward it to our lawyers for review. Kind regards, Zoya Soldatova

Depositary Receipts Institutional Cash & Securities Services Global Transaction Banking Deutsche Bank Ltd 82 Sadovnicheskaya Street, Building 2, 115035 Moscow, Russia Tel. +7 495 7975209 Fax +7 495 7975099 Mobile +7 9168589628 Email zoya.soldatova@db.com

Passion to Perform

From: I I <ilveysinc@gmail.com>
To: Zoya Soldatova/db/dbcom@DBEMEA,
Date: 23.12.2015 12:13
Subject: Re: Fw: Question

---

Dear Sirs! Our company, ILVEYS INC., was the owner of 50,000 YUKOS ADRs at the time of the issuer's liquidation. The process of distributing money among former YUKOS shareholders through Garden City Group, LLC has now begun http://www.yukosclaims.com/en/index . In connection with the fact that YUKOS ADR holders exercise all rights provided by YUKOS shares through Deutsche Bank Trust Company Americas, we ask you to answer the following questions: 1. Is Deutsche Bank TCA , as a YUKOS shareholder, familiar with the above process and its terms? 2. Is Deutsche Bank TCA involved in the process of identifying Garden City Group, LLC, the actual shareholders of YUKOS ADRs? 3. Which organization was the registrar of YUKOS ADRs? Is our company, ILVEYS INC., present in the register of YUKOS ADRs shareholders? Can we obtain an official extract from the register of shareholders of these ADRs? How can we do this? 4. Will the process of paying out money to ADR shareholders take place through Deutsche Bank TCA? I would also like to inform you that we have all the necessary transaction documents, brokerage account statements, and other documents, one of which I am attaching to this letter. Sincerely, Director of ILVEYS INC. Dear Sirs! Our company ILVEYS INC. is the owner of 50,000 Yukos ADRs at the time of

liquidation of the issuer. We have now started the process of distributing money among former Yukos shareholders through Garden City Group, LLC http://www.yukosclaims.com/en/ index. Due to the fact that Yukos ADR holders exercise all rights granted by shares to Yukos, through Deutsche Bank Trust Company Americas, please answer the following questions: 1. Does Deutsche Bank TCA , as a shareholder of Yukos, sign off on the above process and its conditions? 2. Deutsche Bank TCA is involved in the process of identifying the Garden City Group, LLC of actual shareholders Yukos ADRs? 3. Which organization was the holder of the ADRS of Yukos? Whether our company ILVEYS INC. in the register of shareholders of Yukos ADRs? Can we get an official extract from the register of shareholders of this ADRs? How can we do it? 4.

The process of paying money to shareholders ADRs will occur through Deutsche Bank TCA?

Additionally, I am pleased to inform you that we have all the necessary documents of transactions, brokerage account statements and other documents, one of which I attach to this letter.

Sincerely, Director of ILVEYS INC.

December 22, 2015, 4:52 PM, Zoya Soldatova < zoya.soldatova@db.com > wrote:

Yes, of course, call. My phone numbers are below.

Kind regards,

Zoya Soldatova

Depositary Receipts Institutional Cash & Securities Services Global Transaction Banking Deutsche Bank Ltd 82 Sadovnicheskaya Street, Building 2, 115035 Moscow, Russia Tel. +7 495 7975209 Fax +7 495 7975099 Mobile +7 9168589628 Email zoya.soldatova@db.com

Passion to Perform

| | |
|---|---|
| From: | I I <ilveysinc@gmail.com> |
| To: | Zoya Soldatova/db/dbcom@DBEMEA, |
| Date: | 22.12.2015 12:50 |
| Subject: | Re: Fw: Question |

---

Okay.
If you don't mind, could we have a preliminary conversation to clarify some aspects of our relationship, since ADR holders exercise all rights granted by YUKOS shares through Deutsche Bank Trust Company Americas?
If necessary, we can document ownership of ADRs at the time of the issuer's liquidation.

December 22, 2015, 12:04 PM Zoya Soldatova < zoya.soldatova@db.com > wrote:
Vladimir, thank you, I understand perfectly. I am the representative of this particular business in Moscow, please look at my signature. Please state your question in English. Kind regards, Zoya Soldatova
_______________________ _________________ Depositary Receipts Institutional Cash & Securities Services Global Transaction Banking Deutsche Bank Ltd 82 Sadovnicheskaya Street, Building 2, 115035 Moscow, Russia Tel. +7 495 7975209 Fax +7 495 7975099 Mobile +7 9168589628 Email zoya.soldatova@db.com

Passion to Perform

| | |
|---|---|
| From: | I I <ilveysinc@gmail.com> |
| To: | Zoya Soldatova/db/dbcom@DBEMEA, |
| Date: | 22.12.2015 12:00 |
| Subject: | Re: Fw: Question |

---

Zoya!
Our question is not for the Yukos share depository, Deutsche Bank LLC, but for the issuer of American Depositary Shares (ADS), represented by American Depositary Receipts (ADRs), i.e., Deutsche Bank Trust Company Americas.
Could you please provide the relevant contact information?

Sincerely, Vladimir.

On December 22, 2015, at 11:46 AM, user Zoya Soldatova < zoya.soldatova@db.com > wrote:
Vladimir, Deutsche Bank is no longer Yukos's depository bank and no longer fulfills any obligations under this program. Unfortunately, we are unable to assist you in any way. If you would still like to confirm my words, please send me an email in English describing the topic and your questions. I will forward it to New York for consideration. But, as I already said, the likelihood of a different answer is extremely low. Kind regards, Zoya Soldatova

Depositary Receipts Institutional Cash & Securities Services Global Transaction Banking Deutsche Bank Ltd 82 Sadovnicheskaya Street, Building 2, 115035 Moscow, Russia Tel. +7 495 7975209 Fax +7 495 7975099 Mobile +7 9168589628 Email zoya.soldatova@db.com

Passion to Perform

| | |
|---|---|
| From: | I I <ilveysinc@gmail.com> |
| To: | Zoya Soldatova/db/dbcom@DBEMEA, |
| Date: | 22.12.2015 11:22 |
| Subject: | Re: Fw: Question |

---

Hello!
Our company is the owner of ADRs for Yukos shares.
The program of distribution of funds among former shareholders has now started.
http://www.yukosclaims.com/ru/ index In this regard, we have some questions for the issuer (Deutsche Bank Trust Company Americas). Please provide the contact information for the relevant department. Best regards, Vladimir December 22, 2015, 10:45 am user Zoya Soldatova < zoya.soldatova@db.com > wrote: Classification: Public Hello Vladimir, What exactly is your question? P.S. According to the bank's security policy, we are prohibited from corresponding with emails like mail.ru. Please write from a corporate email address. Kind regards, Zoya Soldatova ______________________________ Depositary Receipts Institutional Cash & Securities Services Global Transaction Banking Deutsche Bank Ltd 82 Sadovnicheskaya Street, Building 2, 115035 Moscow, Russia Tel. +7 495 7975209 Fax +7 495 7975099 Mobile +7 9168589628 Email zoya.soldatova@db.com ----- Forwarded by Zoya Soldatova/db/dbcom on 12/22/2015 10:41 -----

Passion to Perform

From: Db Moscow/db/dbcom
To: Zoya Soldatova/db/dbcom@DBEMEA,
Date: 21.12.2015 18:11
Subject: Fw: Question

---

Classification: Public

----- Forwarded by Evgenia Karataeva/ext/dbcom on 21.12.2015 18:10 -----

From: I I <ilveysinc@gmail.com>
To: Db Moscow/db/dbcom@DBEMEA,
Date: 21.12.2015 18:00
Subject: Question

---

Hello!
Who can I speak with regarding Yukos's American Depository Receipts (ADRs) issued by Deutsche Bank?
Sincerely, Vladimir

[attachment "080128 Y.tif" deleted by Zoya Soldatova/db/dbcom] [attachment "II-DB.xps" deleted by Zoya Soldatova/db/dbcom]

Gmail

I I <ilveysinc@gmail.com>

## Re: Fw: Вопрос

1 письмо

**Zoya Soldatova** <zoya.soldatova@db.com> 21 января 2016 г. в 08:56
Кому: ilveysinc@gmail.com

Hello,

Thank you for your email.

Deutsche Bank is not involved in any Yukos claims process and therefore we are unable to provide any further information. We were not aware of any such process until you sent us the link to the Yukos claims website (www.yukosclaims.com). Claim forms can be accessed via this website and it also sets out details of the required supporting documentation . You should contact the Yukos claims administration team if you have any further questions"

Kind regards,

Zoya Soldatova

---

Depositary Receipts
Institutional Cash & Securities Services
Global Transaction Banking

Deutsche Bank Ltd
82 Sadovnicheskaya Street, Building 2, 115035 Moscow, Russia
Tel. +7 495 7975209
Fax +7 495 7975099
Mobile +7 9168589628
Email zoya.soldatova@db.com

Passion to Perform

| | |
|---|---|
| From: | I I <ilveysinc@gmail.com> |
| To: | Zoya Soldatova/db/dbcom@DBEMEA, |
| Date: | 14.01.2016 14:32 |
| Subject: | Re: Fw: Вопрос |

---

Здравствуйте!
Вы отправили наше письмо в NY? Когда ждать ответ?

С уважением, Владимир

23 декабря 2015 г., 13:07 пользователь Zoya Soldatova <zoya.soldatova@db.com> написал:
Здравствуйте,

Ваш вопрос получен, я отправлю его нашим юристам на рассмотрение.

Kind regards,

Zoya Soldatova

---

Depositary Receipts
Institutional Cash & Securities Services
Global Transaction Banking

Deutsche Bank Ltd
82 Sadovnicheskaya Street, Building 2, 115035 Moscow, Russia
Tel. +7 495 7975209
Fax +7 495 7975099
Mobile +7 9168589628
Email zoya.soldatova@db.com

Passion to Perform

| | |
|---|---|
| From: | I I <ilveysinc@gmail.com> |
| To: | Zoya Soldatova/db/dbcom@DBEMEA, |
| Date: | 23.12.2015 12:13 |
| Subject: | Re: Fw: Вопрос |

---

Уважаемые Господа!

Наша компания ILVEYS INC. являлась владельцем 50 тысяч АДР Юкос на момент ликвидации эмитента.
В настоящее время стартовал процесс распределения денег среди бывших акционеров Юкоса через Garden City Group, LLC http://www.yukosclaims.com/en/index
В связи с тем, что владельцы АДР Юкоса реализовывают все права, предоставляемые акциями ЮКОС, через Deutsche Bank Trust Company Americas, просим Вас ответить на нижеследующие вопросы:

1. Знаком ли Deutsche Bank TCA, как акционер НК ЮКОС, с вышеуказанным процессом и его условиями?
2. Участвует ли Deutsche Bank TCA в процессе выявления Garden City Group, LLC фактических акционеров АДР Юкоса ?
3. Какая организация являлась реестродержателем АДР Юкоса? Присутствует ли

наша компания ILVEYS INC. в реестре акционеров АДР Юкоса?
Можем ли мы получить официальную выписку из реестра акционеров этих АДР?
Как мы можем это сделать?

4. Процесс выплаты денег акционерам АДР будет происходить через Deutsche Bank TCA?

Дополнительно сообщаю Вам, что у нас есть все необходимые документы по сделкам, выписки с брокерского счета и иные документы, один из которых прилагаю к этому письму.

С уважением, Директор ILVEYS INC.

Dear Sirs!

Our company ILVEYS INC. is the owner of 50 thousand ADRS Yukos at the time of liquidation of the issuer.
Now started the process of distributing money among former Yukos shareholders through Garden City Group, LLC http://www.yukosclaims.com/en/index
Due to the fact that Yukos ADR holders exercise all rights granted by shares to Yukos, through Deutsche Bank Trust Company Americas, please answer the following questions:

1. Sign of whether Deutsche Bank TCA, as a shareholder of Yukos, with the above process and its conditions?
2. Deutsche Bank TCA involved in the process of identifying the Garden City Group, LLC of actual shareholders Yukos ADRs?
3. Which organization was the holder the ADRS of Yukos? Whether our company ILVEYS INC. in the register of shareholders of Yukos ADRs?
Can we get an official extract from the register of shareholders this ADRs? How can we do it?
4. The process of paying money to shareholders ADRs will occur through Deutsche Bank TCA?

Additionally, I am pleased to inform you that we have all the necessary documents of transactions, brokerage account statements and other documents, one of which I attach to this letter.

Sincerely, Director of ILVEYS INC.

22 декабря 2015 г., 16:52 пользователь Zoya Soldatova <zoya.soldatova@db.com> написал:
Да, конечно, звоните. Мои телефоны ниже.

Kind regards,

Zoya Soldatova

---

Depositary Receipts
Institutional Cash & Securities Services
Global Transaction Banking

Deutsche Bank Ltd
82 Sadovnicheskaya Street, Building 2, 115035 Moscow, Russia
Tel. +7 495 7975209
Fax +7 495 7975099
Mobile +7 9168589628
Email zoya.soldatova@db.com

Passion to Perform

| | |
|---|---|
| From: | I I <ilveysinc@gmail.com> |
| To: | Zoya Soldatova/db/dbcom@DBEMEA, |
| Date: | 22.12.2015 12:50 |
| Subject: | Re: Fw: Вопрос |

---

Хорошо.
Если Вы не против, можем ли мы предварительно пообщаться с целью уточнения некоторых моментов наших взаимоотношений, т.к. владельцы АДР реализовывают все права, предоставляемые акциями ЮКОС, через Deutsche Bank Trust Company Americas ?
Если это необходимо, мы можем документально подтвердить владение АДР на момент ликвидации эмитента.

22 декабря 2015 г., 12:04 пользователь Zoya Soldatova <zoya.soldatova@db.com> написал:
Владимир, спасибо, я прекрасно понимаю.
Я и есть представитель в москве именно этого бизнеса, посмотрите мою подпись.
Пожалуйста, изложите Ваш вопрос на англ.яз

Kind regards,

Zoya Soldatova

---

Depositary Receipts
Institutional Cash & Securities Services
Global Transaction Banking

Deutsche Bank Ltd
82 Sadovnicheskaya Street, Building 2, 115035 Moscow, Russia
Tel. +7 495 7975209
Fax +7 495 7975099
Mobile +7 9168589628
Email zoya.soldatova@db.com

Passion to Perform

| | |
|---|---|
| From: | I I <ilveysinc@gmail.com> |
| To: | Zoya Soldatova/db/dbcom@DBEMEA, |
| Date: | 22.12.2015 12:00 |
| Subject: | Re: Fw: Вопрос |

---

Зоя!
У нас вопрос не к депозитарию акций Юкоса ООО «Дойче Банк», а к эмитенту Американских Депозитарных Акций (АДА), представленных Американскими Депозитарными Расписками (АДР), т.е. Deutsche Bank Trust Company Americas.
Не могли бы Вы предоставить соответствующие контакты?

С уважением, Владимир

22 декабря 2015 г., 11:46 пользователь Zoya Soldatova <zoya.soldatova@db.com> написал:
Владимир,
Дойче Банк уже не является банком-депозитарием Юкоса и не обслуживает никаких обязательств по этой программе.
К сожаленирю, мы не сможем Вам чем-то посодействовать.

Если вы все же хотите подтвердить мои слова, то я прошу Вас напраить на мой адрес е-мейл на английском языке с описанием темы и Вашими вопросами,я отправлю его в Нью-Йорк на рассмотрение. Но , как я уже сказала, вероятность другого ответа крайне низка.

Kind regards,

Zoya Soldatova

---

Depositary Receipts
Institutional Cash & Securities Services
Global Transaction Banking

Deutsche Bank Ltd
82 Sadovnicheskaya Street, Building 2, 115035 Moscow, Russia
Tel. +7 495 7975209
Fax +7 495 7975099
Mobile +7 9168589628
Email zoya.soldatova@db.com

Passion to Perform

| | |
|---|---|
| From: | I I <ilveysinc@gmail.com> |
| To: | Zoya Soldatova/db/dbcom@DBEMEA, |
| Date: | 22.12.2015 11:22 |

Subject: Re: Fw: Вопрос

---

Здравствуйте!
Наша компания является владельцами АДР на акции Юкоса.
В настоящее время стартовала программа распределения средств среди бывших акционеров.
http://www.yukosclaims.com/ru/index
В этой связи у нас есть некоторые вопросы к эмитенту (Deutsche Bank Trust Company Americas).
Просим Вас дать координаты соответствующего отдела.

С уважением, Владимир

22 декабря 2015 г., 10:45 пользователь Zoya Soldatova <zoya.soldatova@db.com> написал:
Classification: Public

Здравствуйте Владимир,

В чем именно состоит Ваш вопрос?

PS По политике безопасности банка нам запрещена переписка с мейлами типа mail.ru. пишите, пожалуйста, с корпоративного адреса электронной почты.

Kind regards,

Zoya Soldatova

---

Depositary Receipts
Institutional Cash & Securities Services
Global Transaction Banking

Deutsche Bank Ltd
82 Sadovnicheskaya Street, Building 2, 115035 Moscow, Russia
Tel. +7 495 7975209
Fax +7 495 7975099
Mobile +7 9168589628
Email zoya.soldatova@db.com

Passion to Perform

----- Forwarded by Zoya Soldatova/db/dbcom on 22.12.2015 10:41 -----

From: Db Moscow/db/dbcom
To: Zoya Soldatova/db/dbcom@DBEMEA,
Date: 21.12.2015 18:11

Gmail - Re: Fw: Вопрос

Subject: Fw: Вопрос

---

Classification: Public

----- Forwarded by Evgenia Karataeva/ext/dbcom on 21.12.2015 18:10 -----

From: I I <ilveysinc@gmail.com>

To: Db Moscow/db/dbcom@DBEMEA,

Date: 21.12.2015 18:00

Subject: Вопрос

---

Здравствуйте!
С кем можно пообщаться по вопросу, эмитированных Дойче Банком, американских депозитарных расписок (АДР) компании Юкос?
С уважением, Владимир

[attachment "080128 Y.tif" deleted by Zoya Soldatova/db/dbcom] [attachment "II-DB.xps" deleted by Zoya Soldatova/db/dbcom]

# Exhibit L: Yukos Recovery Framework Correspondence (2010–2015)

This Exhibit contains direct correspondence between ILVEYS INC. and persons associated with the Yukos recovery and distribution framework, including Claire Davidson, Tim Osborne, and David Andrew Godfrey. The correspondence documents communications concerning anticipated distributions to Yukos shareholders and ILVEYS INC.'s express inquiry whether payments attributable to ADR holdings would be made through Deutsche Bank TCA as Yukos shareholder or directly to ADR owners.

Gmail

I I <ilveysinc@gmail.com>

## Re: yukos

1 Letter

- - <ilveysinc@gmail.com> 19 January 2010 at 14:03
To: Claire Davidson <CDavidson@gardantcommunications.com>

Thanks a lot! I'll try to ask him my question. I hope that he will be able to answer it.
Sincerely, Vladimir

2010/1/19 Claire Davidson <CDavidson@gardantcommunications.com>

> Dear Sir,
>
> I forwarded your information to Mr Tim Osborne….may I suggest you contact him directly on the following email address and telephone number?
>
> Tim.osborne@woflaw.com
>
> Tel: + 44 1242 710 203
>
> Regards,
>
> Claire
>
> Gardant
> expertise creatively applied
>
> **Claire Davidson**
>
> Managing Partner
>
> **Gardant Communications**
>
> The Studio. 51 Causton Street, London SW1P 4AT
>
> t: +44 (0)20 7976 5555
>
> M: +44 (0)7767 351 433
>
> f: +44 (0)20 7976 5353

e: cdavidson@gardantcommunications.com

w: www.gardantcommunications.com

Save a tree, please don't print this e-mail unless you really need to

This email is confidential. If you are not the intended recipient, do not copy its content, but contact the sender immediately.

Gardant is a trading name of Gardant Communications, a private limited company. Registered in England & Wales No 2842427. Registered Office: 51 Causton Street, London, SW1P 4AT

---

**From:** - - [mailto:ilveysinc@gmail.com]
**Sent:** 19 January 2010 17:07
**To:** Claire Davidson
**Subject:** yukos

Claire, hello!
We are the former shareholders, who owned ADR Yukos.
Very serious concern we have no registry of former shareholders of Yukos. Can you comment on the problem in question?
Sincerely, Vladimir

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

2010/1/21 Tim Osborne <tim.osborne@woflaw.com>
>
> Dear Vladimir
>
>
>
> Thank you for your email. I represent only the majority shareholders in Yukos Oil but I will make some enquiries and see who best you should contact. In the meantime it would be helpful to have a list of the ADR holders/shareholders that you represent and their respective holdings.
>
>
>
> Kind regards
>
>
>
> Tim Osborne
> Wiggin Osborne Fullerlove
> DDI: +44 1242 710203
> Fax: +44 1242 710201
> Mob: +44 07899 061495
>
>
>
>
>
>
> ________________________________
>
> From: - - [mailto:ilveysinc@gmail.com]
> Sent: 19 January 2010 19:23
> To: Tim Osborne
> Subject: Fwd: yukos
>
> Hello dear Tim!
> At the suggestion of Claire Davidson, want to redirect your question to her to you.
> We are the former shareholders, who owned ADR Yukos.
> Very serious concern we have no registry of former shareholders of Yukos. Can you comment on the problem in question?
> Sincerely, Vladimir
>
> ---------- Пересланное сообщение ----------
> От: - - <ilveysinc@gmail.com>
> Дата: 19 января 2010 г. 22:03
> Тема: Re: yukos
> Кому: Claire Davidson <CDavidson@gardantcommunications.com>
>
> Thanks a lot! I'll try to ask him my question. I hope that he will be able to answer it.
> Sincerely, Vladimir
>
> 2010/1/19 Claire Davidson <CDavidson@gardantcommunications.com>
>
>

>

> Dear Sir,

>

>

>

> I forwarded your information to Mr Tim Osborne....may I suggest you contact him directly on the following email address and telephone number?

>

>

>

> Tim.osborne@woflaw.com

>

>

>

> Tel: + 44 1242 710 203

>

>

>

> Regards,

>

>

>

> Claire

>

>

>

>

>

>

>

>

>

> Claire Davidson

>

> Managing Partner

>

>

>

> Gardant Communications

>

> The Studio. 51 Causton Street, London SW1P 4AT

>

> t: +44 (0)20 7976 5555

>

> M: +44 (0)7767 351 433

>

> f: +44 (0)20 7976 5353

>

> e: cdavidson@gardantcommunications.com

>

> w: www.gardantcommunications.com

>

>

>
>
>
> P Save a tree, please don't print this e-mail unless you really need to
>
>
>
>
>
> This email is confidential. If you are not the intended recipient, do not copy its content, but
>
> contact the sender immediately.
>
>
>
> Gardant is a trading name of Gardant Communications, a private limited company. Registered in England & Wales No 2842427. Registered Office: 51 Causton Street, London, SW1P 4AT
>
>
>
>
>
>
>
> From: - - [mailto:ilveysinc@gmail.com]
> Sent: 19 January 2010 17:07
> To: Claire Davidson
> Subject: yukos
>
>
>
> Claire, hello!
> We are the former shareholders, who owned ADR Yukos.
> Very serious concern we have no registry of former shareholders of Yukos. Can you comment on the problem in question?
> Sincerely, Vladimir
>
> ________________________________________________________________________
> This email has been scanned by the MessageLabs Email Security System.
> For more information please visit http://www.messagelabs.com/email
> ________________________________________________________________________
>
> ________________________________________________________________________
> This email has been scanned by the MessageLabs Email Security System.
> For more information please visit http://www.messagelabs.com/email
> ________________________________________________________________________
>
>
>
> ________________________________________________________________________
> This email has been scanned by the KeyNetworks Email Security System.
> For more information please visit http://www.keynetworks.co.uk
> ________________________________________________________________________

>
>
>
>
> Wiggin Osborne Fullerlove, Solicitors
>
> 95 The Promenade, Cheltenham, Gloucestershire GL50 1HH.
>
> Tel: 01242 710200 Fax: 01242 710201 DX 7430 Cheltenham.
>
>
>
> Partners: Tim Osborne , Michael Fullerlove , Rod Marlow , Mark Payne , Matthew Cain , Stephen Green , Stephen Pallister Consultant: Paul Wilson
>
>
>
> Regulated by the Solicitors Regulation Authority, No. 0388242
>
>
>
> ====================================================
>
> This transmission (the e-mail and all attachments) is confidential and may be subject to legal professional or other privilege. If you are not the named addressee, or if this transmission has been addressed to you in error, you must not read, disclose, reproduce, distribute or use the transmission. Delivery of this transmission to any person other than the intended recipient(s) does not waive privilege or confidentiality. If you have received this transmission in error, please reply by e-mail and delete it. We do not accept responsibility for the accuracy or completeness of this transmission: communication by e-mail is not totally secure. Please notify the sender immediately if you suspect that it may have been intercepted or amended. We accept no responsibility for any computer virus which might be transferred by way of this transmission.
>
> ====================================================
>
> ______________________________________________________________________
> This email has been scanned by the MessageLabs Email Security System.
> For more information please visit http://www.messagelabs.com/email
> ______________________________________________________________________
...

[Показана часть сообщения] Показать полностью

Gmail

I I <ilveysinc@gmail.com>

**Re: Information on the ownership of shares of Yukos.**
1 Letter

**Dave Godfrey** <comradekoba@hotmail.com> 25 September 2015 at 17:26
To: - - <ilveysinc@gmail.com>

Dear Director!

Following execution of an amicable settlement between Yukos and Rosneft earlier this year whereby the ownership of the FPH structure is no longer in dispute, the Board of the FPH Foundation took a decision to resume preparations for a distribution to the shareholders of Yukos Oil. In furtherance of this objective, a preeminent, the independent claims administrator retained in 2009 was instructed to commence a comprehensive shareholder identification program. This program had to be suspended as a result of litigation brought by OOO Promneftstroy and VR Capital, entities themselves complicit in the expropriation of Yukos Oil. Pending resolution of this dispute, the program will be suspended and distributions to shareholders will not be made. If and when this dispute is resolved in our favor, the shareholder identification process will be resumed and appropriate distributions will be made.

Sincerely,

Dave Godfrey

> On Aug 10, 2013, at 12:15 AM, - - <ilveysinc@gmail.com> wrote:
>
> Dear Sirs,
>
> Company "ILVEYS INC." is a shareholder in Yukos. Our company owns 50’000 (fifty thousand) ADRs (US98849W1080). We have all the necessary documents confirming the purchase of shares and ownership until the liquidation of the issuer from 22.01.2008. If necessary, these documents will be presented in full.
> Please notify us of receipt of said information for further interaction.
>
> Sincerely, Director

Gmail

I I <ilveysinc@gmail.com>

## Re: Information on the ownership of shares of Yukos.

1 Letter

- - <ilveysinc@gmail.com> 26 September 2015 at 06:07
To: Dave Godfrey <comradekoba@hotmail.com>

Hello!

Thank you for your letter. We know about all the events around Yukos.
We know that a decision on the dispute with Promneftestroy will be on November 13.

Please answer only one question:
Payments will be made through Deutshe Bank TCA, as Yukos shareholder, or directly to the owner of the ADRs?

Sincerely, Director

2015-09-26 0:26 GMT+03:00 Dave Godfrey <comradekoba@hotmail.com>:

> Dear Director!
>
> Following execution of an amicable settlement between Yukos and Rosneft earlier this year whereby the ownership of the FPH structure is no longer in dispute, the Board of the FPH Foundation took a decision to resume preparations for a distribution to the shareholders of Yukos Oil. In furtherance of this objective, a preeminent, the independent claims administrator retained in 2009 was instructed to commence a comprehensive shareholder identification program. This program had to be suspended as a result of litigation brought by OOO Promneftstroy and VR Capital, entities themselves complicit in the expropriation of Yukos Oil. Pending resolution of this dispute, the program will be suspended and distributions to shareholders will not be made. If and when this dispute is resolved in our favor, the shareholder identification process will be resumed and appropriate distributions will be made.
>
> Sincerely,
>
> Dave Godfrey
>
> > On Aug 10, 2013, at 12:15 AM, - - <ilveysinc@gmail.com> wrote:
> >
> > Dear Sirs,
> >
> > Company "ILVEYS INC." is a shareholder in Yukos. Our company owns 50’000 (fifty thousand) ADRs (US98849W1080). We have all the necessary documents confirming the purchase of shares and ownership until the liquidation of the issuer from 22.01.2008. If necessary, these documents will be presented in full.
> > Please notify us of receipt of said information for further interaction.
> >
> > Sincerely, Director

Gmail - www.yukosclaims.com

Gmail

I I <ilveysinc@gmail.com>

# www.yukosclaims.com

1 Letter

**Dave Godfrey** <comradekoba@hotmail.com> 13 November 2015 at 21:57
To: - - <ilveysinc@gmail.com>

Gmail - Re: www.yukosclaims.com

Gmail

**I I <ilveysinc@gmail.com>**

## Re: www.yukosclaims.com

1 Letter

**I I** <ilveysinc@gmail.com> 14 November 2015 at 03:30

To: Dave Godfrey <comradekoba@hotmail.com>

Thanks

2015-11-14 5:57 GMT+03:00 Dave Godfrey <comradekoba@hotmail.com>:

GOV•UK

**Find and update company information (https://beta.companieshouse.gov.uk/)**

Companies House does not check the accuracy of the information filed (http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)

Search for a company or officer

Advanced company search (/advanced-search)

# David Andrew GODFREY

## Filter appointments

☐
Current appointments

Apply filter

## Total number of appointments 1

Date of birth
January 1965

---

**YUKOS UK LIMITED (03152485)**

Company status **Dissolved**

Correspondence address **2 Stone Buildings, Lincolns Inn, London, WC2A 3TH**

Role **Director**

Appointed on **24 April 2014**

Nationality **American**

Country of residence **Usa**

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/officers/WcWuP6JTQy4BPgA9BmF5MHOaL4A/appointments)

The New York Times | https://www.nytimes.com/2006/08/18/business/worldbusiness/18yukos.html

# *Yukos Managers Are Now Targets of Prosecutors*

By Andrew E. Kramer

Aug. 18, 2006

MOSCOW, Aug. 17 — The Russian prosecutor general's office said Thursday that it was pursuing a criminal investigation against Steven M. Theede and three other executives who managed the Yukos oil company from outside Russia before it was declared bankrupt.

The announcement was posted on the office's Web site the same day a court in Amsterdam rejected a claim by a Russian bankruptcy receiver to manage the considerable overseas holdings of Yukos. The office said it was investigating the transfer of company assets into a Dutch foundation controlled by the executives.

Mr. Theede, an experienced Houston oilman, worked for Yukos in London. The statement also named Bruce Misamore, a former chief financial officer; David Godfrey, a former adviser; and Tim Osborne, director of the holding company GML, formerly Menatep, which owns a majority of Yukos stock.

Mr. Misamore released a statement denying the accusations. A spokeswoman for Yukos's former managers said the three others were consulting lawyers on Thursday.

"These actions by the Russian Federation demonstrate with great clarity the vindictive nature and pettiness of those who lead Russia today," Mr. Misamore's statement said. "It shows without a doubt the unbelievable length to which the vendetta against Yukos and GML is being pursued."

It is unlikely that the men, all of whom live outside Russia, would be prosecuted in Russian courts or that they would be extradited to this country. Mr. Theede has not visited Russia since autumn 2003, when the company's founder, Mikhail B. Khodorkovsky, was arrested on tax evasion and fraud charges. Mr. Khodorkovsky, who says that the charges were politically motivated, is serving an eight-year term in a Siberian penal colony.

After a bankruptcy ruling early this month, Yukos's Russian oil fields and refineries are being managed by a Russian court-appointed receiver. But the future of the company's assets outside Russia is tied up in court in the Netherlands. Claire Davidson, a spokeswoman for the former management, said from London that the criminal charges stemmed from an attempt to influence the status of those assets.

The Russian authorities accused Mr. Theede and the others of transferring $10 billion in assets into Dutch-registered companies without compensating Yukos International, an offshore subsidiary.

"The investigation believes that these people abused their offices and conspired to acquire the foreign assets of Yukos," the prosecutor's statement said.

"Theede registered a special fund in the Netherlands in April 2005 and appointed Misamore, Godfrey and Osborne and himself as directors of the fund. The criminals appropriated the shares of more than 20 affiliates of the corporation."

Ms. Davidson said overseas assets were placed in a foundation in accordance with Dutch law as a precaution to ensure that proceeds from their sale would be distributed only to creditors recognized in the Dutch courts.

She said the overseas holdings amounted to roughly $2 billion, not the $10 billion cited by Russian authorities. "I don't know where they got that figure," she said.

So far, Dutch courts have recognized a creditors' claim of $750 million by a subsidiary of GML and a claim of $482 million by the Russian state oil company Rosneft attached to the overseas assets of Yukos. By contrast, the Moscow Arbitration Court recognizes a combined $16.2 billion in claims from tax authorities and Rosneft.

# Exhibit M: Deutsche Bank Annual Report 2007

This Exhibit comprises contemporaneous corporate financial evidence documenting record profits reported by Deutsche Bank's Global Transaction Banking division amid the Bank's aggressive expansion in Russia. This document provides contemporaneous corporate evidence supporting Plaintiff's inference that the Defendant's "Worthless Notice" to ADR holders operated as a bad-faith measure to clear its books while Deutsche Bank continued deepening its institutional presence in the Russian Federation.

## EXECUTIVE SUMMARY

Overall, the global economy developed positively in 2007, posting above-average growth of 4.9 %. While the growth rate in emerging markets was sustained at nearly 8 %, there was a slowdown in the industrial nations and especially the U.S. Real GDP in the U.S. grew by an average of just 2.2 % in 2007 compared with 2.9 % in 2006. By contrast, the euro zone nearly managed to maintain its growth momentum at 2.7 %. In Germany, growth slowed to 2.5 % from 2.9 % in 2006, but remained strong despite the 3 percentage point VAT increase at the beginning of 2007.

In the banking sector, the year 2007 featured two distinctively different halves. The first six months of 2007 saw the continuation of a benign environment and robust capital markets, and all of our businesses delivered strong results. Our income before income tax expense reached a record level for the first six months. In the second half of the year, however, the subprime crisis caused widespread concern, as well as increased volatility and a loss of investor confidence in the financial markets. Unexpectedly high losses reported by many market participants, and a growing uncertainty about whether further losses were forthcoming, caused the interbank, securitization, and syndicate markets to dry up. Results in our capital-markets related businesses were negatively impacted by the market conditions in the second half of 2007. These results were limited somewhat by the strength of our risk management and were in part offset by those in most other areas of CIB, as well as in PCAM and CI, highlighting the benefits of our diversified global business portfolio. Despite the particular challenges of 2007, we reported one of the best financial years in our history and increased our earnings versus 2006, while also strengthening our competitive position.

In 2007, income before income tax expense was € 8.7 billion, a 5 % increase over 2006, and revenues were € 30.7 billion, up 8 %. We reported a pre-tax return on average active equity of 29 % in 2007 and 33 % in 2006, with the decline due largely to an increase in average active equity to € 29.8 billion in 2007 versus € 25.5 billion in 2006 (pre-tax return on average shareholders' equity was 24 % and 28 %, for 2007 and 2006, respectively). In 2007, net income was € 6.5 billion, up 7 % versus 2006. Diluted earnings per share increased by 14 % to € 13.05.

Total CIB net revenues advanced by 2 % to € 19.1 billion, with increases in transaction services and advisory offsetting a decline in Origination (debt), mainly related to leveraged finance activities. Overall results from Sales & Trading businesses in CIB were flat year-on-year. Increases in our customer-oriented businesses, such as foreign exchange, money markets, rates and equities trading, offset lower results on credit trading, which were due largely to the stressed credit markets in the second half of 2007. PCAM's net revenues increased by € 814 million, largely driven by acquisition-related business and organic growth. Net revenues in CI were € 943 million above those of 2006 due mainly to gains on sales from our industrial holdings portfolio.

Our total noninterest expenses were € 21.4 billion in 2007 compared to € 19.9 billion in 2006. Compensation and benefits expenses were up 5 % due mainly to a 9,442 increase in headcount and the accelerated recognition of share-based compensation expense following a new definition of early retirement eligibility for the awards granted under the DB Equity Plan in 2007. General and administrative expenses for the year increased by 13 % due largely to the impact of acquired businesses.

In 2007, the provision for credit losses was € 612 million compared to € 298 million in 2006. The increase was due largely to acquisition-related and organic growth in PBC and a provision related to a single counterparty relationship in CIB.

The following table presents our condensed consolidated statement of income for 2007 and 2006.

| | | | 2007 increase (decrease) from 2006 | |
|---|---|---|---|---|
| in € m. (except percentages) | 2007 | 2006 | in € | in % |
| Net interest income | 8,849 | 7,008 | 1,841 | 26 |
| Provision for credit losses | 612 | 298 | 314 | 105 |
| **Net interest income after provision for credit losses** | **8,237** | **6,710** | **1,527** | **23** |
| Commissions and fee income | 12,289 | 11,195 | 1,094 | 10 |
| Net gains (losses) on financial assets/liabilities at fair value through profit or loss | 7,175 | 8,892 | (1,717) | (19) |
| Net gains (losses) on financial assets available for sale | 793 | 591 | 202 | 34 |
| Net income (loss) from equity method investments | 353 | 419 | (66) | (16) |
| Other income | 1,286 | 389 | 897 | N/M |
| **Total noninterest income** | **21,896** | **21,486** | **410** | **2** |
| **Total net revenues** | **30,133** | **28,196** | **1,937** | **7** |
| Compensation and benefits | 13,122 | 12,498 | 624 | 5 |
| General and administrative expenses | 7,954 | 7,069 | 885 | 13 |
| Policyholder benefits and claims | 193 | 67 | 126 | 188 |
| Impairment of intangible assets | 128 | 31 | 97 | N/M |
| Restructuring activities | (13) | 192 | (205) | N/M |
| **Total noninterest expenses** | **21,384** | **19,857** | **1,527** | **8** |
| **Income before income tax expense** | **8,749** | **8,339** | **410** | **5** |
| Income tax expense | 2,239 | 2,260 | (21) | (1) |
| **Net income** | **6,510** | **6,079** | **431** | **7** |
| Net income attributable to minority interest | 36 | 9 | 27 | N/M |
| Net income attributable to Deutsche Bank shareholders | 6,474 | 6,070 | 404 | 7 |

N/M – Not meaningful

CORPORATE INVESTMENTS (CI). Combined net interest income and net gains (losses) on financial assets/liabilities at fair value through profit or loss increased € 154 million, primarily reflecting mark-to-market gains from our option to increase our shareholding in Hua Xia Bank in China.

### PROVISION FOR CREDIT LOSSES

Provision for credit losses was € 612 million in 2007, compared to € 298 million in 2006. This reflects net charges of € 109 million in CIB (including a significant provision taken on a single counterparty relationship partly offset by releases), compared to net releases of € 94 million in 2006, and a 28 % increase in PCAM's provisions to € 501 million, driven predominantly by provisions in PBC.

For further information on the provision for loan losses see the Risk Report.

### REMAINING NONINTEREST INCOME

| | | | 2007 increase (decrease) from 2006 | |
|---|---|---|---|---|
| in € m. (except percentages) | 2007 | 2006 | in € | in % |
| Commissions and fee income[1] | 12,289 | 11,195 | 1,094 | 10 |
| Net gains (losses) on financial assets available for sale | 793 | 591 | 202 | 34 |
| Net income (loss) from equity method investments | 353 | 419 | (66) | (16) |
| Other income | 1,286 | 389 | 897 | N/M |
| **Total remaining noninterest income** | **14,721** | **12,594** | **2,127** | **17** |

N/M – Not meaningful
1 Includes

| | 2007 | 2006 | in € | in % |
|---|---|---|---|---|
| Commissions and fees from fiduciary activities: | | | | |
| Commissions for administration | 427 | 436 | (9) | (2) |
| Commissions for assets under management | 3,376 | 3,293 | 83 | 3 |
| Commissions for other securities business | 162 | 182 | (20) | (11) |
| **Total** | **3,965** | **3,911** | **54** | **1** |
| Commissions, broker's fees, markups on securities underwriting and other securities activities: | | | | |
| Underwriting and advisory fees | 2,515 | 2,220 | 295 | 13 |
| Brokerage fees | 2,982 | 2,489 | 493 | 20 |
| **Total** | **5,497** | **4,709** | **788** | **17** |
| Fees for other customer services | 2,827 | 2,575 | 252 | 10 |
| **Total commissions and fee income** | **12,289** | **11,195** | **1,094** | **10** |

COMMISSIONS AND FEE INCOME. Total 2007 commissions and fee income was € 12.3 billion, an increase of € 1.1 billion, or 10 %, compared with 2006. Commissions and fees from fiduciary activities increased € 54 million compared to the prior year. Underwriting and advisory fees increased by € 295 million, mainly attributable to CIB's Advisory products. Brokerage fees were up € 493 million with CIB's Sales & Trading (equity) products having a significant impact, mainly driven by increased volumes and market activity in Asia. Fees for other customer services increased € 252 million, driven by increases in Sales & Trading (equity) in CIB as well as in PBC Germany.

## GLOBAL TRANSACTION BANKING CORPORATE DIVISION

The following table sets forth the results of our Global Transaction Banking Corporate Division for the years ended December 31, 2007 and 2006, in accordance with our management reporting systems.

| in € m. (except percentages) | 2007 | 2006 |
|---|---|---|
| **Net revenues:** | | |
| Transaction services | 2,585 | 2,228 |
| Other products | – | – |
| **Total net revenues** | **2,585** | **2,228** |
| **Provision for credit losses** | **7** | **(29)** |
| **Total noninterest expenses** | **1,633** | **1,552** |
| therein: | | |
| Policyholder benefits and claims | – | – |
| Impairment of intangible assets | – | – |
| Restructuring activities | (1) | 22 |
| **Minority interest** | **–** | **–** |
| **Income (loss) before income tax expense** | **945** | **705** |
| Cost/income ratio | 63 % | 70 % |
| Assets | 32,083 | 25,646 |
| Average active equity[1] | 1,095 | 1,064 |
| Pre-tax return on average active equity | 86 % | 66 % |

1 See Note [2] to the consolidated financial statements for a description of how average active equity is allocated to the divisions.

Income before income tax expense increased by 34 %, or € 241 million, to a record € 945 million for the year ended December 31, 2007. This development was based on double-digit profit growth in all geographic regions.

Net revenues increased by 16 % to € 2.6 billion in 2007. The significant rise of € 357 million compared to 2006 was derived in all regions. All products achieved a double-digit revenue growth. Cash Management grew substantially due to increased customer balances and a strong increase in payment volumes. This reflected the continued tendency of banks and corporates to consolidate to fewer banking counterparties, as well as the Single Euro Payments Area (SEPA) initiative and new Cash Management capabilities in emerging markets, such as Brazil, Russia and Turkey. Revenue growth in Trade Finance products was predominantly driven by strong business activity in the EMEA region. Trust & Securities Services grew in Asia/Pacific and EMEA, particularly due to increased asset inflows and significant new client mandates in domestic custody.

The provision for credit losses amounted to a net charge of € 7 million in 2007, compared to a net release of € 29 million for 2006.

Noninterest expenses of € 1.6 billion increased by 5 %, or € 80 million, from 2006, mainly reflecting higher staff levels, performance-related compensation, and transaction-related costs in support of increased business volumes.

# Exhibit N: Statement of Interest of the United States (May 8, 2026) in Hulley Enterprises Ltd. v. Russian Federation

Establishes the official U.S. position concerning issue preclusion, comity, and the treatment of foreign-court determinations under the FSIA, including the significance of rulings from courts of primary jurisdiction, and supports Plaintiff's reliance on the Svea Court of Appeal findings as persuasive authority concerning the legal position of Yukos ADR holders and the Depositary.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HULLEY ENTERPRISES LTD., ET AL., *Plaintiff*, v. RUSSIAN FEDERATION *Defendant*. | 1:14-cv-1996<br>Hon. Beryl A. Howell |

**Government's Statement of Interest on Questions of Issue Preclusion as to Jurisdictional Questions under the Foreign Sovereign Immunities Act**

The United States files this statement in response to the Court's minute order dated January 8, 2026 inviting the government's views on the following questions related to the Foreign Sovereign Immunities Act ("FSIA"):

(1) "whether issue preclusion applies to jurisdictional questions under the FSIA," 28 U.S.C. § 1605(a)(6), which issue the D.C. Circuit "has not previously addressed," though the Circuit has established that "in general, '[i]ssue preclusion applies to threshold jurisdictional issues'" in other contexts, *Hulley*, 149 F.4th at 691 (quoting *Nat'l Ass'n of Home Builders v. EPA*, 786 F.3d 34 (D.C. Cir. 2015) (applying issue preclusion to decision on standing)); and

(2) if issue preclusion applies to jurisdictional questions under the FSIA,
(a) "whether [issue] preclusion [regarding 'jurisdictional questions under the FSIA'] extends to *foreign*" courts' decisions "of fact or law," which the D.C. Circuit emphasized is also a "novel question," *id.* (emphasis in original);

(b) whether issue-preclusive effect applies to all foreign decisions or is limited to decisions of courts in the "primary jurisdiction," *i.e.*, the "competent authority of the country in which, or under the law of which, th[e] [arbitral] award was made," *see* New York Convention, art. V(1)(e);

(c) whether the factors enumerated in *Hilton v. Guyot*, 159 U.S. 113 (1895), for

whether Haiti had a "valid arbitration agreement" with the arbitral-award creditor because the question had been litigated in state court, and so Haiti "is not entitled to FSIA immunity").

Consistent with established caselaw, therefore, courts have the discretion to apply issue preclusion to jurisdictional questions under the FSIA where, for example, the findings of U.S. courts satisfy the normal requirements for issue preclusion.

**Question 2(a):** The United States takes the position that, while *foreign* courts' determinations are not binding on jurisdictional questions, there is no categorical bar to U.S. courts extending issue preclusion, where appropriate, to the determinations of fact or law by foreign courts as they bear on U.S. courts' own FSIA jurisdictional inquiries.

As the D.C. Circuit remarked, "[w]e are aware of no case … in which a court has given preclusive effect to a foreign judgment in order to exercise jurisdiction over a foreign sovereign under the FSIA." *Hulley*, 149 F.4th at 691. But the court of appeals immediately noted that "United States courts have long accorded respect to, and often enforced, judgments of foreign courts." *Id*. Further, the court observed, "[s]ince *Hilton*, the federal courts have extended comity to foreign *judgments* that comport with the standard expounded by the [Supreme] Court [in that case]." *Id*. at 692 (emphasis added). Examples include *Tahan v. Hodgson*, 662 F.2d 862, 864-68 (D.C. Cir. 1981) (applying the *Hilton* factors and concluding that enforcement of an Israeli judgment was required); *Donnelly v. FAA*, 411 F.3d 267, 270-71 (D.C. Cir. 2005) (upholding, as consistent with *Hilton*, a federal agency's use of a foreign criminal conviction as evidence in an adjudication, stating that "principles of comity suggest that [a foreign] judgment should be given weight as *prima facie* evidence of the facts underlying it"); *see also Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354, 361 (10th Cir.1996) (applying *Hilton* and collateral estoppel to conclude

U.S. courts must apply these factors searchingly in a case-specific inquiry before deciding whether to extend comity to a foreign determination of fact or law. To ensure that the arbitration exception to sovereign immunity under the FSIA is satisfied, a U.S. court must apply this searching inquiry with stringency to address its own jurisdiction over a foreign sovereign. *Fed. Republic of Germany v. Philipp*, 592 U.S. 169, 173 (2021) (stating that foreign-state defendants are "presumptively immune from the jurisdiction of United States courts[,]" other than for enumerated "exceptions"). For this reason, the United States takes the position that, when a U.S. court weighs whether to exercise its discretion to recognize a foreign judgment for purposes of findings of jurisdictional fact relevant to the FSIA's arbitration exception, a "heightened *Hilton* analysis" governs the court's jurisdictional inquiry. As such, a U.S. court should scrutinize not merely the outcome of the foreign proceedings but should also assess the foreign court's evidentiary record (*e.g.*, expert testimony, transcripts, documents) against the foreign court's conclusions, thereby evaluating the foreign court's reasoned persuasive power. This approach ensures that the foreign proceedings robustly satisfy the *Hilton* standard with an evidentiary heft appropriate to jurisdictional matters under the FSIA's arbitration exception.

A heightened *Hilton* analysis is also consistent with caselaw expressly stating that a comity analysis is discretionary and entrusted to the judgment of the court. As the Supreme Court observed in *Hilton*, comity "is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." 159 U.S. at 163-64. Granting comity to foreign judgments—including for the purpose of issue preclusion—is neither required nor automatic. Rather, *Hilton* requires "a case-specific inquiry" into whether any special circumstances of the relevant litigation weigh against granting comity to the foreign judgment. *Diorinou v. Mezitis*, 237 F.3d 133, 143 (2d Cir. 2001). Likewise, as courts have consistently held, an appeal to comity

A heightened *Hilton* analysis addresses the adequacy of the "opportunity for a full and fair trial," and special and case-specific scrutiny of "any other reason" to deny comity, thus affording an adequate safeguard to U.S. public policy and interests. *Hilton*, 159 U.S. at 202; *see also Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) (federal courts applying *Hilton* will generally recognize foreign country judgments where "the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy.") Such an analysis is a reasonable balance between ensuring that U.S. courts retain final say over whether jurisdiction exists under the FSIA arbitration exception, while also facilitating a resolution of international commercial disputes as specified in the New York Convention and Federal Arbitration Act.

As a result, the United States takes the position that a "heightened *Hilton* analysis" test should be the standard for assessing whether to extend comity to foreign determinations of fact or law relevant to jurisdictional questions under the FSIA's arbitration exception.

**Question 2(d):** The United States takes the position that the heightened *Hilton* analysis must precede the issue-preclusion analysis. The issue preclusion analysis, a separate "full and fair" assessment of the foreign proceedings, must include examination of the case-specific factual record before the foreign court as it relates to the reasoned persuasiveness of the determinations specific to the challenged issues.

Whether and how to apply the *Hilton* factors is separate from the inquiry into whether issue preclusion applies to a given factual or legal question that has been resolved by a foreign court. Moreover, courts considering the preclusive effect of a foreign court's determinations must conduct these two separate inquiries sequentially. In other words, a court first must apply a *Hilton*

# Exhibit O: Deutsche Bank Media Release – Acquisition of United Financial Group (December 6, 2005)

This Exhibit contains Deutsche Bank's contemporaneous corporate announcement of legally binding agreements to acquire the remaining 60% of United Financial Group (UFG), following its earlier acquisition of a 40% interest. The announcement documents Deutsche Bank's stated strategic commitment to the Russian market shortly before the December 13, 2005 Confidential Sale Agreement described in Exhibit I.

Media Release | December 6, 2005

# Deutsche Bank becomes sole owner of United Financial Group

Deutsche Bank (XETRA: DBKGn.DE / NYSE: DB) today announced it has entered into legally binding agreements to acquire the remaining 60% of United Financial Group (UFG). The transaction is expected to close in the first quarter of 2006 subject to regulatory and anti-monopoly approvals. The parties have agreed that financial terms will not be disclosed.

Founded in 1994, Moscow-based UFG has established a leading position as a full-service investment company for international and Russian clients.

The acquisition follows Deutsche Bank's purchase of a 40% stake in UFG in 2004. Since then UFG and Deutsche Bank have worked successfully together in a strategic partnership. The acquisition will consolidate Deutsche Bank's position as one of the leading investment banks in Russia, with an unrivalled presence in advisory, equities, fixed income and derivatives markets.

Tessen von Heydebreck, member of Deutsche Bank's Board of Managing Directors, said: "Our partnership with UFG has been highly successful in creating one of the leading players in Russian investment banking. The final acquisition allows us to build on this successful partnership and underscores our strategic commitment to Russia, one of the most exciting growth economies in the world. The new entity will combine the skill sets of both organisations to create a leading force in the Russian market and to become an integral part of Deutsche Bank's premier global investment banking franchise."

**For further information, please contact:**

Press and Media Relations
Elaine Bartleet Tel: +44 7207 545 4907 (London)
Armin Niedermeier Tel: +49 69 910 33402 (Frankfurt)
Olga Podoinitsyna Tel: (+7 495) 797 5303 (Moscow)

Investor Relations
Tel: +49 69 910 35395 (Frankfurt)
Tel: +1 212 250 7125 (New York)
db.ir@db.com

This Release contains forward-looking statements. Forward-looking statements are statements that are not historical facts; they include statements about our beliefs and expectations. Any statement in this Release that states our intentions, beliefs, expectations or predictions (and the assumptions underlying them) is a forward-looking statement. These statements are based on plans, estimates and projections as they are currently available to the management of Deutsche Bank. Forward-looking statements therefore speak only as of the date they are made, and we undertake no obligation to update publicly any of them in light of new information or future events.

By their very nature, forward-looking statements involve risks and uncertainties. A number of important factors could therefore cause actual results to differ materially from those contained in any forward-looking statement. Such factors include: the conditions in the financial markets in Germany, in Europe, in the United States and elsewhere from which we derive a substantial portion of our trading revenues; potential defaults of borrowers or trading counterparties; the implementation of our management agenda; the reliability of our risk management policies, procedures and methods; and other risks referenced in our filings with the U.S. Securities and Exchange Commission. Such factors are described in detail in our SEC Form 20-F of 24 March 2005 in the section "Risk Factors." Copies of this document are readily available upon request or can be downloaded from Deutsche Bank Investor Relations.

# Exhibit P: Contemporary Financial Media Records Concerning Deutsche Bank's Russian Operations (2003–2010)

This Exhibit contains contemporaneous financial-media reporting and market data concerning Deutsche Bank's expansion in Russia, its relationships with state-controlled energy companies, its UFG investment, and its reported position in the Russian investment-banking market. These materials provide historical and commercial context relevant to Plaintiff's allegations concerning institutional conflict and economic motive.

THE TIMES

Log in Start trial

Home UK World Comment Money Life & Style Business Sport Culture Travel

# Deutsche unfazed by Yukos as bank buys Moscow's UFG

**By Carl Mortished**

Tuesday November 04 2003, 12.00am GMT, The Times

Share Prefer us on Google

DEUTSCHE Bank said yesterday that the political turmoil in Russia was "not a major setback" to its decision to buy a large holding in United Financial Group, one of the leading Moscow investment banks.

Vladimir Putin was informed of Deutsche Bank's plans a month ago by Josef Ackermann, Deutsche's chief executive, at a summit meeting between Germany's Chancellor, Gerhard Schröder, and the Russian leader, *The Times* has learnt.

The partnership deal, in which Deutsche will buy 40 per cent of UFG for some $70 million (£48 million), will provide the Russian brokerage with the capital to take part in big financings for Russian companies. Charlie Ryan, UFG's chief executive, said the support of the Germans would further UFG in its ambition to take number one position in Russian securities. "We think there is more business to be done, and we will have more free capital to invest," he said. Deutsche Bank consulted the Russian Government before sealing the deal, but a senior source in the bank was sanguine about the impact of the Yukos affair: "If people ran for cover every time there was trouble, no one would ever invest in emerging markets."

THE TIMES

Log in

Start trial

Home UK World Comment Money Life & Style Business Sport Culture Travel Ol

2 LIVE
PGA Championship 2026 live updates: leaderboard, scores, round 1 highlights
PGA Championship

3 NEW
As costs spiral at home, Modi begins summer of diplomacy
Asia

4 NEW
Why we're ditching our Norfolk cottage for a fortnight in St Tropez
Property & Home

5 NEW
Little Shop of Horrors review — the terrifying plant still steals the show
Theatre & Dance

Deutsche's investment is part of a broader German interest in the Russian market and reflects close industrial ties between the two countries. Germany's leading gas distributor, Ruhrgas, has a minority shareholding in Gazprom and retains a seat in the gas giant's boardroom. Deutsche maintained its presence in Moscow during the 1998 crash when US investment banks fled.

A senior Moscow investment banker said Deutsche probably regarded Russia as part of its territory in the same way that US banks maintained their presence in Latin America, despite frequent market upsets. "It explains why they are willing to take risks," he said.

ADVERTISEMENT

THE TIMES

Log in

Start trial

Home UK World Comment Money Life & Style Business Sport Culture Travel

Mr Ryan said that he would remain at the top of the company after the purchase, and that his partner Boris Fedorov would remain a non-executive director. Mr Fedorov is a leading political figure in Moscow, and is contesting the elections for a new Duma, or parliament, due to take place in December.

Business > Companies & Markets

Banking Economics World politics Russia Vladimir Putin

PROMOTED CONTENT

# Deutsche Bank rakes in the roubles from Russia

Ownership of UFG pays dividends

By Jason Corcoran in Moscow

Monday, 11 December 2006 at 11:00

Deutsche Bank's status as adviser to gas group Gazprom and its close relationships with other state-controlled Russian monopolies is the envy of Moscow's investment banking community. Its decision to take full ownership of the Russian investment bank UFG in February has only cemented its commitment to the country.

The move seems to be paying off with Deutsche powering ahead this year in mergers and acquisitions, equity capital markets and debt financing despite several staff departures. Deutsche, which employs more than 700 people in Moscow, has had ties with Russia since its financing of a natural gas pipeline in the 1970s during Leonid Brezhnev's leadership. Charlie Ryan, chief country officer and chief executive of Deutsche Bank in Russia and founder of UFG, said: "I think this clear and strong bond between Germany and Russia is a positive. The more we can integrate Russia economically with the west, the safer the world's going to be. I think we are doing God's work there." Western investors have criticised Deutsche and other banks for helping the Kremlin to regain control of Russia's natural resources, but this has not daunted Deutsche's Moscow management. The bank's recent work with national champions Gazprom and Rosneft has put it under the spotlight. The bank advised Gazprom on its bid to buy Yuganskneftegas, the main

production asset of the beleaguered Yukos oil company, as well as two privately owned oil groups Surgutneftegaz and Sibneft, acquired from oligarch Roman Abramovich. In the case of Yuganskneftegas, Deutsche wanted to help fund Gazprom's plans for a $10bn bid (€7.7bn) for the Yukos subsidiary but a Texas bankruptcy court judge granted an injunction barring Gazprom and its lenders from taking part. Rosneft, the state-owned oil company, ultimately took control of Yuganskneftegas, which led to the end of merger talks between Rosneft and Gazprom. Deutsche now finds itself in the middle of a battle for the remaining assets of Yukos, which include two oil production units and five refineries. Ryan hopes Deutsche can service both companies, although his team was not selected to join a syndicate of six banks putting together a $24.5bn loan for Rosneft to acquire the remainder of Yukos. He said: "Rosneft and Gazprom are clients and we definitely work for both companies but we have a rigorous system for managing conflicts. The fact we can be relevant and offer services and work on deals for Gazprom and Rosneft is the reason we are so happy with the merger." However, analysts believe UFG has lost its cachet as one of the few remaining Russian independent banks after the Deutsche move. A Moscow banker said: "UFG gained a balance sheet but it gave up its independence for a huge bureaucracy, which hasn't played well with some clients." A former UFG employee said: "They are doing more blue chips now and have Deutsche's debt capability but Troika and Renaissance would be seen as sexier brokers." Last week, Troika hired Goldman Sachs to advise it on a possible IPO. Ryan, an American, first arrived in Russia in 1991 to work for the European Bank for Reconstruction and Development in St Petersburg. His job assisting the country's privatisation programme brought him into contact with reformers, including Vladimir Putin, then deputy mayor of St Petersburg. Ryan set up UFG with Boris Fedorov, finance minister under Boris Yeltsin,

in 1994. Fedorov, who left UFG shortly before the merger, is a director of Gazprom, the state savings bank Sberbank and sat on the board of the electricity monopoly, Unified Energy Systems. UFG prospered after the 1998 financial crises, which sent most US investment bankers scampering home. It made its mark by helping foreign investors get round restrictions on foreign ownership of local shares in Gazprom. The success of the initiative meant that at one stage Gazprom represented as much as 25% of UFG's business. By 2002, UFG needed access to a global bank's capital and products to serve its blue-chip clients so Ryan started talking to western banks about a tie-up. Ryan said: "We were clearly becoming less relevant to companies like Gazprom. It was impossible for the likes of UFG, Troika and Rencap to be relevant to a company of that size." Deutsche Bank acquired a 40% stake in UFG in 2004 and bought the rest this year for an estimated aggregate price of $700m. The completion of the merger led to the departure of executives, including Christopher Granville, UFG's chief strategist, Derek Weaving, head of utilities research, Paul Swigart, head of the international sales team, and equity salesman Mike Stein. Competition in Moscow is set to intensify. US banks Goldman Sachs and Lehman Brothers plan to return but Ryan is not quaking in his boots. He said: "It will be healthy for the market and hopefully we will stay this time. In the past, they have viewed it opportunistically. The reality they will discover is the Russian investment banking business is not a get-rich-quick scheme." He plans to develop Deutsche's derivatives platform and expand DWS, its private banking operation and retail fund management business. Ryan claims the revenues Deutsche generates from Russia are larger than any other investment bank, although Frankfurt will not allow him to disclose any figures.

Investment banks gear up for Russia's privatisation drive

# Investment banks gear up for Russia's privatisation drive

The offloading of minority stakes in 11 state-run companies will mean plenty of mandates

By Liam Vaughan and Matt Turner

Monday, 9 August 2010 at 13:00

Russia may be battling through its worst drought in half a century, but investment banks in Moscow could soon be benefiting from a flood of advisory and underwriting mandates after the Ministry of Finance last month unveiled plans to raise $30bn (€23bn) via the privatisation of some of the country's largest companies.

The part-privatisation scheme, Russia's biggest since the 1990s, will see the government offload minority stakes in 11 state-run companies before 2013, including banks VTB and Sberbank, shipping group Sovcomflot, oil pipeline group Transneft, oil company Rosneft and hydropower utility RusHydro.

The process is being run concurrently with a broader privatisation drive in which hundreds of small and medium-sized state-owned businesses will be sold off or part-privatised as the government seeks to address Russia's rising budget deficit and transform the country's reputation as a global financial centre.

For investment banks, the opportunities for mandates are three-fold: as advisers to the government as it auctions off individual stakes via strategic sales or launches initial public offerings; as advisers to already listed but majority state-owned companies as they undertake

share placements or carry out auctions; and as advisers to potential investors looking to make strategic investments.

Andrew Chulack, head of global banking for Russia at Deutsche Bank, said: "There will be plenty of opportunities for banks to advise on how to structure deals, how to price them, how to target investors, whether to split the sales into tranches and so forth. The programme is good for banks, but also good for the capital markets in Russia and for Moscow's place as a financial centre."

According to one co-head of banking in Russia at a US bank, the second and third option are the most lucrative. While working on behalf of the government carries cachet, it is likely to pay a fraction of the commercial rate and therefore representing foreign investors will be the plum mandate.

Ranked number one for investment banking revenues in Russia year to date by Dealogic, Deutsche Bank is one of a handful of global investment banks with an established presence that could benefit from the wave of new business. Deutsche Bank was a bookrunner on the IPO of VTB in 2007 and electricity groups OGK-2 in 2007 and OGK-5 in 2006.

Other international banks that are strong in the region include JP Morgan, which was an underwriter on the $11bn IPO of Rosneft in 2006 and the $9bn rights issue by Sberbank in 2007; Credit Suisse, which worked on Sberbank, OGK-5 and the follow-on by LUKoil in 2001; Morgan Stanley, which was an underwriter on Rosneft, Lukoil and Gazprom in 1996; and Citigroup, which featured on the VTB IPO and the sale of oil group Slavneft in 2002.

According to one banker close to the situation, the ministry has come up with a long list of 20 banks to handle the various

divestments - 11 international banks and nine domestic banks. That shortlist will be approved by the end of the month, although bankers anticipate the final list will be much shorter.

In the past, the government has opted for a mix of global and domestic institutions. Bankers agree that Renaissance Capital and Troika Dialog are likely to feature strongly. VTB Capital, the state-owned bank which has grown from outsider to top-tier player since launching in 2008, is also expected to take a dominant role. VTB finished last year ranked first by revenues, according to Dealogic.

One of the key questions - and something that will influence which banks the government hires - is the level of non-Russian investment the state is prepared to countenance. Natalya Orlova, chief economist at Russian broker Alfabank, said that one of the goals for the government beyond cutting the deficit was attracting international investment and helping add legitimacy to the market.

She said: "Part of the reason for the privatisation programme is to help transform Russia's image in the eyes of the international investment community.

"There is likely to be plenty of international interest and without international banks it will be very difficult to attract foreign investors."

Bankers are keen to stress that the process is still at a very early stage, with little clarity on what will be sold, when and how. The government's only stipulation is that it will hold on to at least 51% in all the companies under consideration.

While details are tightened up, investment banks are ramping up their marketing efforts. The co-head of Russian banking at a US bank said: "Everybody is pulling on everybody at the moment, trying to

use their relationships with the ministry and with the companies themselves to ensure they participate."

Banks have also been strengthening their presence on the ground. Since the beginning of the year, UBS, Morgan Stanley and JP Morgan have all appointed new heads or co-heads of investment banking in the region, while Renaissance Capital has appointed a new head of financial institutions.

The privatisation programme is not the only game in town, and fees are likely to be comparatively modest, but the stake sales are part of a broader liberalisation of Russian capital markets and every bank is keen to grab a piece of the action.

- Russian banks ready to compete with western rivals

Do you have a story for Financial News? Get in touch confidentially on tips@financialnews.co.uk

# EXHIBIT Q: The Governing Yukos American Depositary Receipt Deposit Agreement (Dated as of March 12, 2001)

This Exhibit contains relevant excerpts from the governing Yukos ADR Deposit Agreement, filed with the U.S. Securities and Exchange Commission under Registration No. 333-104052. The Agreement establishes the contractual framework governing the respective positions and rights of the Depositary, Holders, Beneficial Owners, and Deposited Securities, including representative authority, claims mechanisms, judicial proceedings, standards governing negligence and bad faith, and the post-termination framework.

The same Deposit Agreement was subsequently submitted by the Russian Federation as Exhibit R-637 (ECF No. 109-20) in Case No. 1:14-cv-01996-BAH – the very U.S. Yukos recognition and enforcement proceeding in which Plaintiff seeks to compel Defendant DBTCA to intervene and actively participate on behalf of the Yukos ADR beneficiaries..

# EXHIBIT Q: GOVERNING YUKOS DEPOSIT AGREEMENT

## Contractual Structure, Representative Authority, Holder Rights, and Continuing Economic Interests

This Exhibit contains relevant provisions of the governing Deposit Agreement dated as of March 12, 2001, establishing the contractual framework through which the Yukos ADR program was administered and defining the respective positions, powers, rights, and limitations applicable to the Depositary, Holders, Beneficial Owners, and the Deposited Securities.

The provisions reproduced herein are relevant in particular to the following contractual features:

1. **Contractual Position and Representative Authority of the Depositary — §2.01.**

   The Agreement designates the Depositary as the central contractual intermediary through which the Deposited Securities are administered and grants the Depositary specified authority to act in connection with the performance of its duties and obligations under the Agreement, including authority conferred through the attorney-in-fact structure established therein.

2. **Contractual Exit Rights of Holders — §2.06.**

   The Agreement provides a mechanism by which a Holder, upon surrender of the applicable Receipt and satisfaction of the contractual requirements, may obtain delivery of the corresponding Deposited Securities through the Depositary structure.

3. **Representative Claims Architecture — §5.01.**

   Most significantly, the Agreement expressly contemplates circumstances in which only the Depositary, acting on behalf of Holders and Beneficial Owners, is permitted to bring claims in respect of losses incurred by Holders and Beneficial Owners. Accordingly, exclusive representative claims activity by the Depositary on behalf of Holders and Beneficial Owners is not foreign to the contractual architecture of the Deposit Agreement itself.

4. **Contractual Standards Governing Depositary Conduct — §§5.03, 5.08.**

   The Agreement limits the Depositary's obligations and liabilities while expressly requiring performance of the obligations specifically set forth therein without negligence or bad faith, and separately incorporates negligence and bad faith into its allocation of indemnification rights and liabilities.

5. **Judicial Proceedings, Indemnity, and Recovery Expenses — §§5.03, 5.09.**

   The Agreement expressly contemplates the Depositary's appearance in, prosecution of, or defense of proceedings concerning Deposited Securities or Receipts. Where, in the Depositary's opinion, such proceedings may involve expense or liability, §5.03 expressly provides for satisfactory indemnity against such expense and liability. Thus, expense or liability is addressed through an express contractual indemnity mechanism rather than stated as a categorical prohibition on Depositary litigation.

6. **Post-Termination Rights and Economic Interests — §6.02**

   The Agreement does not provide that termination itself automatically extinguishes the underlying economic interests of Holders. Defendant's own December 18, 2007 Notice states that, by the time of termination, the underlying Yukos ordinary shares had been removed from the register and "no longer exist[ed]," rendering physical delivery of those shares unavailable. See Exhibit D. Section 6.02 establishes a continuing post-termination framework governing the surrender of Receipts and delivery of Deposited Securities; the continued collection of dividends and other distributions pertaining to such securities; and, following any subsequent sale of remaining Deposited Securities, the holding of net proceeds for the pro rata benefit of Holders whose Receipts had not been surrendered.

**Additional relevant provisions reproduced herein include the Agreement's definitions of Holder, Beneficial Owner, Deposited Securities, and Custodian; the contractual agency relationship applicable to the Custodian; the status of Holders and Beneficial Owners as parties to the Agreement; and the Agreement's New York governing-law provision.**

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 SaAxmclRV95LpVLpyA9BO1NEIBIfog3K5vCtpfLUVJGlvxY+CKBZChQqvUZ95yVH
 TBkMd/sNXpSn9nl0Nrui6A==

<SEC-DOCUMENT>0000950117-03-001138.txt : 20030327
<SEC-HEADER>0000950117-03-001138.hdr.sgml : 20030327
<ACCEPTANCE-DATETIME>20030326194242
ACCESSION NUMBER: 0000950117-03-001138
CONFORMED SUBMISSION TYPE: F-6EF
PUBLIC DOCUMENT COUNT: 4
FILED AS OF DATE: 20030327
EFFECTIVENESS DATE: 20030327

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: YUKOS OIL CO
CENTRAL INDEX KEY: 0001223005

FILING VALUES:
FORM TYPE: F-6EF
SEC ACT: 1933 Act
SEC FILE NUMBER: 333-104052
FILM NUMBER: 03619238

BUSINESS ADDRESS:
STREET 1: 60 WALL STREET 25TH FL
CITY: NEW YORK
STATE: NY
ZIP: 10005
BUSINESS PHONE: 2126023761

MAIL ADDRESS:
STREET 1: 60 WALL STREET 25TH FL
CITY: NEW YORK
STATE: NY
ZIP: 10005
</SEC-HEADER>
<DOCUMENT>
<TYPE>F-6EF
<SEQUENCE>1
<FILENAME>a34767.txt
<DESCRIPTION>YUKOS OIL COMPANY
<TEXT>

<PAGE>

As filed with the U.S. Securities and Exchange Commission on March 17, 2003

Registration No. 333-

================================================================================

SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

----------

FORM F-6

REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

For Depositary Shares Evidenced by American Depositary Receipts

OAO "HK "IOKOC"
(Exact Name of Issuer as Specified in Its Charter)

YUKOS OIL COMPANY
(Translation of Issuer's Name into English)

----------

RUSSIAN FEDERATION
(Jurisdiction of incorporation or organization of issuer)

DEUTSCHE BANK TRUST COMPANY AMERICAS
(Exact name of depositary as specified in its charter)

60 Wall Street, New York, NY 10005
Telephone (212) 602-3761
(Address, including zip code, and telephone number, including area code, of depositary's principal executive offices)

----------

Depositary Management Corporation
570 Lexington Avenue, 44th Floor
New York, New York 10022
(212) 319-4800
(Address, including zip code, and telephone number, including area code, of agent for service)
Copy to:
Scott A. Ziegler, Esq.
Ziegler, Ziegler & Associates LLP
570 Lexington Avenue, 44th Floor
New York, New York 10022
(212) 319-7600

It is proposed that this filing become effective under Rule 466

[x] immediately upon filing    [_] on [date] at [time]

If a separate registration statement has been filed to register the deposited shares, check the following box. [_]

CALCULATION OF REGISTRATION FEE

<TABLE>
<CAPTION>
============================================================================================================

Proposed maximum    Proposed
maximum
Title of each class of    Amount    aggregate price    aggregate
offering    Amount of

     Securities to be registered          to be registered     per unit (1)        price (2)
registration fee
- -------------------------------------------------------------------------------------------
-------------------------
<S>                                           <C>                  <C>              <C>
<C>

| | | | | |
|---|---|---|---|---|
| American Depositary Shares evidenced by American Depositary Receipts, each American Depositary Share representing fifteen common shares of Yukos Oil Company | 400,000,000 American Depositary Shares | $0.05 | $20,000,000 | $1618 |

=============================================================================================
=======================
</TABLE>

(1) Each Unit represents one American Depositary Share.

(2) Estimated solely for the purpose of calculating the registration fee. Pursuant to Rule 457(k), such estimate is computed on the basis of the maximum aggregate fees or charges to be imposed in connection with the issuance of American Depositary Receipts evidencing American Depositary Shares.

<PAGE>

PART I
INFORMATION REQUIRED IN PROSPECTUS

The Prospectus consists of the proposed form of American Depositary Receipt ("ADR" or "American Depositary Receipt") included as Exhibit A to the Deposit Agreement filed as Exhibit (a) to this Registration Statement, which is incorporated herein by reference.

CROSS REFERENCE SHEET

Item 1. DESCRIPTION OF SECURITIES TO BE REGISTERED

<TABLE>
<CAPTION>

| Item Number and Caption | Location in Form of American Depositary Receipt Filed Herewith as Prospectus |
|---|---|
| <S> | <C> |
| (1) Name and address of Depositary | Introductory paragraph |
| (2) Title of American Depositary Receipts and identity of deposited securities | Face of American Depositary Receipt, top center |
| Terms of Deposit: | |
| (i) Amount of deposited securities represented by one unit of American Depositary Shares | Face of American Depositary Receipt, upper right corner |

(ii) Procedure for voting, if any, the deposited securities — Paragraphs (15) and (16)

(iii) Collection and distribution of dividends — Paragraphs (4), (7), (12), (13), (14) and (15)

(iv) Transmission of notices, reports and proxy soliciting material — Paragraphs (15), (16), (17), (19) and (21)

(v) Sale or exercise of rights — Paragraphs (4), (7), (13) and (15)

(vi) Deposit or sale of securities resulting from dividends, splits or plans of reorganization — Paragraphs (3), (4), (5), (7), (17) and (22)

(vii) Amendment, extension or termination of the Deposit Agreement — Paragraphs (20) and (21)

(viii) Rights of holders of receipts to inspect the transfer books of the Depositary and the list of Holders of receipts — Paragraph (11)

(ix) Restrictions upon the right to deposit or withdraw the underlying securities — Paragraphs (2), (3), (4), (7) and (9)

(x) Limitation upon the liability of the Depositary — Paragraphs (18), (24) and (26)

(3) Fees and Charges — Paragraph (7)

</TABLE>

<PAGE>

Item 2. AVAILABLE INFORMATION

<TABLE>
<CAPTION>

| Item Number and Caption | Location in Form of American Depositary Receipt Filed Herewith as Prospectus |
| --- | --- |
| <S> | <C> |
| (a) Statement that Yukos Oil Company furnishes the Commission with certain public reports and documents required by foreign law or otherwise under Rule 12g3-2(b) under the Securities Exchange Act of 1934 and that such reports can be inspected by holders of American Depositary Receipts and copied at public reference facilities maintained by the Commission in Washington, D.C. | Paragraph (11) |

</TABLE>

<PAGE>

PART II
INFORMATION NOT REQUIRED IN PROSPECTUS

Item 3. EXHIBITS

(a) Form of Deposit Agreement. Form of Deposit Agreement dated as of March 12, 2001 among Yukos Oil Company, Deutsche Bank Trust Company Americas (fka Bankers Trust Company), as depositary (the "Depositary"), and all holders from time to time of ADRs issued thereunder (the "Deposit Agreement"), including the Form of American Depositary Receipt, is filed herewith as Exhibit (a).

(b) Any other agreement to which the Depositary is a party relating to the issuance of the American Depositary Shares registered hereunder or the custody of the deposited securities represented thereby. Not Applicable.

(c) Every material contract relating to the deposited securities between the Depositary and the issuer of the deposited securities in effect at any time within the last three years. Not Applicable.

(d) Opinion of Ziegler, Ziegler & Associates LLP, counsel to the Depositary, as to the legality of the securities being registered. Filed herewith as Exhibit (d).

(e) Certification under Rule 466. Filed herewith as Exhibit (e).

(f) Power of Attorney. Included as part of the signature pages hereto.

Item 4. UNDERTAKINGS

(a) The Depositary hereby undertakes to make available at the principal office of the Depositary in the United States, for inspection by holders of the American Depositary Receipts, any reports and communications received from the issuer of the deposited securities which are both (1) received by the Depositary as the holder of the deposited securities, and (2) made generally available to the holders of the underlying securities by the issuer.

(b) If the amounts of fees charged are not disclosed in the prospectus, the Depositary undertakes to prepare a separate document stating the amount of any fee charged and describing the service for which it is charged and to deliver promptly a copy of such fee schedule without charge to anyone upon request. The Depositary undertakes to notify each registered holder of an American Depositary Receipt thirty days before any change in the fee schedule.

<PAGE>

SIGNATURE

<DESCRIPTION>EXHIBIT (A)
<TEXT>

<PAGE>

- ------------------------------------------------------------------------------

DEPOSIT AGREEMENT

- ------------------------------------------------------------------------------

by and among

YUKOS Corp.

AND

BANKERS TRUST COMPANY
as Depositary

AND

HOLDERS AND BENEFICIAL OWNERS OF AMERICAN DEPOSITARY SHARES
EVIDENCED BY AMERICAN DEPOSITARY RECEIPTS ISSUED HEREUNDER

- ------------------------------------------------------------------------------

Dated as of March 12, 2001

- ------------------------------------------------------------------------------

<PAGE>

TABLE OF CONTENTS

<TABLE>
<S>
<C>
ARTICLE
1.............................................................................................1
SECTION 1.01.
Affiliate..........................................................................1
SECTION 1.02. American Depositary Receipt(s) and
Receipt(s).....................................1
SECTION 1.03. American Depositary Share(s) and
ADS(s)............................................2
SECTION 1.04. ADS Record
Date..............................................................2
SECTION 1.05. Beneficial
Owner.............................................................2
SECTION 1.06. Business
Day.................................................................2
SECTION 1.07.
Commission.........................................................................2
SECTION 1.08.
Company............................................................................2
SECTION 1.09. Corporate Trust

Office....................................................................2
SECTION 1.10. Custodian.................................................................2
SECTION 1.11. Deposit Agreement.........................................................2
SECTION 1.12. Depositary................................................................3
SECTION 1.13. Deposited Securities......................................................3
SECTION 1.14. Dollars; $................................................................3
SECTION 1.15. Foreign Registrar.........................................................3
SECTION 1.16. Holder....................................................................3
SECTION 1.17. Pre-Release...............................................................3
SECTION 1.18. Registrar.................................................................3
SECTION 1.19. Restricted Securities.....................................................3
SECTION 1.20. Russian Share Registrar...................................................3
SECTION 1.21. Securities Act............................................................4
SECTION 1.22. Securities Exchange Act...................................................4
SECTION 1.23. Share Register............................................................4
SECTION 1.24. Shares....................................................................4

ARTICLE 2...............................................................................4
SECTION 2.01. Appointment of Depositary.................................................4
SECTION 2.02. Form and Transferability of Receipts......................................4
SECTION 2.03. Deposit of Shares.........................................................6
SECTION 2.04. Execution and Delivery of Receipts........................................7
SECTION 2.05. Transfer of Receipts; Combination and Split-up of Receipts................7
SECTION 2.06. Surrender of Receipts and Withdrawal of Deposited Securities..............8
SECTION 2.07. Limitations on Execution and Delivery, Transfer and Surrender of Receipts.........9
SECTION 2.08. Lost Receipts, etc........................................................10
SECTION 2.09. Cancellation and Destruction of Surrendered Receipts......................10
SECTION 2.10. Pre-Release of Receipts...................................................10
SECTION 2.11. Maintenance of Records....................................................11
</TABLE>

<PAGE>

<TABLE>
<S>
<C>
ARTICLE
3.....................................................................................11
SECTION 3.01. Filing Proofs, Certificates and Other
Information...............................11
SECTION 3.02. Liability of Holders or Beneficial Owners for
Taxes.............................12
SECTION 3.03. Representations and Warranties on Deposit of
Shares.............................12
SECTION 3.04. Disclosure of
Interests..........................................................13

ARTICLE
4.....................................................................................13
SECTION 4.01. Cash
Distributions...............................................................13
SECTION 4.02. Distributions Other Than Cash, Shares or
Rights.................................14
SECTION 4.03. Distributions in
Shares.........................................................14
SECTION 4.04.
Rights.......................................................................15
SECTION 4.05. Conversion of Foreign
Currency...................................................16
SECTION 4.06. Fixing of ADS Record
Date......................................................17
SECTION 4.07. Voting of Deposited
Securities.................................................18
SECTION 4.08. Changes Affecting Deposited
Securities.........................................18
SECTION 4.09. Available
Information...........................................................19
SECTION 4.10.
Reports.......................................................................19
SECTION 4.11. Lists of
Holders..............................................................19
SECTION 4.12.
Withholding...................................................................19
SECTION 4.13
Taxation......................................................................19

ARTICLE
5.....................................................................................20
SECTION 5.01. Maintenance of Office and Transfer Books by the Depositary;
Agents..............20
SECTION 5.02. Prevention or Delay in Performance by the Depositary or the
Company.............21
SECTION 5.03. Obligations of the Depositary and the
Company..................................22
SECTION 5.04. Resignation and Removal of the
Depositary.....................................23
SECTION 5.05.
Custodian.....................................................................23

SECTION 5.06. Notices and Reports..............................................................24
SECTION 5.07. Issuance of Additional Shares, ADSs etc.........................................25
SECTION 5.08. Indemnification; Reimbursement...................................................26
SECTION 5.09. Charges of Depositary..............................................................26
SECTION 5.10. Retention of Depositary Documents..............................................27
SECTION 5.11. Exclusivity............................................................................27
SECTION 5.12. List of Restricted Securities Holders...........................................27

ARTICLE 6.................................................................................................28
SECTION 6.01. Amendment..........................................................................28
SECTION 6.02. Termination..........................................................................29

ARTICLE 7.................................................................................................29
SECTION 7.01. Counterparts.........................................................................29
SECTION 7.02. No Third Party Beneficiaries.......................................................30
SECTION 7.03. Severability...........................................................................30
SECTION 7.04. Holders and Beneficial Owners as Parties; Binding Effect........................30
</TABLE>



<PAGE>

<TABLE>
<S>
<C>

SECTION 7.05. Notices...............................................................................30
SECTION 7.06. Governing Law........................................................................31
SECTION 7.07. Assignment............................................................................31
SECTION 7.08. Compliance with U.S. Securities Laws............................................31
SECTION 7.09. Titles...................................................................................31
SECTION 7.10. Registration of Shares; Russian Share Registrar; Share Registrar.................31
SECTION 7.11. Arbitration; Settlement of Disputes...............................................33
SECTION 7.12. Submission to Jurisdiction; Appointment of Agent for Service of

Process..........34
SECTION 7.13. Waiver of
Immunities.............................................................35

EXHIBIT
A...........................................................................................A-1
</TABLE>

iii

<PAGE>

DEPOSIT AGREEMENT

THIS DEPOSIT AGREEMENT is made as of March 12, 2001 by and among YUKOS Corp., an open joint stock companyorganized under the laws of the Russian Federation (the "Company"), BANKERS TRUST COMPANY, a bank organized under the laws of the State of New York, United States of America, and all Holders and Beneficial Owners from time to time of American Depositary Shares (as herein defined) evidenced by Receipts (as defined herein) issued hereunder.

W I T N E S S E T H T H A T:

WHEREAS, the Company desires to provide for (i) the deposit of Shares (as hereinafter defined) from time to time with the Depositary or the Custodian (as defined herein), as agent of the Depositary, for the purposes set forth in the Deposit Agreement and (ii) the execution and delivery of Receipts evidencing the American Depositary Shares representing the Shares so deposited; and

WHEREAS, the Board of Directors of the Company (or an authorized committee thereof) has duly approved the establishment of an American Depositary Receipts facility upon the terms set forth in this Deposit Agreement, the execution and delivery of the Deposit Agreement on behalf of the Company, and the actions of the Company and the transactions contemplated therein.

NOW, THEREFORE, in consideration of the premises, the parties hereto agree as follows:

ARTICLE 1

DEFINITIONS

The following definitions shall for all purposes, unless otherwise clearly indicated, apply to the respective terms used in this Deposit Agreement:

SECTION 1.01. "Affiliate" means a person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, another entity.

SECTION 1.02. "American Depositary Receipt(s)" or "Receipt(s)" mean the American Depositary Receipt(s) evidencing American Depositary Shares issued hereunder. Receipts may be either in physical certificated or book-entry form. Receipts in physical certificated form shall be substantially in the form of Exhibit A hereto and evidencing American Depositary Shares, as such American Depositary Receipts may be amended from time to time. A Receipt may represent any number of American Depositary Shares. References to "Receipts" shall include

book-entry notations on the books of the Depositary, unless the context otherwise requires.



<PAGE>

SECTION 1.03. "American Depositary Share(s)" and "ADS(s)" mean the securities representing the interests in the Deposited Securities and the rights evidenced by the Receipts issued hereunder. Each American Depositary Share shall represent the right to receive fifteen Shares until there shall occur a distribution upon Deposited Securities covered by Section 4.03 or a change in Deposited Securities covered by Section 4.08 with respect to which additional Receipts are not executed and delivered, and thereafter the American Depositary Shares shall evidence the right to receive the amount of Shares or Deposited Securities specified in such Sections.

SECTION 1.04. "ADS Record Date" has the meaning set forth in Section 4.06.

SECTION 1.05. "Beneficial Owner" means each person owning from time to time a beneficial interest in the American Depositary Shares evidenced by any Receipt. A Beneficial Owner may or may not be the Holder of the Receipt evidencing such ADSs. A Beneficial Owner shall be able to exercise any right or receive any benefit hereunder solely through the person who is the Holder of the Receipt(s) evidencing the ADSs owned by such Beneficial Owner.

SECTION 1.06. "Business Day" means, in the case of the Company, any day on which banks in the Russian Federation are not required or authorized by law to close and, in the case of the Depositary, any day on which banks in New York, New York are not required or authorized to close.

SECTION 1.07. "Commission" means the Securities and Exchange Commission of the United States or any successor governmental agency in the United States.

SECTION 1.08. "Company" means YUKOS Corp., a company organized under the laws of the Russian Federation, having its principal executive office at 26 Ulansky Lane, Moscow 103045, Russian Federation, and its successors.

SECTION 1.09. "Corporate Trust Office" means the office of the Depositary at which its Depositary receipts business shall be principally administered, which at the date of this Deposit Agreement is 4 Albany Street, New York, New York 10006.

SECTION 1.10. "Custodian" means the Moscow, Russian Federation office of Deutsche Bank AG, as agent of the Depositary for the purposes of this Deposit Agreement, and any other firm or corporation which may hereafter be appointed by the Depositary pursuant to the terms of Section 5.05, as substitute or additional custodian or custodians hereunder, and shall also mean (as the context shall require) all of them collectively.

SECTION 1.11. "Deposit Agreement" means this Deposit Agreement, as the same may be amended from time to time in accordance with the provisions hereof.

<PAGE>

SECTION 1.12. "Depositary" means Bankers Trust Company, a New York banking corporation, and any successor as depositary hereunder.

SECTION 1.13. "Deposited Securities" as of any time mean Shares at such time deposited or deemed to be deposited under this Deposit Agreement and any and all other securities, property and cash received by the Depositary or the Custodian in respect thereof and at such time held hereunder, subject as to cash to the provisions of Section 4.05. The collateral delivered in connection with Pre-Release transactions described in Section 2.10 hereof shall not constitute Deposited Securities.

SECTION 1.14. "Dollars"; "$" The terms "Dollars" shall mean the lawful currency of the United States.

SECTION 1.15. "Foreign Registrar" means the Company or any other entity that presently carries out the duties of registrar for the Shares or any successor as registrar for the Shares and any other appointed agent of the Company for the transfer and registration of the Shares.

SECTION 1.16. "Holder" means the person in whose name a Receipt is registered on the books of the Depositary (or the Registrar (as hereinafter defined), if any) maintained for such purpose. A Holder may or may not be a Beneficial Owner. If a Holder is not the Beneficial Owner of the ADSs evidenced by the Receipt registered in its name, such person shall be deemed to have all requisite authority to act on behalf of the Beneficial Owners of such ADSs.

SECTION 1.17. "Pre-Release" has the meaning set forth in Section 2.10 hereof.

SECTION 1.18. "Registrar" means the Depositary, or any bank or trust company having an office in the Borough of Manhattan, The City of New York, which shall be appointed by the Depositary to register Receipts and transfers of Receipts as herein provided.

SECTION 1.19. "Restricted Securities" mean American Depositary Shares, Shares, Receipts or Deposited Securities which are "restricted securities" as such term is defined in Rule 144(a)(3) promulgated under the Securities Act, or which are held by an officer, director (or persons performing similar functions) or other Affiliate of the Company or which are subject to restrictions on sale or deposit under the laws of the United States (including without limitation the Securities Act) or the Russian Federation, or under a shareholder agreement or the Charter of the Company.

SECTION 1.20 "Russian Share Registrar" means the entity that maintains the Share Register for the Shares or any successor thereto and any other appointed agent of the Company for the transfer and registration of Shares.

<PAGE>

SECTION 1.21. "Securities Act" means the United States Securities Act of 1933, as from time to time amended.

SECTION 1.18. "Securities Exchange Act" means the United States Securities Exchange Act of 1934, as from time to time amended.

SECTION 1.19 "Share Register" means the shareholder register maintained by the Russian Share Registrar in which ownership of the Shares is registered.

SECTION 1.20. "Shares" means the Company's common shares, nominal value 0,004 rubles validly issued and outstanding and fully paid, nonassessable and free of any preemptive rights of the holders of outstanding Shares or evidence of the right to receive such Shares. If there shall occur any change in the nominal or par value, split-up, consolidation or any other reclassification of the Shares or, upon the occurrence of any event described in Section 4.08, an exchange or conversion in respect of the Shares, the term "Shares" shall, subject to applicable law, mean the resulting securities.

ARTICLE 2

APPOINTMENT OF DEPOSITARY, FORM OF RECEIPTS, DEPOSIT OF SHARES, EXECUTION AND DELIVERY, TRANSFER AND SURRENDER OF RECEIPTS

SECTION 2.01. Appointment of Depositary. The Company hereby appoints the Depositary as depositary for the Deposited Securities and hereby authorizes and directs the Depositary to act in accordance with the terms set forth in this Deposit Agreement. Each Holder and each Beneficial Owner, upon acceptance of any ADSs (or any interest therein) issued in accordance with the terms of this Deposit Agreement, shall be deemed for all purposes to (a) be a party to and bound by the terms of this Deposit Agreement and (b) appoint the Depositary its attorney-in-fact, with full power to delegate, to act on its behalf and to take any and all actions contemplated in this Deposit Agreement, to adopt any and all procedures necessary to comply with applicable law and to take such action as the Depositary in its sole discretion may deem necessary or appropriate to carry out the purposes of this Deposit Agreement (the taking of such actions to be the conclusive determinant of the necessity and appropriateness thereof).

SECTION 2.02. Form and Transferability of Receipts. Receipts shall be substantially in the form set forth in Exhibit A annexed to this Deposit Agreement, with appropriate insertions, modifications and omissions, as hereinafter provided. No certificated Receipt shall be entitled to any benefits under this Deposit Agreement or be valid or obligatory for any purpose, unless such Receipt shall have been executed by the Depositary by the manual or facsimile signature of a duly authorized signatory of the Depositary; provided, however, that, if a Registrar for the Receipts shall have been appointed, such Receipts shall be countersigned by the manual signature of a duly authorized officer of the Registrar. Such signature of any Receipt by manual signature shall be conclusive evidence, and the only evidence, that such Receipt has been duly executed and delivered hereunder. The Depositary shall maintain books on which each Receipt so executed and delivered as hereinafter provided and the transfer of each such Receipt

<PAGE>

hereunder, together with the other documents specified in this Deposit Agreement, the Custodian or its agents, promptly after receipt of evidence that such transfer has been accomplished, shall present such extract or extracts, certificate or certificates or other documents as above specified to the Russian Share Registrar for transfer and recordation of the Shares being deposited in the name of the Depositary or its nominee or the Custodian or its nominee, and the Company shall use its best efforts to ensure that such transfer and recordation is promptly effected by the Russian Share Registrar. Records of ownership of Deposited Securities (including extracts from the Share Register) shall be held by the Custodian for the account and to the order of the Depositary at such place or places and in such manner as the Depositary shall determine. The Depositary agrees to instruct the Custodian to place all Shares accepted for deposit under this Deposit Agreement into segregated accounts separate from any Shares of the Company that may be held by such Custodian under any other depositary receipt facility relating to the Shares.

Notwithstanding anything herein to the contrary, the Depositary shall have no obligation to accept Shares for deposit hereunder from any person or entity identified by the Company as holding Restricted Securities.

SECTION 2.04. Execution and Delivery of Receipts. Upon receipt by any Custodian of any deposit pursuant to Section 2.03 hereunder together with any other documents required by the Depositary in accordance with this Deposit Agreement, and upon receipt in form satisfactory to the Depositary or a proper acknowledgement or other evidence from the Company or the Russian Share Registrar (including extracts from the Share Register) that any Deposited Securities have been recorded on the Share Register maintained by the Russian Share Registrar in the name of the Depositary or its nominee or the Custodian or its nominee, such Custodian shall notify the Depositary of such deposit and the person or persons to whom or upon whose written order a Receipt or Receipts are deliverable in respect thereof and the number of American Depositary Shares to be evidenced thereby. Such notification shall be made by letter or, at the request, risk and expense of the person making the deposit, by cable, telex or facsimile transmission. Upon receiving such notice from such Custodian, the Depositary, subject to the terms and conditions of this Deposit Agreement, shall execute and deliver at its Corporate Trust Office, to or upon the order of the person or persons entitled thereto, a Receipt or Receipts, registered in the name or names and evidencing any authorized number of American Depositary Shares requested by such person or persons, but only upon payment to the Depositary of the fees and expenses of the Depositary for the execution and delivery of such Receipt or Receipts as provided in Section 5.09, and of all taxes (including, without limitation, amounts in respect of any applicable transfer taxes) and governmental charges and fees payable in connection with such deposit and the transfer of the Deposited Securities.

Nothing in this Section shall be interpreted to prohibit Pre-Release as defined in Section 2.10 hereof.

SECTION 2.05. Transfer of Receipts; Combination and Split-up of Receipts. The Depositary, subject to the terms and conditions of this Deposit Agreement including payment of applicable fees and charges of the Depositary set forth in Section 5.09 hereof, shall register transfers of Receipts on its transfer books, as promptly as practicable, upon

<PAGE>

any surrender of a Receipt at the Corporate Trust Office of the Depositary, by the Holder in person or by a duly authorized attorney, properly endorsed or accompanied by proper instruments of transfer, and duly stamped as may be required by applicable law. Thereupon the Depositary shall execute a new Receipt or Receipts and deliver the same to or upon the order of the person entitled thereto.

The Depositary, subject to the terms and conditions of this Deposit Agreement, shall upon surrender of a Receipt or Receipts for the purpose of effecting a split-up or combination of such Receipt or Receipts, execute and deliver a new Receipt or Receipts for any number of American Depositary Shares requested, evidencing the same aggregate number of American Depositary Shares as the Receipt or Receipts surrendered.

The Depositary may, after consultation with the Company, appoint one or more co-transfer agents for the purpose of effecting transfers, combinations and split-ups of Receipts at designated transfer offices on behalf of the Depositary. In carrying out its functions, a co-transfer agent may require evidence of authority and compliance with applicable laws and other requirements by Holders or persons entitled to Receipts and will be entitled to protection and indemnity to the same extent as the Depositary. Such co-transfer agents may be removed and substitutes appointed by the Depositary.

SECTION 2.06. Surrender of Receipts and Withdrawal of Deposited Securities. Upon surrender at the Corporate Trust Office of the Depositary of a Receipt for the purpose of withdrawal of the Deposited Securities represented by the American Depositary Shares evidenced by such Receipt, and upon payment of the fees of the Depositary for the surrender of Receipts as provided in Section 5.09 and payment of all taxes and governmental charges payable in connection with such surrender and withdrawal of the Deposited Securities, and subject to the terms and conditions of this Deposit Agreement and the Charter of the Company, the Holder of such Receipt shall be entitled to delivery, to him or upon his order, at the principal office of the Custodian of the amount of Deposited Securities at the time represented by the American Depositary Shares evidenced by such Receipt. Delivery of such Deposited Securities may be made by (a)(i) the delivery of certificates in the name of such Holder or as ordered by him or certificates properly endorsed or accompanied by proper instruments of transfer to such Holder or as ordered by him or (ii) other documents evidencing title (including extracts from the Share Register) in the name of such Holder or as ordered by such Holder, and (b) delivery of any other securities, property and cash to which such Holder is then entitled in respect of such Receipts to such Holder or as ordered by him. Such delivery shall be made, as hereinafter provided, without unreasonable delay, at the office of the Custodian. At the request, risk and expense of the Holder, the Depositary may deliver Deposited Securities (other than Shares) at the Corporate Trust Office. The Company shall use its best efforts to ensure that transfer and recordation of the Deposited Securities into the name of the Holder or as directed by such Holder is effected within three (3) Business Days of the Russian Share Registrar's receipt of such documentation as may be required by applicable law and regulation and the reasonable and customary internal regulations of the Russian Share Registrar, or as soon as possible thereafter.

and rights to subscribe therefor) is subject to any tax or other governmental charge which the Depositary is obligated to withhold, the Depositary shall withhold the amount required to be withheld and may by public or private sale dispose of all or a portion of such property (including Shares and rights to subscribe therefor) in such amounts and in such manner as the Depositary deems necessary and practicable to pay such taxes or charges and the Depositary shall distribute the net proceeds of any such sale after deduction of such taxes or charges to the Holders entitled thereto in proportion to the number of American Depositary Shares held by them respectively.

SECTION 4.13 Taxation. The Depositary will, and will instruct the Custodian to, forward to the Company or its agents such information from its records as the Company may reasonably request to enable the Company or its agents to file the necessary reports with governmental authorities or agencies, and the Depositary, the Custodian or the Company and its agents may (but shall not be obligated to) file such reports as are necessary to reduce or eliminate applicable taxes on distributions in respect of Deposited Securities on dividends and other benefits under applicable tax treaties for the Holders and Beneficial Owners. Holders and Beneficial Owners of American Depositary Shares may be required from time to time, and in a timely manner, to file such proof of taxpayer status, residence and beneficial ownership (where applicable), to execute such certificates and to make such representations and warranties, or to provide any other information or documents as the Depositary may deem necessary or proper to fulfill the Depositary's obligations under applicable law. The Holders and Beneficial Owners shall indemnify the Depositary, the Company, the Custodian and any of their



<PAGE>

respective directors, employees, agents and Affiliates against, and hold each of them harmless from, any claims by any governmental authority with respect to taxes, additions to tax, penalties or interest arising out of any refund of taxes, reduced rate of withholding at source or other tax benefit obtained.

The Depositary is under no obligation to provide the Holders and Beneficial Owners with any information about the tax status of the Company or any of its Affiliates. The Depositary shall not incur any liability for any tax consequences that may be incurred by Holders and Beneficial Owners on account of their ownership of the American Depositary Shares, including without limitation, tax consequences resulting from the Company (or any of its subsidiaries) being treated as a "Foreign Personal Holding Company," or as a "Passive Foreign Investment Company" (in each case as defined in the U.S. Internal Revenue Code and the regulations issued thereunder) or otherwise.

ARTICLE 5

THE DEPOSITARY, THE CUSTODIANS AND THE COMPANY

SECTION 5.01. Maintenance of Office and Transfer Books by the Depositary; Agents. (a) Until termination of this Deposit Agreement in accordance with its terms, the Depositary shall maintain in the Borough of Manhattan, The City of New York, facilities for the execution and delivery, registration, registration of transfers and surrender of Receipts in accordance with the provisions of this Deposit Agreement.

The Depositary shall keep books, at its Corporate Trust Office, for the registration of Receipts and transfers of Receipts which at all reasonable times shall be open for inspection by the Holders, provided that such inspection shall not be for the purpose of communicating with Holders in the interest of a business or object other than the business of the Company or a matter related to this Deposit Agreement or the Receipts.

The Depositary may close the transfer books, at any time or from time to time, when deemed expedient by it in connection with the performance of its duties hereunder.

If any Receipts or the American Depositary Shares evidenced thereby are listed on one or more stock exchanges or automated quotation systems in the United States, the Depositary shall act as Registrar or, upon written notice to the Company, appoint a Registrar or one or more co-Registrars for registry of such Receipts in accordance with any requirements of such stock exchange or exchanges or automated quotation system or systems.

(b) The Depositary may perform its obligations under this Deposit Agreement through any agent appointed by it, provided that the Depositary shall notify the Company of such appointment. With respect to any and all losses, damages, costs, judgments, expenses and other liabilities (including reasonable attorneys' fees and expenses) (collectively referred to as "Losses") incurred by any Holder or Beneficial Owner as a result of the acts or failure to act by such agent or attorney (or, in the case of the Custodian, only such damages as are described below), the Depositary, to the extent it shall receive indemnification and security acceptable to it



<PAGE>

from such Holder or Beneficial Owner, may take appropriate action to recover such Losses from such agent or attorney and, to the extent is takes such action and recovers any amounts, as promptly as practicable shall distribute any amounts so recovered (exclusive of costs and expenses incurred by the Depositary in connection with recovering such Losses which are not reimbursed by such agent or attorney, including, without limitation, the Custodian) to the Holders and Beneficial Owners entitled thereto; and the Depositary's sole responsibility and liability to such Holders and Beneficial Owners shall be limited to amounts so received from such agent or attorney (exclusive of costs and expenses incurred by the Depositary in connection with recovering such Losses which are not reimbursed by such agent or attorney, including, without limitation, the Custodian).

The liability of the Custodian is set forth in the Custody Agreement between the Depositary and the Custodian (the "Custody Agreement"). Under the terms of the Custodian Operating Agreement, the Custodian is only liable for its breach of the Custody Agreement, its gross negligence, willful default or fraud in connection with the performance of its obligations thereunder and for loss of Shares or funds held in custody under the Custody Agreement. In each case, the liability of the Custodian with respect to the loss of Shares or funds will be limited to direct (but not indirect, including consequential) losses incurred by Holders and Beneficial Owners.

Moreover, only the Depositary, acting on behalf of Holders and Beneficial Owners, will be permitted to bring claims against the Custodian in respect of such losses incurred by Holders and Beneficial Owners as a result of the acts of, or the failure to act by, the Custodian. Any such claims by the Depositary against the Custodian will be resolved exclusively by arbitration. The Depositary agrees to promptly remit to Holders any amounts recovered from such claims (exclusive of costs and expenses incurred by the Depositary in connection with recovering such losses which are not reimbursed by the Custodian). The Depositary shall have no other responsibility or liability to Holders or Beneficial Owners with respect to the acts of, or the failure to act by, the Custodian or for the unavailability of the Shares or the failure to make any distribution of cash or property with respect thereto as a result of such unavailability.

The liability of the Custodian for such losses incurred by Holders and Beneficial Owners, the obligation of the Depositary to bring claims against the Custodian for such losses and the method by which such claims may be brought are subject to the terms and conditions of the Custody Agreement, a copy of which is available from the Depositary upon the written request of any Holder.

SECTION 5.02. Prevention or Delay in Performance by the Depositary or the Company. Neither the Depositary nor the Company nor any of their respective directors, employees, agents or Affiliates shall incur any liability to any Holder or Beneficial Owner of any Receipt, if by reason of any provision of any present or future law or regulation of the United States or any state thereof, the Russian Federation, or any other country, or of any governmental or regulatory authority, stock exchange or automated quotation system, or by reason of any provision, present or future, of the Charter of the Company, or by reason of any provision of any securities issued or distributed by the Company, or any offering or distribution thereof, or by reason of any act of God or war or other circumstances beyond its control, the Depositary or the Company shall be prevented, delayed or forbidden from, or be subject to any civil or criminal



<PAGE>

penalty on account of, doing or performing any act or thing which by the terms of this Deposit Agreement or the Deposited Securities it is provided shall be done or performed; nor shall the Depositary or the Company or any of their respective directors, employees, agents or Affiliates incur any liability to any Holder or Beneficial Owner of any Receipt by reason of any nonperformance or delay, caused as aforesaid, in the performance of any act or thing which by the terms of this Deposit Agreement it is provided shall or may be done or performed, or by reason of any exercise of, or failure to exercise, any discretion provided for in this Deposit Agreement. Neither the Depositary nor the Company, nor any of their respective directors, officers, employees, agents or Affiliates shall incur any liability in the case that any or all holders of Deposited Securities benefit from any distribution, offering, right or other benefit which is not, under the terms of this Deposit Agreement, made available to any or all Holder(s) or Beneficial Owners of American Depositary Shares issued hereunder. Where, by the terms of a distribution pursuant to Section 4.01, 4.02, or 4.03 of this Deposit Agreement, or an offering or distribution pursuant to Section 4.04 of this Deposit Agreement, or an event described in Section 4.08 of this Deposit Agreement, for any other reason, a distribution or offering may not be made available to Holders, and the Depositary may not

dispose of such distribution or offering on behalf of such Holders and make the net proceeds available to such Holders, then the Depositary shall not make such distribution or offering, and shall allow any rights, if applicable, to lapse.

SECTION 5.03. Obligations of the Depositary and the Company. The Company assumes no obligation nor shall it be subject to any liability under this Deposit Agreement to Holders or Beneficial Owners or other persons, except that it agrees to perform its obligations specifically set forth in this Deposit Agreement without negligence or bad faith.

The Depositary assumes no obligation nor shall it be subject to any liability under this Deposit Agreement or the Receipts to any Holder or Beneficial Owner or other persons (including, without limitation, liability with respect to the validity or worth of the Deposited Securities), except that it agrees to perform its obligations specifically set forth in this Deposit Agreement without negligence or bad faith.

Without limitation of the foregoing, neither the Depositary nor the Company shall be under any obligation to appear in, prosecute or defend any action, suit or other proceeding in respect of any Deposited Securities or in respect of the Receipts, which in its opinion may involve it in expense or liability, unless an indemnity satisfactory to it against all expense and liability shall be furnished as often as may be required, and the Custodian shall not be under any obligation whatsoever with respect to such proceedings, the responsibility of the Custodian being solely to the Depositary.

Neither the Depositary nor the Company shall be liable for any action or nonaction by it in reliance upon the advice of or information from legal counsel, accountants, any person presenting Shares for deposit, any Holder or Beneficial Owner or any other person believed by it in good faith to be competent to give such advice or information; provided, however, that in the case of the Company, advice of or information from legal counsel is from recognized U.S. counsel for U.S. legal issues, recognized Russian counsel for Russian legal issues and recognized counsel of any other jurisdiction for legal issues with respect to that

22

<PAGE>

jurisdiction. The Depositary, the Custodian and the Company may rely and shall be protected in acting upon any written notice, request, direction or other document believed to be genuine and to have been signed or presented by the proper party or parties.

The Depositary shall not be liable to the Company, any Holder or Beneficial Owner or any other person for the unavailability of the Deposited Securities or for the failure to make any distribution of Cash or Other Distributions with respect thereto as a result of (a) any act or failure to act of the Company or its agents, including the Russian Share Registrar, or its or their respective directors, employees, agents or affiliates, (b) any provision of any present or future law or regulation of the United States, the Russian Federation or any other country, (c) any provision of any present or future regulation of any governmental or regulatory authority or stock exchange, (d) any provision of any present or future Charter of the Company or any other instrument of the Company governing Deposited Securities, (e) any provision of

any securities issued or distributed by the Company, or any offering or distribution thereof, or (f) any act of God or waror other circumstances beyond its control.

The Depositary shall not be liable for any acts or omissions made by a successor depositary whether in connection with a previous act or omission of the Depositary or in connection with any matter arising wholly after the removal or resignation of the Depositary, provided that in connection with the issue out of which such potential liability arises the Depositary performed its obligations without negligence or bad faith while it acted as Depositary.

The Depositary shall not be responsible for any failure to carry out any instructions to vote any of the Deposited Securities, or for the manner in which any such vote is cast or the effect of any such vote, provided that any such action or nonaction is without negligence and in good faith and in accordance with the terms of the Deposit Agreement.

The Custodian and the Depositary (and any of their Affiliates) may own and deal in any class of securities of the Company (and any of its Affiliates) and in Receipts.

No disclaimer of liability under the Securities Act is intended by any provision of this Deposit Agreement.

SECTION 5.04. Resignation and Removal of the Depositary. The Depositary at any time may resign as Depositary hereunder by written notice of its election so to do delivered to the Company. The Depositary at any time may be removed by the Company by written notice of such removal. Notwithstanding anything to the contrary contained herein, in case at any time the Depositary acting hereunder shall resign or be removed, it shall continue to act as Depositary for the purpose of terminating this Deposit Agreement pursuant to Section 6.02 of this Deposit Agreement. Any corporation into or with which the Depositary may be merged or consolidated shall be the successor of the Depositary without the execution or filing of any document or any further act.

SECTION 5.05. Custodian. The Depositary may from time to time appoint one or more entities as Custodian. The Custodian shall be subject at all times and in all respects



<PAGE>

to the directions of the Depositary and shall be responsible solely to it. Any Custodian may resign and be discharged from its duties hereunder by notice of such resignation delivered to the Depositary at least 30 days prior to the date on which such resignation is to become effective. If upon such resignation there shall be no Custodian acting hereunder, the Depositary shall, promptly after receiving such notice, appoint a substitute custodian or custodians. Whenever the Depositary in its discretion determines that it is in the best interest of the Holders to do so, it may appoint a substitute or additional custodian or custodians, each of which shall thereafter be one of the Custodians hereunder. The Depositary shall notify the Company promptly after the appointment of replacement or additional Custodian hereunder. Upon demand of the Depositary, any Custodian shall deliver such of the Deposited Securities held by it as are requested of it, and any rewards pertaining thereto, to any other Custodian or

agrees that in the event it or any of its Affiliates (to the extent the Company has, or should have, knowledge) proposes (i) an issuance, sale or distribution of additional Shares, (ii) an offering of rights to subscribe for Shares or other Deposited Securities, (iii) an issuance of securities convertible into or exchangeable for Shares, (iv) an issuance of rights to subscribe for securities convertible into or exchangeable for Shares, (v) an elective dividend of cash or Shares, (vi) a redemption of Deposited Securities, (vii) a meeting of holders of Deposited Securities, or solicitation of consents or proxies, relating to any reclassification of securities, merger or consolidation or transfer of assets or (viii) any reclassification, recapitalization, reorganization, merger, consolidation or sale of assets which affects the Deposited Securities, it will obtain U.S. legal advice and take all steps necessary to ensure that the application of the proposed transaction to Holders and Beneficial Owners does not violate the registration provisions of the Securities Act, or any other applicable laws including, without limitation, the Securities Exchange Act or the securities laws of the states of the United States. In support of the foregoing, the Company will furnish to the Depositary (a) a written opinion of U.S. counsel (reasonably satisfactory to the Depositary) stating whether or not application of such transaction to Holders and Beneficial Owners (1) requires a registration statement under the Securities Act (and the securities laws of the states of the United States) to be in effect or (2) is exempt from the registration requirements of the Securities Act (and the securities laws of the states of the United States) and (b) an opinion of counsel in the Russian Federation stating that (1) making the transaction available to Holders and Beneficial Owners does not violate the laws of the Russian Federation and (2) all requisite regulatory consents and approvals have been obtained in the Russian Federation. If the filing of a registration statement is required, the Depositary shall not have any obligation to proceed with the transaction unless it shall have received evidence reasonably satisfactory to it that such registration statement has been declared effective. If, being advised by counsel, the Company determines that a transaction is required to be registered under the Securities Act, the Company will either (i) register such transaction to the extent necessary, (ii) alter the terms of the transaction to avoid the registration requirements of the Securities Act or (iii) direct the Depositary to take specific measures, in each case as contemplated in this Deposit Agreement, to prevent such transaction from violating the registration requirements of the Securities Act (and the securities laws of the states of the United States).

The Company agrees with the Depositary that neither the Company nor any of its Affiliates will at any time deposit Shares hereunder unless (i) the deposit and sale of such Shares (and the ADSs to be issued upon such deposit) have been registered under the Securities Act or (ii) an exemption from the registration requirements of the Securities Act is available.



<PAGE>

SECTION 5.08. Indemnification; Reimbursement. The Company agrees to indemnify the Depositary, its directors, employees, agents and Affiliates and any Custodian and their respective agents against, and hold each of them harmless from, any loss, liability or expense (including, but not limited to, the reasonable fees and expenses of counsel) which may arise out of (a) any acts performed or omitted, in accordance with the provisions of this Deposit Agreement and of the Receipts, as the same may be amended, modified or

supplemented from time to time, (i) by either the Depositary or a Custodian or their respective directors, employees, agents and Affiliates, except for any liability or expense arising out of the negligence or bad faith of either of them, or (ii) by the Company or any of its directors, employees, agents and Affiliates , (b) any offer or sale of Receipts, ADSs or Shares or any registration statement under the Securities Act in respect thereof, except to the extent such loss, liability or expense arises out of information (or omission from information) provided to the Commission by the Depositary or Custodian expressly for use in a registration statement under the Securities Act, or (c) the unavailability of Deposited Securities or the failure to make any distribution which would be covered by Article IV hereof with respect thereto as a result of (i) any act or failure to act of the Company or its agents, including the Russian Share Registrar, or their respective directors, employees, agents or affiliates, (ii) any provision of any present or future Charter of the Company or any other instrument of the Company governing Deposited Securities or (iii) any provision of any securities issued or distributed by the Company, or any offering or distribution thereof.

The Depositary agrees to indemnify the Company, its directors, employees, agents and Affiliates against, and hold them harmless from, any liability or expense (including, but not limited to, the reasonable fees and expenses of counsel) which may arise out of acts performed (or omitted) negligently or in bad faith by the Depositary under the terms of this Deposit Agreement.

Notwithstanding anything herein to the contrary the obligations set forth in this Section shall survive the termination of this Deposit Agreement and the succession or substitution of any indemnified person (as hereinafter defined).

Any person seeking indemnification hereunder (an "indemnified person") shall notify the person from whom it is seeking indemnification (the "indemnifying person") of the commencement of any indemnifiable action or claim promptly after such indemnified person becomes aware of such commencement (provided that the failure to make such notification shall not affect such indemnified person's rights otherwise than under this Section 5.08) and shall consult in good faith with the indemnifying person as to the conduct of the defense of such action or claim that may give rise to an indemnity hereunder, which defense shall be reasonable in the circumstances. No indemnified person shall compromise or settle any action or claim that may give rise to an indemnity hereunder without the consent of the indemnifying person, which consent shall not be unreasonably withheld.

SECTION 5.09. Charges of Depositary. The Company agrees to pay or reimburse the fees, reasonable expenses and out-of-pocket charges of the Depositary and those of any Registrar only in accordance with agreements in writing entered into between the Depositary and the Company from time to time. The Depositary shall present its statement for such charges



<PAGE>

and expenses to the Company once every three months. The charges and expenses of the Custodian are for the sole account of the Depositary. The right of the Depositary to receive payment and/or reimbursements under this Section 5.09

SECTION 6.02. Termination. Upon the resignation or removal of the Depositary pursuant to Section 5.04 of this Deposit Agreement, the Depositary may, and shall at any time at the direction of the Company, terminate this Deposit Agreement by mailing notice of such termination to the Holders of all Receipts then outstanding at least 30 days prior to the date fixed in such notice for such termination. On and after the date of termination, the Holder of a Receipt will, upon (a) surrender of such Receipt at the Corporate Trust Office of the Depositary, (b) payment of the fee of the Depositary for the surrender of Receipts referred to in Section 2.06, and (c) payment of any applicable taxes or governmental charges, be entitled to delivery, to him or upon his order, of the amount of Deposited Securities represented by the American Depositary Shares evidenced by such Receipt. If any Receipts shall remain outstanding after the date of termination, the Depositary thereafter shall discontinue the registration of transfers of Receipts, shall suspend the distribution of dividends to the Holders thereof, and shall not give any further notices or perform any further acts under this Deposit Agreement, except that the Depositary shall continue to collect dividends and other distributions pertaining to Deposited Securities, shall sell rights and other property as provided in this Deposit Agreement, and shall continue to deliver Deposited Securities, together with any dividends or other distributions received with respect thereto and the net proceeds of the sale of any rights or other property, in exchange for Receipts surrendered to the Depositary (after deducting, in each case, the fee of the Depositary for the surrender of a Receipt, any expenses for the account of the Holder of such Receipt in accordance with the terms and conditions of this Deposit Agreement, and any applicable taxes or governmental charges). At any time after the expiration of six months from the date of termination, the Depositary may sell the Deposited Securities then held hereunder and may thereafter hold uninvested the net proceeds of any such sale, together with any other cash then held by it hereunder, unsegregated and without liability for interest, for the pro rata benefit of the Holders of Receipts which have not theretofore been surrendered, such Holders thereupon becoming general creditors of the Depositary with respect to such net proceeds. After making such sale, the Depositary shall be discharged from all obligations under this Deposit Agreement, except to account for such net proceeds and other cash (after deducting, in each case, the fee of the Depositary for the surrender of a Receipt, any expenses for the account of the Holder of such Receipt in accordance with the terms and conditions of this Deposit Agreement, and any applicable taxes or governmental charges) and except for its obligations to the Company under Section 5.08 and Section 7.10 hereof. Upon the termination of this Deposit Agreement, the Company shall be discharged from all obligations under this Deposit Agreement except for its obligations to the Depositary hereunder.

## ARTICLE 7

## MISCELLANEOUS

SECTION 7.01. Counterparts. This Deposit Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of such counterparts shall constitute one and the same instrument. Copies of this Deposit Agreement shall be filed with the Depositary and the Custodian and shall be open to inspection by any Holder or Beneficial Owner of a Receipt during business hours.

<PAGE>

SECTION 7.02. No Third Party Beneficiaries. This Deposit Agreement is for the exclusive benefit of the parties hereto (and their successors) and shall not be deemed to give any legal or equitable right, remedy or claim whatsoever to any other person (except as specifically set forth herein).

SECTION 7.03. Severability. In case any one or more of the provisions contained in this Deposit Agreement or in the Receipts should be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein or therein shall in no way be affected, prejudiced or disturbed thereby.

SECTION 7.04. Holders and Beneficial Owners as Parties; Binding Effect. The Holders and Beneficial Owners of Receipts evidencing ADSs from time to time shall be parties to this Deposit Agreement and shall be deemed to have knowledge of and be bound by all of the terms and conditions hereof and of the Receipts evidencing ADSs by acceptance thereof.

SECTION 7.05. Notices. Any and all notices to be given to the Company shall be deemed to have been duly given if in English and personally delivered or sent by mail or cable, telex or facsimile transmission confirmed by letter, addressed to YUKOS Corp., 26 Ulansky Lane, Moscow 103045, Fax: 7 095 755 5334; Tel: 7 095 785 2446, Attention: Mr. Alexei D. Golubovich, Director of Corporate Finance, or to such place as the Company may have transferred its principal office.

Any and all notices to be given to the Depositary shall be deemed to have been duly given if in English and personally delivered or sent by mail or cable, telex or facsimile transmission confirmed by letter, addressed to Bankers Trust Company, 4 Albany Street, New York, New York 10006, Attention: ADR Department (telephone number: (212) 250-8500; facsimile number: (212) 250-5644), or any other place to which the Depositary may have transferred its Corporate Trust Office.

Any and all notices to be given to any Holder shall be deemed to have been duly given if personally delivered or sent by mail or cable, telex or facsimile transmission confirmed by letter, addressed to such Holder at the address of such Holder as it appears on the transfer books for Receipts of the Depositary, or, if such Holder shall have filed with the Depositary a written request that notices intended for such Holder be mailed to some other address, at the address designated in such request. Notice to Holders shall be deemed to be notice to Beneficial Owners for all purposes of this Deposit Agreement.

Delivery of a notice sent by mail or cable, telex or facsimile transmission shall be deemed to be effective at the time when a duly addressed letter containing the same (or a confirmation thereof in the case of a cable, telex or facsimile transmission) is deposited, postage prepaid, in a post-office letter box. The Depositary or the Company may, however, act upon any cable, telex or facsimile transmission received by it, notwithstanding that such cable, telex or facsimile transmission shall not subsequently be confirmed by letter as aforesaid.

<PAGE>

SECTION 7.06. Governing Law. This Deposit Agreement and the Receipts shall be interpreted and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York.

SECTION 7.07. Assignment. Subject to the provisions of Section 5.04 hereof, this Deposit Agreement may not be assigned by either the Company or the Depositary.

SECTION 7.08. Compliance with U.S. Securities Laws. Notwithstanding anything in this Deposit Agreement to the contrary, the withdrawal or delivery of Deposited Securities will not be suspended by the Company or the Depositary except as would be permitted by Instruction I.A.(1) of the General Instructions to Form F-6 Registration Statement, as amended from time to time, under the Securities Act.

SECTION 7.09. Titles. All references in this Deposit Agreement to exhibits, articles, sections, subsections, and other subdivisions refer to the exhibits, articles, sections, subsections and other subdivisions of this Deposit Agreement unless expressly provided otherwise. The words "this Deposit Agreement", "herein", "hereof", "hereby", "hereunder", and words of similar import refer to the Deposit Agreement as a whole as in effect between the Company, the Depositary and the Holders and Beneficial Owners of ADSs and not to any particular subdivision unless expressly so limited. Pronouns in masculine, feminine and neuter gender shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa unless the context otherwise requires. Titles to sections of this Deposit Agreement are included for convenience only and shall be disregarded in construing the language contained in this Deposit Agreement.

SECTION 7.10. Registration of Shares; Russian Share Registrar; Share Registrar. (a) The Company hereby designates and appoints M-Reestr JSC], in the Russian Federation, as its Russian Share Registrar in respect of the Shares and Deposited Securities. The Company further agrees to take any and all action, including the filing of any and all such documents and instruments, as may be necessary to continue such designation and appointment in full force and effect for so long as any ADSs or ADRs remain outstanding hereunder or this Agreement remains in force.

(b) The Company agrees that it shall, at any time and from time to time: (i) take any and all action necessary to assure the accuracy and completeness of all information set forth in the Share Register maintained by the Russian Share Registrar in respect of the Shares or Deposited Securities; (ii) provide or use its best efforts to cause the Russian Share Registrar to provide to the Depositary, the Custodian or their respective agents unrestricted access to the Share Registrar during ordinary business hours in Moscow, the Russian Federation, in such manner and upon such terms and conditions as the Depositary, in its reasonable discretion, may deem appropriate, to permit the Depositary, the Custodian or their respective agents to regularly (and in any event not less than monthly) confirm the number of Deposited Securities registered in the name of the Depositary, the Custodian or their respective nominees, as applicable, pursuant to the terms of the Deposit Agreement and, in connection therewith, to provide the Depositary, the Custodian or their respective agents, upon request, with a duplicate extract from the Share